## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

2020 DEC 11  P 3:00

FILED
U.S. BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN

|  |  |
|---|---|
| SEAN DUNNE | CIVIL ACTION NO. |
| Plaintiff | 3:20-cv-00734-JAM |
| v. | |
| JOHN DUNNE | |
| Defendant | |
| And | |
| RICHARD M. COAN, TRUSTEE | December 12, 2020 |
| Defendant-Intervenor | |

United States District Court
District of Connecticut
FILED AT   NEW HAVEN
12 11 20 20
Roberta D. Tabora, Clerk
By_____
Deputy Clerk

### DECLARATION OF SEAN DUNNE

I, Sean Dunne, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.  I am the plaintiff in this action on behalf of my minor children. I am pro se.

2.  I make this Declaration in support of my motion.

3.  I am the Debtor in the Bankruptcy proceeding *In re Sean Dunne* Chapter 7, Case No. 13-50484 (JAM) (Bankr. D. Conn.).

4.  I say as follows in response to the declaration of John Dunne ("JD") filed on 20 November 2020.

5.  At paragraph 5, JD confirms he was not found liable in any way for any actions or transactions related to the Debtor in claims made by the Trustee.

6.  In relation to paragraph 6, the Trustee is not asserting any equitable claims against John Dunne or against Yesreb.

7.  I refer to a letter from attorney Timothy D. Miltenberger on behalf of the Trustee dated July 3, 2019 at **Exhibit A**. This letter was my Trustee setting out his position in relation to Walford and Yesreb:

1

*"However we wish to advise your Honor that the Trustee's authority is limited by the Federal Rules of Bankruptcy Procedure which require Bankruptcy Court approval of any settlement after due notice to creditors in the bankruptcy case. The Official Assignee may have similar constraints on his "full authority".*

8.  The Trustee also knowingly and erroneously states :

    *"After the trustee commenced his litigation against the Dunne's in the United States Bankruptcy Court, Walford was transferred to an entity known as Celtic Trustees"*

9.  Unfortunately, making deliberate erroneous statements to color the Court's and jury's views of the real facts have become a common feature of the tic-tac-toe operation of my two bankruptcy trustees. To date both have had free reign over me, to paint and treat me as one of the biggest fraudsters of all time. As they both know to their absolute horror, not one dollar, nickel or dime has been found to not be declared by me in my filings. I made a full and frank disclosure of all my assets. My Trustee made a claim for fraudulent transfers of $150m. He has obtained in real terms less than $4m when the Walford transfer is reversed which legal experts familiar with the facts concur will be. I accept fully this is a matter for the courts which has yet to be ruled on.

10. In paragraph 4 of the letter the trustee states: *"The Trustee currently has no claims pending against either Celtic Trustees or Yesreb."*

11. In relation to paragraph 8, the jury findings in relation to Walford are flawed. The Jury were denied access to evidence from Professor Wiley, who is the foremost expert on Irish contract, trust and land law. He in fact is the authority on Irish land law and the recognised authority the government use for legislation.

12. The jury verdict has been appealed. I refer to a copy of the Revenue Tax Appals Commissions ruling dated 23rd December 2019 which is a post-trial legal finding and now Irish law. Walford was tried in the consolidated action in front of Judge Meyer under Irish law and as Irish law is the applicable law it is quite clear that the directions to the jury and the jury's verdict were incorrect as a matter of law and fact. The Trustee is on notice of this and has at no point acknowledged this or sought to correct this abuse of process, despite being an officer of the court.

13. It is my understanding that a US Court is bound to accept the decision of the Revenue Appeals Commissioner as it is now Irish law. The Trustee opted to have Walford tried under Irish law and is therefore bound by the judicial findings of fact in relation to this claim. Professor Wiley was the expert witness made available to the Court and jury but his expert opinion was limited and edited following objections by the Trustee. Proper access to Professor Wiley and this ruling would have been beneficial to all of the parties and in particular the trial Judge Meyer and the jury.

14. It is very easy to understand how a lay Connecticut jury adjudicating on the resting on contract of a property under Irish trust and land law would be confused. We have an entirely different land law system to the US. By unbelievable sheer coincidence the then beneficial owner of Walford, Gayle Dunne, transferred and disposed of her interest in the property to Yesreb which miraculously happened to be registered on 29 March 2013 being the very same day I filed my bankruptcy petition in Bridgeport Connecticut. Registration in Ireland is a long and drawn out process. It was the mirror coincidence of two unconnected events in two different countries coinciding to be the same day at which allowed a platform for Trustee Coan to press his claim and allow a lay jury to be convinced that this was a fraudulent transfer which took place on the day I filed for bankruptcy. The legal and factual situation is far clearer and is entirely at odds with the jury's verdict which was presented with complexities that do not exist. The Appeal Commissioner's conclusion confirms as a matter of law – I had no beneficial interest in Walford from 23rd July 2005 at a time when I was worth €500 million and in June 2007 KPMG certified my net worth at €699 million. All these facts were before the Court but they failed to correctly apply Irish law.

15. I am also advised by Irish and US counsel given the post-trial legal findings of a Irish judicial body that the US Appeal Judge is highly likely to set the verdict aside and reaffirm that I, Sean Dunne, was never the owner of Wallford post 23rd July 2005 and did not make a fraudulent transfer of the property on 29th March 2013, to Gayle Dunne. The conclusion also states the maximum amount I ever owned of Walford was the 10% deposit I paid prior to the transfer on 23rd July 2005.

16. In relation to paragraph 10, JD holds the shares in Yesreb in trust for the first three of my minor children, my fourth minor son who was not born when Yesreb was established. This is the reason why he holds the shares in trust for only three of my minor children. I refer to a letter I was obliged to write to Attorneys Nolin, Miltenberger, Antonelli and JD, Gayle Dunne and her accountant James Ryan on the 21st September 2020 in relation to the Yesreb default action commenced by the Trustee con in Bridgeport. I have not received any response to this letter from Attorney Nolan or the attorneys for the Trustee. I have been denied the documents I require which will prove my case.

17. I have not received any explanation as to how the Trustee saw it appropriate to bring a Yesreb claim in Bridgeport Bankruptcy Court seeking to neatly avoid the action currently pending before the District Court of Connecticut. I have not been provided with the papers in the US Yesreb Action (Case Number:20-05010, Lead Bankruptcy Case Number:13-50484). The Trustee and Attorney Nolin have to date avoided responding to my letter and confirming to me and the court whether or not the Bridgeport Court was advised of this pending claim. I am taking their silence as confirmation that Judge Manning was not so advised.

18. There has been a consistent lack of transparency from Attorney Nolan and the Defendant JD in relation to the points raised by me in my letter of 21st September 2020. One can only conclude that there is something to hide which must be exposed and brought to light in this action by this Court.

19. In relation to paragraph 11, JD engineered for Totalserve to resign due to non-payment of fees and put himself in a position to take over the Yesreb/Bloem Trust structure with Gayle Dunne in order to illegitimately try and use the funds to settle personal litigation. This is the most basic breach of a clos relative could seek to inflict on minor dependents.

20. In relation to paragraph 12, no profits derived from the development of Walford and JD is therefore not entitled to any percentage share of these funds which he acknowledges. JD confirms that the profit share agreement was with three of my minor children.

21. At paragraph 13, JD seeks to play "*hide the ball*" with the Court. He is correct of course that the beneficial interest in Yesreb is not held for four of my minor children. It is held for three of my minor children as our fourth child was not born when it was established.

22. In relation to paragraph 14, Yesreb is in effect owned by the Bloem Trust and is a connected party. This is proven by the draft financial and audited statements at **Exhibit B**. Note 10 (the Borrowings) and Note 12 (the Related Parties) are the most relevant. I do not have the latest financial statements which are held and concealed from the Court by JD and the Trustee. The Court requires the full audited accounts which are in the possession of JD and his attorney.

23. JD makes representations as though he is a trust and legal expert which he is not these. These representations should be dismissed as they are a false representation of the true position, on the purpose of the Bloem Trust. His evidence to the Court in the Consolidated Act of 2019 is correct. JD and his attorney wish for me and the Court to suffer amnesia to allow my four minor children to be victims of a fraud.

24. JD and Gayle Dunne simply wish to disregard the duties of their offices as directors/trustees and self-deal in the assets of the trust structure. Their actions seek to breach every rule in place to protect trust monies and are quite open about the fact that they wish to unlawfully collapse the structure for personal gain.

25. If this was the case then no trust would be safe and it would be open to the settlor, protector and trustees to take the monies for themselves whenever they so wish making a mockery of all trust law worldwide and the legal system.

26. At paragraph 16, in relation to the Yesreb lawsuit in Dublin. The Trustee provided undertakings to this court and to the Irish courts that Wakford could and would only be litigated once the Trustee had decided where to litigate. He decided to litigate the matter in the Consolidated Action heard before Judge Meyer in May/June 2019 and agreed that the matter would be decided under Irish law. The Irish law is now clear on the matter, I was not the beneficial owner post 23rd July 2005 and therefore was not in a position to transfer the property. I was only ever the beneficial owner of 10% of Walford.

27. In relation to paragraph 20, this is an incorrect statement. JD states the Official Assignee in Bankruptcy and the Trustee pressed to proceed with the Walford litigation. It was not possible for the Trustee to proceed with the Walford litigation under law and under the representations he had made to the US and Irish courts. He was the party on whose behalf the OA was taking the action and as such it could never proceed. He could not risk allowing the case to be tried in Dublin and suffering a reversal of his luck in confusing the lay Connecticut jury.

28. As stated previously the Trustee commenced an action against Yesreb in Bridgeport bankruptcy court . This action was commenced against the wrong party and is also statute barred. A question remains if the court in this action was notified of this pending action and if this court was notified of the Yesreb new action .

29. We await the facts from Attorney Miltenberger first raised in my letter if the 21September 2020 and which he continues to ignore. For attorneys for the Trustee to conceal the truth from the court and me is always troubling and more so when their own case against me has always been based on me concealing the truth from them. Their use of the media to ground cases and get worldwide headlines.

30. JD and the Trustee are aware that he cannot take two actions over the same matter in two different jurisdictions as that can result of two different competing findings. The Trustee decided to litigate under Irish law in Connecticut and this was a tactic which paid off as he was successful in confusing a lay jury in relation to Irish contract, property, trust and tax law. The decision of the Revenue Appeals Commissioners is delivered by a judicial finding from an expert who deals in such matters every day in Ireland applying Irish law and as such is the expert, and her findings are law.

31. At paragraphs 21-24, it is because I became aware of the attempted misappropriation of the Yesreb fund being a trust for three of my minor children and being part of the Bloem settlement which is a trust for all my minor children that forced me to commence said proceedings now before the courts.

32. At paragraph 25, JD deliberately tries to mislead the court. He also ignores his own deposition and testimony under oath to this court regarding the beneficial ownership of Yesreb. He also ignores the testimony of Gayle Dunne, the children's mother and Protector of The Bloom Trust. For clarity, I answered the question posed to me correctly and as advised by Attorney Nolin who assisted and prepared me for the deposition. The question posed was:

> *"What I am asking, isn't it true that Yesreb was owned by John Dunne, your son but he was holding that ownership interest for the benefit of your four children that you have with Gayle?"*

33. I confirm that that proposition as put forward by the Attorney representing the Trustee was incorrect. Indeed, the correct position is JD was holding the beneficial interest of Yesreb in trust for three of my minor children as set out in the letter to Attorney Nolin dated 21st September 2020 due to the fact that our fourth minor child was not born until after the establishment of Yesreb.

34. I also draw the court's attention to my letter to attorney Nolin and others 21st September 2020 where it states that JD has sworn in the Yesreb proceedings that the beneficial interest in the shares is held for Gayle Dunne. This is an untruthful statement sworn in Irish proceedings apparently with JD and Gayle Dunne working clandestinely with the Trustee and the Irish Official Assignee in order to illegally access the Yesreb fund, being a fund for my minor children.

35. The Trustee and his army of legal advisors in America, Ireland and around the world are a party to the Irish proceedings. They have full visibility of all legal documentation, affidavits and sworn witness statements. All of these documents up to this mystical swearing by JD were aware of the correct position as all legal back up is in the discovery and affidavits. However it is now apparent that they were happy to be a party to an untruthful sworn declaration claiming the Yesreb shares and therefore its assets were held for the benefit of Gayle Dunne, his co-defendant in proceedings. I do not know what the sanctions are available in U.S. Bankruptcy Court to censure a trustee participating in such an illegal manner – accessing trust funds of innocent minor children who are and unconnected parties to any action he has brought, any claims he has pressed, or any judgements he has obtained.

36. Indeed his actions in seeking a default judgment in Bridgeport bankruptcy court have still to be explained to the Court and I now call on him to make such an explanation within 14 days. I also call on the Trustee Coan, Attorney Nolin and all attorneys to make available to the Court the sworn statement which Attorney Fay refers to in her email and letter of 1st February 2020, as referenced in my motion before the court and as referenced in my letter to Attorney Nolin where JD affirms he holds Yesreb shares for Gayle Dunne. There are many things which have confounded me during nearly 8 years of litigation in bankruptcy regarding the actions of the Trustee and his companion the Official Assignee in Ireland but nothing tops how much I am confounded by their combined actions regarding the Yesreb trust fund. I do not believe there is any court which will allow the Trustee and his attorneys to twist and invent circumstances which fly in the face of legal judicial findings, contract and trust laws in an effort to steal the assets of those who cannot protect themselves. As

Protector I relied on JD their half-brother as settlor of a trust and trustee holding the Yesreb shares on behalf of three of them being today minors, to at all times look out for their interests and not his own. He has failed in his basic duties and its time to put an end to the false narrative which can never fly.

37. At paragraph 35, JD discusses how he agreed to pay €1.6m of Yesreb monies to the Official Assignee, Chris Lehane, to settle a personal claim against him by Celtic Trustees Limited which is a trust vehicle for one of Ireland's richest men, Dermot Desmond. The Official Assignee leaked personal information about Dermot Desmond relating to the Yesreb case to the media and was sued as a result. As the Official Assignee does not have an indemnity for actions outside the remit of his office, he needed to use the Yesreb monies to pay off Mr Desmond to avoid personal liability. JD and Gayle Dunne agreed to allow this in contravention of their duties as directors and trustees. Bizarrely the Official Assignee, Mr Lehane himself, is a party to stealing my minor children's trust funds. I say there have been long running issues regarding the Official Assignee's action in relation to my bankruptcy. Just this week I have been forced to bring an application to remove an unlawful bankruptcy payment order granted over me. In said document I outline the legal problems regarding the bankruptcy litigation in Ireland including the Official Assignee and his Senior Counsel, Ed Farrelly, swearing false evidence in relation to Walford and also using prejudicial comments regarding my character from judges who were objectively biased against me. Please see affidavit of Sean Dunne sworn 9th September 2020 at **Exhibit C**.

38. The presiding judge ordered that the hearing be in secret. It is clear to me that the doors of the Courts of Ireland are closed to me in terms of getting an impartial fair hearing since 2009. Irish judges are political appointees of the Irish government and there is no independent selection process. The Irish state is currently in breach of a number of international treaties regarding regulation of judges and judicial ethics. My bankruptcy has been from the start a political issue where the law can be disapplied and twisted to suit the result the Irish government wants. Issues regarding my personal rights, the administration of justice in public and the right to a fair hearing are routinely ignored. My affidavit of 9th September 2020 is a matter of grave public importance to the citizens of Ireland who rely

and depend on the Courts for Justice. To quote Lord Denning: *"Be ye never so high, the law is above you."*

39. At paragraph 36, no trial was possible as the matter was already tried under US law by the same parties, and could not proceed.

40. At paragraph 37, JD fails to advise the court that in September 2020 he disposed of the independent trustees in Bloem Trust in an effort to further bolster the illegal attempts to dissipate the Bloem assets; Yesreb being a connected party to Bloem from whom it depends upon for its funds. Yesreb funds are owed to Bleom and no other party.

41. At paragraph 38, JD's expectation of a global settlement have evaporated as the mediation commenced under Magistrate Spector and July 2019 has concluded without a global settlement. Furthermore a global settlement cannot involve Yesreb as Yesreb is not part of my estate. There are no claims over it. The claims asserted by the Trustee in the Bridgeport Yesreb action fail on a number of grounds. Primarily, they fail because the action is:

   - Taken against the incorrect company and is statute barred; and
   - The Trustee failed to advise another Connecticut court of the pending legal action in a deceitful and underhanded attempt at yet again to steal the Yesreb trust fund, his actions have to be sanctioned.

42. Paragraph 39, I confirm I have never been a trustee of Bloem. JD failed to advise the court that I was the original Protector. I resigned my position prior to filing for bankruptcy and appointed Gayle Dunne, mother of the minor children as the Protector. I fully expected that she would uphold the role of Protector and protect the assets for the beneficiaries. Gayle Dunne and myself are excluded beneficiaries of the Bloom Trust. JD as settlor is also excluded. Bloem is a trust for the Minor Children of Gyale and Sean Dunne and no other person. Please see **Exhibit D.**

43. JD's reference to me not supporting my children is in relation to financial matters only. As the world is aware I am an undischarged bankrupt primarily because of the illegal actions of the Official Assignee in Ireland which I hope will be rectified when my appeal to the penal 12 year extension of my bankruptcy is heard. My four minor children are in my primary sole care and custody and live with me permanently. As I did for JD and his trust funds when he was a minor I will defend the rights of my now minor children and their funds. I was not ever or ever will be party to a fraud especially on my own minor children.

44. At paragraph 44, JD confirms why he consented to the Yesreb trust funds being gratuitously handed over to Trustee yet fails to put the settlement agreement before this court.

45. I previously wrote to the Court explaining the grave situation my minor children find themselves. I as sole disinterested guardian am the only person who is in a position to defend their rights and prevent a fraud being perpetrated. I refer to a copy of my letter to Judge Manning dated 21st September 2020 at **Exhibit E.**

**Summary**

46. There is no benefit to my minor children in the dissipation of the assets of Yesreb and Bloom to be gratuitously given away to my Trustee is if those funds were a charitable donation. The Trustee has commenced an incorrect action, being the Yesreb proceedings in Bridgeport against the incorrect owner of the trust fund. It is time and statute barred which in itself is enough to have the case struck out however when added to the fact that he commenced the proceedings in a cloak and dagger and clandestine manner not advising the court of this pending action, I say it is further reason for the proceedings to be struck out as an abuse of process. The Trustee should be sanctioned and the monies immediately released back to independent trustees, to be appointed, who will look after the trust on behalf of its beneficiaries being the four minor children of Gayle Dunne and myself. It is no more than they are entitled to. They have been incorrectly and unnecessarily dragged

into my bankruptcy. I believe there are enough facts before the Court to allow for the Defence of JD supported by Trustee Coan to be struck out for abuse of process.

47. As a result of the facts set out by me here, I do not believe any of the statements relied upon by JD can be accepted. Full disclosure is required and cross examination at a full hearing of this matter.

48. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 11th day of December, 2020.

_____

Sean Dunne

# EXHIBIT A

# COAN, LEWENDON, GULLIVER & MILTENBERGER, LLC

ATTORNEYS AT LAW

495 ORANGE STREET

NEW HAVEN, CONNECTICUT 06511

RICHARD M. COAN
CARL T. GULLIVER
WHITNEY M. LEWENDON
TIMOTHY D. MILTENBERGER

CHRISTOPHER M. ROYSTON
- OF COUNSEL -

TIMOTHY M. LEWENDON

TELEPHONE
(203) 624-4756
TELEFAX
(203) 865-3673

July 3, 2019

VIA ELECTRONIC MAIL

Hon. Robert M. Spector
United States Magistrate Judge
141 Church Street
Room 303
New Haven, CT 06510

Re:    In re Sean Dunne: Coan, Trustee v. Dunne, et al. (Civil Action No. 15-cv-0050)
       Mediation Scheduled for July 17, 2019

Dear Judge Spector:

We represent Richard M. Coan, Trustee of the Bankruptcy Estate of Sean Dunne (the "Trustee"). Pursuant to Your Honor's *Settlement Conference Order* (the "Order"), we write to raise two issues with the Court.

First, the Order requires a person with "full authority" to attend the settlement conference, and defines full authority to mean "final authority to dismiss the case with prejudice, and to accept in settlement an amount or terms down to the defendant's last offer." We anticipate that both the Trustee and Mr. Christopher Lehane, Official Assignee in the Irish Bankruptcy Case of Sean Dunne, will attend the settlement conference in mid-July. However, we wish to advise Your Honor that the Trustee's authority is limited by the Federal Rules of Bankruptcy Procedure, which require bankruptcy court approval of any settlement after due notice to creditors in the bankruptcy case. The Official Assignee may have similar constraints on his "full authority."

Second, the Trustee has obtained a jury verdict of, *inter alia*, more than €14 million based on an actually fraudulent transfer of a piece of real estate situated in Dublin, Ireland commonly referred to as "Walford." After the Trustee commenced his litigation against the Dunnes in the United States

Hon. Robert M. Spector
United States Magistrate Judge
July 3, 2019

Bankruptcy Court, Walford was transferred to an entity known as Celtic Trustees. The proceeds of the sale to Celtic Trustees are currently held in escrow pursuant to an escrow agreement between Celtic Trustees and a Dunne-controlled entity known as Yesreb Holdings, Limited ("Yesreb"). Attorney Nolin, who represents Gayle Killilea Dunne and her related entities, has advised me that his clients' Irish counsel will contact Celtic Trustees (and Yesreb) to inquire about the use of the escrowed funds and whether Celtic Trustees is willing to participate in settlement talks with Your Honor. Attorney Nolin has requested that I ask Your Honor to invite Celtic Trustees (and Yesreb) to participate in the settlement conference. Attorney Nolin consents to such an invitation.

The Trustee currently has no claims pending against either Celtic Trustees or Yesreb. However, Mr. Lehane, the Official Assignee is engaged in litigation with both of these entities. The Trustee and the Official Assignee have no objection to Celtic Trustees joining in the settlement conference if, and only if, it cares to do so. The Trustee has no objection to Yesreb joining the settlement conference, but does not believe that any "invitation" is necessary because Yesreb is under the control of the Dunne family. If Your Honor would like Celtic Trustees and Yesreb to participate in the settlement conference, please have your chambers contact me so I can ask the defendants to issue the requested invitations.

Thank you for your attention to these matters.

Very truly yours,

/s/ Timothy D. Miltenberger

Timothy D. Miltenberger

TDM/lsf

cc:    Peter Nolin, Esq. (via electronic mail)
        Brian Spears, Esq. (via electronic mail)
        Jennifer Fay, Esq. (via electronic mail)

# EXHIBIT B

**YESREB HOLDING LIMITED**

REPORT AND FINANCIAL STATEMENTS
Period from 21 February 2013 to 31 December 2013

**P.G. ECONOMIDES & CO LIMITED**
**Chartered Certified Accountants**

**YESREB HOLDING LIMITED**

REPORT AND FINANCIAL STATEMENTS
Period from 21 February 2013 to 31 December 2013

**CONTENTS**      **PAGE**

Board of Directors and other Officers      1

Report of the Board of Directors      2 - 3

Independent auditor's report      4 - 5

Statement of profit or loss and other comprehensive income      6

Statement of financial position      7

Statement of changes in equity      8

Statement of cash flows      9

Notes to the financial statements      10 - 19

Additional information to the Statement of profit or loss and other comprehensive income      20 - 22

**YESREB HOLDING LIMITED**

BOARD OF DIRECTORS AND OTHER OFFICERS

**Board of Directors:** Totaltrust Management Limited app. on 21/02/2013

**Company Secretary:** Totalserve Management Limited app. on 21/02/2013

**Independent Auditors:** P.G. Economides & Co Limited
Chartered Certified Accountants

**Registered office:** Totalserve House
17 Gr. Xenopoulou stree
3106 Limassol
Cyprus

**Banker:** Hellenic Bank Public Company Ltd

**YESREB HOLDING LIMITED**

REPORT OF THE BOARD OF DIRECTORS

The Board of Directors presents its first report and audited financial statements of the Company for the period from 21 February 2013 to 31 December 2013.

**Incorporation**
The Company Yesreb Holding Limited was incorporated in Cyprus on 21 February 2013 as a private limited liability company under the Cyprus Companies Law, Cap. 113.

**Principal activities**
The principal activity of the Company is property development.

**Review of current position, future developments and significant risks**
The Company's development to date, financial results and position as presented in the financial statements are not considered satisfactory and the Board of Directors is making an effort to reduce the Company losses.

The main risks and uncertainties faced by the Company and the steps taken to manage these risks, are described in note 3 of the financial statements.

**Results**
The Company's results for the period are set out on page 6.

**Dividends**
The Board of Directors does not recommend the payment of a dividend.

**Share capital**
**Authorised capital**
Under its Memorandum the Company fixed its share capital at 2.000 ordinary shares of nominal value of €1 each.
**Issued capital**
Upon incorporation on 21 February 2013 the Company issued to the subscribers of its Memorandum of Association 2.000 ordinary shares of €1 each at par.

**Board of Directors**
The member of the Company's Board of Directors as at 31 December 2013 and at the date of this report is presented on page 1. The sole director was a member of the Board of Directors throughout the period from 21 February 2013 to 31 December 2013.

In accordance with the Company's Articles of Association the sole director presently member of the Board continues in office.

**Events after the reporting period**
Any significant events that occurred after the end of the reporting period are described in note 16 to the financial statements.

The Company did not have any cash with banks affected from the above measures as at the relevant date for implementation of the decisions, and hence it is not affected.

**YESREB HOLDING LIMITED**

REPORT OF THE BOARD OF DIRECTORS

**Independent Auditors**
The Independent Auditors, P.G. Economides & Co Limited, have expressed their willingness to continue in office and a resolution giving authority to the Board of Directors to fix their remuneration will be proposed at the Annual General Meeting.


By order of the Board of Directors,



Totaltrust Management Limited
Director

Limassol, 25 November 2016

**Independent auditor's report**

**To the Members of Yesreb Holding Limited**

**Report on the financial statements**

We have audited the financial statements of Yesreb Holding Limited (the "Company") on pages 6 to 19 which comprise the statement of financial position as at 31 December 2013, and the statements of profit or loss and other comprehensive income, changes in equity and cash flows for the period from 21 February 2013 to 31 December 2013, and a summary of significant accounting policies and other explanatory information.

*Board of Directors' responsibility for the financial statements*

The Board of Directors is responsible for the preparation of financial statements that give a true and fair view in accordance with International Financial Reporting Standards as adopted by the European Union and the requirements of the Cyprus Companies Law, Cap. 113, and for such internal control as the Board of Directors determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with International Standards on Auditing. Those Standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation of financial statements that give a true and fair view in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by the Board of Directors, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**To the Members of Yesreb Holding Limited**

*Opinion*

In our opinion, the financial statements give a true and fair view of the financial position of Yesreb Holding Limited as at 31 December 2013, and of its financial performance and its cash flows for the period from 21 February 2013 to 31 December 2013 in accordance with International Financial Reporting Standards as adopted by the European Union and the requirements of the Cyprus Companies Law, Cap. 113.

*Emphasis of matter*

We draw attention to note 2 to the financial statements which indicates that the Company incurred a loss of €397.791 during the period from 21 February 2013 to 31 December 2013, and, as at that date its current liabilities exceeded its current assets by €(14.310.780). These conditions, along with other matters as set forth in note 2 indicate the existence of a material uncertainty which may cast significant doubt about the Company's ability to continue as a going concern. Our opinion is not qualified in respect of this matter.

**Report on other legal requirements**

Pursuant to the additional requirements of the Auditors and Statutory Audits of Annual and Consolidated Accounts Laws of 2009 and 2013, we report the following:

- We have obtained all the information and explanations we considered necessary for the purposes of our audit.
- In our opinion, proper books of account have been kept by the Company, so far as appears from our examination of these books.
- The Company's financial statements are in agreement with the books of account.
- In our opinion and to the best of our information and according to the explanations given to us, the financial statements give the information required by the Cyprus Companies Law, Cap. 113, in the manner so required.
- In our opinion, the information given in the report of the Board of Directors is consistent with the financial statements.

**Other matter**

This report, including the opinion, has been prepared for and only for the Company's members as a body in accordance with Section 34 of the Auditors and Statutory Audits of Annual and Consolidated Accounts Laws of 2009 and 2013 and for no other purpose. We do not, in giving this opinion, accept or assume responsibility for any other purpose or to any other person to whose knowledge this report may come to.

Galatia Efstathiou
Chartered Certified Accountant and Registered Auditor
for and on behalf of
**P.G. ECONOMIDES & CO LIMITED**
**Chartered Certified Accountants**

Limassol, 25 November 2016

**YESREB HOLDING LIMITED**

STATEMENT OF PROFIT OR LOSS AND OTHER COMPREHENSIVE INCOME
Period from 21 February 2013 to 31 December 2013

|  | Note | 2013 € |
|---|---|---|
| Administration expenses |  | (5.924) |
| Other expenses | 4 | (2.360) |
| **Operating loss** | 5 | (8.284) |
| Finance income | 6 | 50.399 |
| Finance costs | 6 | (439.906) |
| **Loss before tax** |  | (397.791) |
| Tax | 7 | - |
| **Net loss for the period** |  | (397.791) |
| **Other comprehensive income** |  | - |
| **Total comprehensive income for the period** |  | (397.791) |

The notes on pages 10 to 19 form an integral part of these financial statements.

6

**YESREB HOLDING LIMITED**

STATEMENT OF FINANCIAL POSITION
31 December 2013

|  | Note | 2013 € |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Inventories | 8 | 14.317.065 |
| | | 14.317.065 |
| **Total assets** | | 14.317.065 |
| **EQUITY AND LIABILITIES** | | |
| **Equity** | | |
| Share capital | 9 | 2.000 |
| Accumulated losses | | (397.791) |
| **Total equity** | | (395.791) |
| **Non-current liabilities** | | |
| Borrowings | 10 | 14.706.571 |
| | | 14.706.571 |
| **Current liabilities** | | |
| Creditors and accruals | 11 | 2.559 |
| Shareholders' current accounts - credit balances | 13 | 3.726 |
| | | 6.285 |
| **Total liabilities** | | 14.712.856 |
| **Total equity and liabilities** | | 14.317.065 |

On 25 November 2016 the Board of Directors of Yesreb Holding Limited authorised these financial statements for issue.

....................................
Totaltrust Management Limited
Director

The notes on pages 10 to 19 form an integral part of these financial statements.

7

STATEMENT OF CHANGES IN EQUITY
Period from 21 February 2013 to 31 December 2013

| | Note | Share capital € | Accumulated losses € | Total € |
|---|---|---|---|---|
| **Comprehensive income** | | | | |
| Net loss for the period | | - | (397.791) | (397.791) |
| **Transactions with owners** | | | | |
| Issue of share capital | 9 | 2.000 | - | 2.000 |
| **Balance at 31 December 2013** | | **2.000** | **(397.791)** | **(395.791)** |

Companies which do not distribute 70% of their profits after tax, as defined by the relevant tax law, within two years after the end of the relevant tax year, will be deemed to have distributed as dividends 70% of these profits. Special contribution for defence at 20% for the tax years 2012 and 2013 and 17% for 2014 and thereafter will be payable on such deemed dividends to the extent that the shareholders (companies and individuals) are Cyprus tax residents. The amount of deemed distribution is reduced by any actual dividends paid out of the profits of the relevant year at any time. This special contribution for defence is payable by the Company for the account of the shareholders.

The notes on pages 10 to 19 form an integral part of these financial statements.

8

**YESREB HOLDING LIMITED**

STATEMENT OF CASH FLOWS
Period from 21 February 2013 to 31 December 2013

|  | Note | 2013 € |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| **Loss before tax** | | (397.791) |
| Adjustments for: | | |
| Unrealised exchange (profit) | | (50.399) |
| Interest expense | 6 | 437.969 |
| | | |
| **Cash flows used in operations before working capital changes** | | (10.221) |
| Increase in inventories | | (14.317.065) |
| Increase in shareholders' current accounts | | 3.726 |
| Increase in creditors and accruals | | 2.559 |
| **Cash flows used in operations** | | (14.321.001) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | - |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from issue of share capital | | 2.000 |
| Proceeds from borrowings | | 14.756.970 |
| Interest paid | | (437.969) |
| **Net cash flows from financing activities** | | 14.321.001 |
| | | |
| **Net increase in cash and cash equivalents** | | - |
| Cash and cash equivalents: | | |
| At beginning of the period | | - |
| **At end of the period** | | - |

The notes on pages 10 to 19 form an integral part of these financial statements.

9

NOTES TO THE FINANCIAL STATEMENTS
Period from 21 February 2013 to 31 December 2013

## 1. Incorporation and principal activities

### Country of incorporation

The Company Yesreb Holding Limited (the "Company") was incorporated in Cyprus on 21 February 2013 as a private limited liability company under the Cyprus Companies Law, Cap. 113. Its registered office is at Totalserve House, 17 Gr. Xenopoulou stree, 3106 Limassol, Cyprus.

### Principal activities

The principal activity of the Company is property development.

## 2. Accounting policies

The principal accounting policies adopted in the preparation of these financial statements are set out below.

### Going concern basis

The Company incurred a loss of €397.791 for the period from 21 February 2013 to 31 December 2013, and, as at that date its current liabilities exceeded its current assets by €(14.310.780). These conditions, indicate the existence of a material uncertainty which may cast significant doubt about the Company's ability to continue as a going concern.

### Basis of preparation

The financial statements have been prepared in accordance with International Financial Reporting Standards (IFRSs) as adopted by the European Union (EU) and the requirements of the Cyprus Companies Law, Cap.113. The financial statements have been prepared under the historical cost convention.

The preparation of financial statements in conformity with IFRSs requires the use of certain critical accounting estimates and requires Management to exercise its judgment in the process of applying the Company's accounting policies. It also requires the use of assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Although these estimates are based on Management's best knowledge of current events and actions, actual results may ultimately differ from those estimates.

NOTES TO THE FINANCIAL STATEMENTS
Period from 21 February 2013 to 31 December 2013

**2. Accounting policies (continued)**

**Adoption of new and revised IFRSs**

During the current period the Company adopted all the new and revised International Financial Reporting Standards (IFRS) that are relevant to its operations and are effective for accounting periods beginning on 21 February 2013.

At the date of approval of these financial statements, standards and interpretations were issued by the International Accounting Standards Board which were not yet effective. Some of them were adopted by the European Union and others not yet. The Board of Directors expects that the adoption of these accounting standards in future periods will not have a material effect on the financial statements of the Company.

**Finance costs**

Interest expense and other borrowing costs are charged to profit or loss as incurred.

**Foreign currency translation**

(1)   <u>**Functional and presentation currency**</u>
      Items included in the Company's financial statements are measured using the currency of the primary economic environment in which the entity operates ('the functional currency'). The financial statements are presented in Euro (€), which is the Company's functional and presentation currency.

(2)   <u>**Transactions and balances**</u>
      Foreign currency transactions are translated into the functional currency using the exchange rates prevailing at the dates of the transactions. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at year-end exchange rates of monetary assets and liabilities denominated in foreign currencies are recognised in profit or loss.

**Dividends**

Dividend distribution to the Company's shareholders is recognised in the Company's financial statements in the year in which they are approved by the Company's shareholders.

**Financial instruments**

Financial assets and financial liabilities are recognised in the Company's statement of financial position when the Company becomes a party to the contractual provisions of the instrument.

NOTES TO THE FINANCIAL STATEMENTS
Period from 21 February 2013 to 31 December 2013

**2. Accounting policies (continued)**

**Financial instruments (continued)**

**Borrowings**

Borrowings are recognised initially at fair value, net of transaction costs incurred. Borrowings are subsequently stated at amortised cost. Any difference between the proceeds (net of transaction costs) and the redemption value is recognised in profit or loss over the period of the borrowings, using the effective interest method, unless they are directly attributable to the acquisition, construction or production of a qualifying asset, in which case they are capitalised as part of the cost of that asset.

Fees paid on the establishment of loan facilities are recognised as transaction costs of the loan to the extent that it is probable that some or all of the facility will be drawn down. In this case, the fee is deferred until the draw-down occurs. To the extend there is no evidence that it is probable that some or all of the facility will be drawn down, the fee is capitalised as a prepayment and amortised over the period of the facility to which it relates.

Borrowing costs that are directly attributable to the acquisition, construction or production of a qualifying asset, being an asset that necessarily takes a substantial period of time to get ready for its intended use or sale, are capitalised as part of the cost of that asset, when it is probable that they will result in future economic benefits to the Company and the costs can be measured reliably.

Borrowings are classified as current liabilities, unless the Company has an unconditional right to defer settlement of the liability for at least twelve months after the reporting date.

**Impairment of assets**

Assets that have an indefinite useful life are not subject to amortisation and are tested annually for impairment. Assets that are subject to depreciation or amortisation are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. An impairment loss is recognised for the amount by which the asset's carrying amount exceeds its recoverable amount. The recoverable amount is the higher of an asset's fair value less costs to sell and value in use. For the purposes of assessing impairment, assets are grouped at the lowest levels for which there are separately identifiable cash flows (cash-generating units).

**YESREB HOLDING LIMITED**

NOTES TO THE FINANCIAL STATEMENTS
Period from 21 February 2013 to 31 December 2013

**2. Accounting policies (continued)**

**Land and buildings under development**

The cost of land and buildings under development and completed buildings for sale comprise the cost of acquiring the land and the development costs of the buildings. The development cost of the buildings includes raw materials, direct labour cost, depreciation of plant and equipment and other indirect costs of construction.

The land for development is carried at cost and included in land and buildings under development at the reporting date.

**Share capital**

Ordinary shares are classified as equity.

**Non-current liabilities**

Non-current liabilities represent amounts that are due more than twelve months from the reporting date.

**3. Financial risk management**

**Financial risk factors**
The Company is exposed to interest rate risk, liquidity risk, currency risk, capital risk management and other risks arising from the financial instruments it holds. The risk management policies employed by the Company to manage these risks are discussed below:

**3.1 Interest rate risk**
Interest rate risk is the risk that the value of financial instruments will fluctuate due to changes in market interest rates. Borrowings issued at variable rates expose the Company to cash flow interest rate risk. Borrowings issued at fixed rates expose the Company to fair value interest rate risk. The Company's management monitors the interest rate fluctuations on a continuous basis and acts accordingly.

**3.2 Liquidity risk**
Liquidity risk is the risk that arises when the maturity of assets and liabilities does not match. An unmatched position potentially enhances profitability, but can also increase the risk of losses. The Company has procedures with the object of minimising such losses such as maintaining sufficient cash and other highly liquid current assets and by having available an adequate amount of committed credit facilities.

NOTES TO THE FINANCIAL STATEMENTS
Period from 21 February 2013 to 31 December 2013

### 3. Financial risk management (continued)

#### 3.3 Currency risk
Currency risk is the risk that the value of financial instruments will fluctuate due to changes in foreign exchange rates. Currency risk arises when future commercial transactions and recognised assets and liabilities are denominated in a currency that is not the Company's measurement currency. The Company is exposed to foreign exchange risk arising from various currency exposures primarily with respect to the US Dollar. The Company's management monitors the exchange rate fluctuations on a continuous basis and acts accordingly.

#### 3.4 Capital risk management
The Company manages its capital to ensure that it will be able to continue as a going concern while maximising the return to shareholders through the optimisation of the debt and equity balance.

#### 3.5 Other risks
The general economic environment prevailing in Cyprus and internationally may affect the Company's operations to a great extent. Economic conditions such as inflation, unemployment, and development of the gross domestic product are directly linked to the economic course of every country and any variation in these and the economic environment in general may create chain reactions in all areas hence affecting the Company.

### 4. Other expenses

|  | 2013 € |
|---|---|
| Incorporation expenses | 2.360 |
|  | 2.360 |

### 5. Operating loss

|  | 2013 € |
|---|---|
| Operating loss is stated after charging the following items: |  |
| Auditors' remuneration | 2.142 |
| Incorporation expenses | 2.360 |

**YESREB HOLDING LIMITED**

NOTES TO THE FINANCIAL STATEMENTS
Period from 21 February 2013 to 31 December 2013

**6. Finance income**

|  | 2013 |
|---|---|
|  | € |
| Exchange profit | 50.399 |
| **Finance income** | 50.399 |
|  |  |
| Interest expense | (437.969) |
| Sundry finance expenses | (1.937) |
| **Finance costs** | (439.906) |
|  |  |
| **Net finance costs** | (389.507) |

**7. Tax**

The tax on the Company's results before tax differs from the theoretical amount that would arise using the applicable tax rates as follows:

|  | 2013 |
|---|---|
|  | € |
| Loss before tax | (397.791) |
|  |  |
| Tax calculated at the applicable tax rates | (49.724) |
| Tax effect of expenses not deductible for tax purposes | 55.085 |
| Tax effect of allowances and income not subject to tax | (6.300) |
| Tax effect of tax loss for the period | 939 |
| **Tax charge** | - |

The corporation tax rate is 12,5% (2012:10%).

Due to tax losses sustained in the period, no tax liability arises on the Company. Under current legislation, tax losses may be carried forward and be set off against taxable income of the five succeeding years

NOTES TO THE FINANCIAL STATEMENTS
Period from 21 February 2013 to 31 December 2013

## 8. Inventories

|  | 2013 € |
|---|---|
| Property under development | 14.317.065 |
|  | 14.317.065 |

Development site at Watford, 24 Shrewsbury Road, Dublin

It is a residential house with a large back garden. It has an initial building permit to construct an additional 3 houses in the garden and extend the main house. The building permit is under appeal.

Inventories are stated at cost.

## 9. Share capital

|  | 2013 Number of shares | 2013 € |
|---|---|---|
| **Authorised** |  |  |
| Ordinary shares of €1 each | 2.000 | 2.000 |
| **Issued and fully paid** |  |  |
| Issue of shares | 2.000 | 2.000 |
| **Balance at 31 December** | 2.000 | 2.000 |

**Authorised capital**
Under its Memorandum the Company fixed its share capital at 2.000 ordinary shares of nominal value of €1 each.

**Issued capital**
Upon incorporation on 21 February 2013 the Company issued to the subscribers of its Memorandum of Association 2.000 ordinary shares of €1 each at par.

**YESREB HOLDING LIMITED**

**10. Borrowings**

|  | 2013 |
|  | € |
| **Non current borrowings** |  |
| Other loans | 4.411.065 |
| Loans from related companies (Note 13) | 10.295.506 |
|  | 14.706.571 |

Maturity of non-current borrowings:

|  | 2013 |
|  | € |
| Between two and five years | 14.706.571 |

Other payable loan with principal amount of €4.288.197 and interest balance of €122.868 bears interest of 1.25% per annum and is repayable on 2018.

**11. Creditors and accruals**

|  | 2013 |
|  | € |
| Accruals | 2.142 |
| Other creditors | 417 |
|  | 2.559 |

The fair values of trade and other payables due within one year approximate to their carrying amounts as presented above.

**12. General events**

The negotiations of the Cyprus Government with the European Commission, the European Central Bank and the International Monetary Fund (the "Troika"), in order to obtain financial support, resulted in an agreement and decision of the Eurogroup on 25 March 2013 on the key elements necessary for a future macroeconomic adjustment programme which includes the provision of financial assistance to the Republic of Cyprus of up to €10 billion. The programme aims to address the exceptional economic challenges that Cyprus is facing, and to restore the viability of the financial sector, with a view to restoring sustainable economic growth and sound public finances in the coming years.

# YESREB HOLDING LIMITED

## 12. General events (continued)

The Eurogroup decision on Cyprus includes plans for the restructuring of the financial sector and safeguards deposits below €100.000 in accordance with European Union legislation. In addition, the Cypriot authorities have reaffirmed their commitment to step up efforts in the areas of fiscal consolidation, structural reforms and privatizations.

On 12 April 2013 the Eurogroup welcomed the agreement that was reached between Cyprus and the Troika institutions regarding the macroeconomic adjustment programme for Cyprus. Subsequently all the necessary procedures for the formal approval of the Board of Directors of the European Stability Mechanism were completed, as well as the ratification by Eurozone member states. Following the completion of the above procedures, the first tranche of the financing of the Republic of Cyprus was released in line with the provisions of the Memorandum.

On 22 March 2013 legislation was enacted by the House of Representatives concerning restrictive measures in respect of transactions executed through the banking institutions operating in Cyprus. The extent and duration of the restrictive measures are decided by the Minister of Finance and the Governor of the Central Bank of Cyprus and were enforced on 28 March 2013. The temporary restrictive measures, with respect to banking and cash transactions include restrictions on cash withdrawals, the cashing of cheques and transfers of funds to other credit institutions in Cyprus and abroad. They also provide for the compulsory partial renewal of certain maturing deposits.

On 29 March 2013 the Central Bank of Cyprus issued decrees relating to Laiki Bank and Bank of Cyprus, implementing measures for these two banks under the Resolution of Credit and Other Institutions Law of 2013.

On the basis of the relevant decrees, Laiki Bank was placed into resolution. What remained in Laiki Bank were mainly the uninsured deposits and assets outside Cyprus. The assets of Laiki Bank in Cyprus, the insured deposits and the Eurosystem financing have been transferred to Bank of Cyprus, with compensation for the value of the net assets transferred, the issue of shares by Bank of Cyprus to Laiki Bank.

The recapitalization process for the Bank of Cyprus was completed in accordance with the relevant decrees of the Resolution Authority through "bail-in", that is through the partial conversion of uninsured deposits into shares. In addition, the holders of shares and debt instruments in Bank of Cyprus on 29 March 2013 have contributed to the recapitalization of Bank of Cyprus through the absorption of losses.

Following the positive outcome of the first and second quarterly reviews of Cyprus's economic programme by the European Commission, the European Central Bank and the International Monetary Fund during 2013, the Eurogroup endorsed the disbursement of the scheduled tranches of financial assistance to Cyprus.

NOTES TO THE FINANCIAL STATEMENTS
Period from 21 February 2013 to 31 December 2013

**13. Related party transactions**

The following transactions were carried out with related parties:

**13.1 Loans from related undertakings (Note 10)**

|  | 2013 |
|---|---|
|  | € |
| Bloem (PTC) Ltd | 10,295,506 |
|  | 10,295,506 |

Loan payable to Bloem (PTC) Ltd bears interest of 17% and is repayable by 5 September 2018

**13.2 Shareholders' current accounts - credit balances**

|  | 2013 |
|---|---|
|  | € |
| Shareholder's current account | 3,726 |
|  | 3,726 |

The shareholders' current accounts are interest free, and have no specified repayment date.

**14. Contingent liabilities**

The Company had no contingent liabilities as at 31 December 2013.

**15. Commitments**

The Company had no capital or other commitments as at 31 December 2013.

**16. Events after the reporting period**

There were no material events after the reporting period, which have a bearing on the understanding of the financial statements.

**Independent auditor's report on pages 4 and 5**

**YESREB HOLDING LIMITED**

DETAILED INCOME STATEMENT
Period from 21 February 2013 to 31 December 2013

|  | Page | 2013 € |
|---|---|---|
| **Operating expenses** | | |
| Administration expenses | 21 | (5.924) |
| | | (5.924) |
| **Other operating expenses** | | |
| Incorporation expenses | | (2.360) |
| **Operating loss** | | (8.284) |
| Finance income | 22 | 50.399 |
| Finance costs | 22 | (439.906) |
| **Net loss for the period before tax** | | (397.791) |

**YESREB HOLDING LIMITED**

OPERATING EXPENSES
Period from 21 February 2013 to 31 December 2013

|  | 2013 |
|---|---|
|  | € |
| **Administration expenses** | |
| Annual levy | 350 |
| Auditors' remuneration | 2.142 |
| Other professional fees | 1.844 |
| Management fees | 165 |
| Representation fees | 1.423 |
|  | **5.924** |

**YESREB HOLDING LIMITED**

FINANCE INCOME/COST
Period from 21 February 2013 to 31 December 2013

|  | 2013 € |
|---|---|
| **Finance income** | |
| Unrealised exchange profit | 50.399 |
| | 50.399 |
| **Finance costs** | |
| **Interest expense** | |
| Loan interest | 437.969 |
| **Sundry finance expenses** | |
| Bank charges | 1.937 |
| | 439.906 |

**YESREB HOLDING LIMITED**

REPORT AND FINANCIAL STATEMENTS
31 December 2014

**P.G. ECONOMIDES & CO LIMITED**
Chartered Certified Accountants

**YESREB HOLDING LIMITED**

REPORT AND FINANCIAL STATEMENTS
31 December 2014

| CONTENTS | PAGE |
|---|---|
| Board of Directors and other officers | 1 |
| Report of the Board of Directors | 2 - 3 |
| Independent auditor's report | 4 - 5 |
| Statement of profit or loss and other comprehensive income | 6 |
| Statement of financial position | 7 |
| Statement of changes in equity | 8 |
| Cash flow statement | 9 |
| Notes to the financial statements | 10 - 17 |
| Additional information to the statement of profit or loss and other comprehensive income | 18 - 20 |

**YESREB HOLDING LIMITED**

BOARD OF DIRECTORS AND OTHER OFFICERS

**Board of Directors:**            Totaltrust Management Limited

**Company Secretary:**            Totalserve Management Limited

**Independent Auditors:**            P.G. Economides & Co Limited
                                     Chartered Certified Accountants

**Registered office:**            Totalserve House
                                  17 Gr. Xenopoulou stree
                                  3106 Limassol
                                  Cyprus

**Banker:**            Hellenic Bank Public Company Ltd

REPORT OF THE BOARD OF DIRECTORS

The Board of Directors presents its report and audited financial statements of the Company for the year ended 31 December 2014.

**Principal activities**
The principal activities of the Company, which are unchanged from last year, is property development.

**Review of current position, future developments and significant risks**
The Company's development to date, financial results and position as presented in the financial statements are not considered satisfactory and the Board of Directors is making an effort to reduce the Company's losses.

The main risks and uncertainties faced by the Company and the steps taken to manage these risks, are described in note 3 of the financial statements.

**Results**
The Company's results for the year are set out on page 6.

**Dividends**
The Company did not have any distributable profits as at 31 December 2014, thus the Board of Directors cannot recommend the payment of a dividend.

**Share capital**
There were no changes in the share capital of the Company during the year under review.

**Board of Directors**
The sole member of the Company's Board of Directors as at 31 December 2014 and at the date of this report is presented on page 1. The sole Director was a member of the Board of Directors throughout the year ended 31 December 2014.

In accordance with the Company's Articles of Association the sole Director presently member of the Board continues in office.

There were no significant changes in the remuneration of the Board of Directors.

**Events after the reporting period**
There were no material events after the reporting period, which have a bearing on the understanding of the financial statements.

**YESREB HOLDING LIMITED**

REPORT OF THE BOARD OF DIRECTORS

**Independent Auditors**
The Independent Auditors, P.G. Economides & Co Limited, have expressed their willingness to continue in office and a resolution giving authority to the Board of Directors to fix their remuneration will be proposed at the Annual General Meeting.


By order of the Board of Directors,



Totaltrust Management Limited
Director

Limassol, 29 November 2016

**Independent auditor's report**

**To the Members of Yesreb Holding Limited**

**Report on the financial statements**

We have audited the financial statements of Yesreb Holding Limited (the "Company") on pages 6 to 17 which comprise the statement of financial position as at 31 December 2014, and the statements of profit or loss and other comprehensive income, changes in equity and cash flows for the year then ended, and a summary of significant accounting policies and other explanatory information.

*Board of Directors' responsibility for the financial statements*

The Board of Directors is responsible for the preparation of financial statements that give a true and fair view in accordance with International Financial Reporting Standards as adopted by the European Union and the requirements of the Cyprus Companies Law, Cap. 113, and for such internal control as the Board of Directors determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with International Standards on Auditing. Those Standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation of financial statements that give a true and fair view in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by the Board of Directors, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Independent auditor's report (continued)**

**To the Members of Yesreb Holding Limited**

*Opinion*

In our opinion, the financial statements give a true and fair view of the financial position of Yesreb Holding Limited as at 31 December 2014, and of its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards as adopted by the European Union and the requirements of the Cyprus Companies Law, Cap. 113.

*Emphasis of matter*

We draw attention to note 2 to the financial statements which indicates that the Company incurred a loss of €4.003.708 during the year ended 31 December 2014, and, as at that date its liabilities exceeded its assets by €4.399.499. These conditions, along with other matters as set forth in note 2 indicate the existence of a material uncertainty which may cast significant doubt about the Company's ability to continue as a going concern. Our opinion is not qualified in respect of this matter.

**Report on other legal requirements**

Pursuant to the additional requirements of the Auditors and Statutory Audits of Annual and Consolidated Accounts Laws of 2009 and 2013, we report the following:
- We have obtained all the information and explanations we considered necessary for the purposes of our audit.
- In our opinion, proper books of account have been kept by the Company, so far as appears from our examination of these books.
- The Company's financial statements are in agreement with the books of account.
- In our opinion and to the best of our information and according to the explanations given to us, the financial statements give the information required by the Cyprus Companies Law, Cap. 113, in the manner so required.
- In our opinion, the information given in the report of the Board of Directors is consistent with the financial statements.

**Other matter**

This report, including the opinion, has been prepared for and only for the Company's members as a body in accordance with Section 34 of the Auditors and Statutory Audits of Annual and Consolidated Accounts Laws of 2009 and 2013 and for no other purpose. We do not, in giving this opinion, accept or assume responsibility for any other purpose or to any other person to whose knowledge this report may come to.

Galatia Efstathiou
Certified Public Accountant and Registered Auditor
for and on behalf of
**P.G. ECONOMIDES & CO LIMITED**
**Chartered Certified Accountants**

Limassol, 29 November 2016

# YESREB HOLDING LIMITED

STATEMENT OF PROFIT OR LOSS AND OTHER COMPREHENSIVE INCOME
31 December 2014

| | Note | 2014 € | 2013 € |
|---|---|---|---|
| Other operating income | 5 | - | 50.399 |
| Administration expenses | | (2.492) | (5.924) |
| Other expenses | 6 | - | (2.360) |
| **Operating (loss)/profit** | | **(2.492)** | 42.115 |
| Finance costs | 7 | (4.001.216) | (439.906) |
| **(Loss) before tax** | | **(4.003.708)** | (397.791) |
| **Net loss for the year/period** | | **(4.003.708)** | (397.791) |
| **Other comprehensive income** | | **-** | - |
| **Total comprehensive income for the year/period** | | **(4.003.708)** | (397.791) |

The notes on pages 10 to 17 form an integral part of these financial statements.

6

**YESREB HOLDING LIMITED**

STATEMENT OF FINANCIAL POSITION
31 December 2014

| | Note | 2014 € | 2013 € |
|---|---|---|---|
| **ASSETS** | | | |
| | | | |
| **Current assets** | | | |
| Inventories | 9 | 14.379.249 | 14.317.065 |
| | | 14.379.249 | 14.317.065 |
| | | | |
| **Total assets** | | 14.379.249 | 14.317.065 |
| **EQUITY AND LIABILITIES** | | | |
| | | | |
| **Equity** | | | |
| Share capital | 10 | 2.000 | 2.000 |
| Accumulated losses | | (4.401.499) | (397.791) |
| **Total equity** | | (4.399.499) | (395.791) |
| | | | |
| **Non-current liabilities** | | | |
| Borrowings | 11 | 18.769.972 | 14.706.571 |
| | | 18.769.972 | 14.706.571 |
| | | | |
| **Current liabilities** | | | |
| Trade and other payables | 12 | 8.776 | 6.285 |
| | | 8.776 | 6.285 |
| | | | |
| **Total liabilities** | | 18.778.748 | 14.712.856 |
| | | | |
| **Total equity and liabilities** | | 14.379.249 | 14.317.065 |

On 29 November 2016 the Board of Directors of Yesreb Holding Limited authorised these financial statements for issue.


.....................................
Totaltrust Management Limited
Director

The notes on pages 10 to 17 form an integral part of these financial statements.

7

STATEMENT OF CHANGES IN EQUITY
31 December 2014

| | Note | Share capital € | Accumula-ted losses € | Total € |
|---|---|---|---|---|
| **Comprehensive income** | | | | |
| Net loss for the period | | - | (397.791) | (397.791) |
| **Transactions with owners** | | | | |
| Issue of share capital | 10 | 2.000 | - | 2.000 |
| **Balance at 31 December 2013/ 1 January 2014** | | 2.000 | (397.791) | (395.791) |
| **Comprehensive income** | | | | |
| Net loss for the year | | - | (4.003.708) | (4.003.708) |
| **Balance at 31 December 2014** | | 2.000 | (4.401.499) | (4.399.499) |

Companies which do not distribute 70% of their profits after tax, as defined by the relevant tax law, within two years after the end of the relevant tax year, will be deemed to have distributed as dividends 70% of these profits. Special contribution for defence at 20% for the tax years 2012 and 2013 and 17% for 2014 and thereafter will be payable on such deemed dividends to the extent that the shareholders (companies and individuals) are Cyprus tax residents. The amount of deemed distribution is reduced by any actual dividends paid out of the profits of the relevant year at any time. This special contribution for defence is payable by the Company for the account of the shareholders.

The notes on pages 10 to 17 form an integral part of these financial statements.

8

**YESREB HOLDING LIMITED**

CASH FLOW STATEMENT
31 December 2014

|  | Note | 2014<br>€ | 2013<br>€ |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | |
| **(Loss) before tax** | | **(4.003.708)** | (397.791) |
| Adjustments for: | | | |
| Unrealised exchange loss/(profit) | | **1.687.556** | (50.399) |
| Interest expense | 7 | **2.312.716** | 437.969 |
| | | **(3.436)** | (10.221) |
| **Changes in working capital:** | | | |
| Increase in inventories | | **(62.185)** | (14.317.065) |
| Increase in shareholders' current accounts | | **-** | 3.726 |
| Increase in trade and other payables | | **2.492** | 2.559 |
| **Cash used in operations** | | **(63.129)** | (14.321.001) |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | **-** | **-** |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | |
| Proceeds from issue of share capital | | **-** | 2.000 |
| Proceeds from borrowings | | **4.063.401** | 14.706.571 |
| Unrealised exchange (loss) | | **(1.687.556)** | 50.399 |
| Interest paid | | **(2.312.716)** | (437.969) |
| **Net cash generated from financing activities** | | **63.129** | 14.321.001 |

The notes on pages 10 to 17 form an integral part of these financial statements.

9

## YESREB HOLDING LIMITED

NOTES TO THE FINANCIAL STATEMENTS
31 December 2014

## 1. Incorporation and principal activities

### Country of incorporation

The Company Yesreb Holding Limited (the "Company") was incorporated in Cyprus on 21 February 2013 as a private limited liability company under the provisions of the Cyprus Companies Law, Cap. 113. Its registered office is at Totalserve House, 17 Gr. Xenopoulou stree, 3106 Limassol, Cyprus.

### Principal activities

The principal activities of the Company, which are unchanged from last year, is property development.

## 2. Significant accounting policies

The principal accounting policies adopted in the preparation of these financial statements are set out below. These policies have been consistently applied to all years presented in these financial statements unless otherwise stated.

### Basis of preparation

The financial statements have been prepared in accordance with International Financial Reporting Standards (IFRSs) as adopted by the European Union (EU) and the requirements of the Cyprus Companies Law, Cap.113. The financial statements have been prepared under the historical cost convention as modified by the revaluation of and investment property.

### Adoption of new and revised IFRSs

During the current year the Company adopted all the new and revised International Financial Reporting Standards (IFRS) that are relevant to its operations and are effective for accounting periods beginning on 1 January 2014. This adoption did not have a material effect on the accounting policies of the Company.

At the date of approval of these financial statements, standards and interpretations were issued by the International Accounting Standards Board which were not yet effective. Some of them were adopted by the European Union and others not yet. The Board of Directors expects that the adoption of these accounting standards in future periods will not have a material effect on the financial statements of the Company.

### Finance costs

Interest expense and other borrowing costs are charged to profit or loss as incurred.

NOTES TO THE FINANCIAL STATEMENTS
31 December 2014

**2. Significant accounting policies (continued)**

**Foreign currency translation**

(1)     <u>Functional and presentation currency</u>
        Items included in the Company's financial statements are measured using the currency
        of the primary economic environment in which the entity operates ('the functional
        currency'). The financial statements are presented in Euro (€), which is the Company's
        functional and presentation currency.

(2)     <u>Transactions and balances</u>
        Foreign currency transactions are translated into the functional currency using the
        exchange rates prevailing at the dates of the transactions. Foreign exchange gains and
        losses resulting from the settlement of such transactions and from the translation at
        year-end exchange rates of monetary assets and liabilities denominated in foreign
        currencies are recognised in profit or loss.

<u>Borrowings</u>

Borrowings are recorded initially at the proceeds received, net of transaction costs incurred.
Borrowings are subsequently stated at amortised cost. Any difference between the proceeds (net
of transaction costs) and the redemption value is recognised in profit or loss over the period of
the borrowings using the effective interest method.

**Land and buildings under development**

The cost of land and buildings under development and completed buildings for sale comprise the
cost of acquiring the land and the development costs of the buildings. The development cost of
the buildings includes raw materials, direct labour cost, depreciation of plant and equipment and
other indirect costs of construction.

The land for development is carried at cost and included in land and buildings under
development at the reporting date.

**Share capital**

Ordinary shares are classified as equity.

**Provisions**

Provisions are recognised when the Company has a present legal or constructive obligation as a
result of past events, it is probable that an outflow of resources will be required to settle the
obligation, and a reliable estimate of the amount can be made. Where the Company expects a
provision to be reimbursed, for example under an insurance contract, the reimbursement is
recognised as a separate asset but only when the reimbursement is virtually certain.

NOTES TO THE FINANCIAL STATEMENTS
31 December 2014

**2. Significant accounting policies (continued)**

**Non-current liabilities**

Non-current liabilities represent amounts that are due more than twelve months from the reporting date.

**Comparatives**

Where necessary, comparative figures have been adjusted to conform to changes in presentation in the current year.

**3. Financial risk management**

**Financial risk factors**
The Company is exposed to interest rate risk, liquidity risk, currency risk and capital risk management arising from the financial instruments it holds. The risk management policies employed by the Company to manage these risks are discussed below:

**3.1 Interest rate risk**
Interest rate risk is the risk that the value of financial instruments will fluctuate due to changes in market interest rates. The Company's income and operating cash flows are substantially independent of changes in market interest rates as the Company has no significant interest-bearing assets. The Company is exposed to interest rate risk in relation to its non-current borrowings. Borrowings issued at variable rates expose the Company to cash flow interest rate risk. Borrowings issued at fixed rates expose the Company to fair value interest rate risk. The Company's management monitors the interest rate fluctuations on a continuous basis and acts accordingly.

**3.2 Liquidity risk**
Liquidity risk is the risk that arises when the maturity of assets and liabilities does not match. An unmatched position potentially enhances profitability, but can also increase the risk of losses. The Company has procedures with the object of minimising such losses such as maintaining sufficient cash and other highly liquid current assets and by having available an adequate amount of committed credit facilities.

**3.3 Currency risk**
Currency risk is the risk that the value of financial instruments will fluctuate due to changes in foreign exchange rates. Currency risk arises when future commercial transactions and recognised assets and liabilities are denominated in a currency that is not the Company's measurement currency. The Company is exposed to foreign exchange risk arising from various currency exposures primarily with respect to the US Dollar and the Euro. The Company's management monitors the exchange rate fluctuations on a continuous basis and acts accordingly.

NOTES TO THE FINANCIAL STATEMENTS
31 December 2014

**3. Financial risk management (continued)**

**3.4 Capital risk management**
Capital includes equity shares and share premium, convertible preference shares and loan from parent company

The Company manages its capital to ensure that it will be able to continue as a going concern while maximising the return to shareholders through the optimisation of the debt and equity balance. The Company's overall strategy remains unchanged from last year.

**4. Critical accounting estimates and judgements**

The preparation of financial statements in conformity with IFRSs requires the use of certain critical accounting estimates and requires Management to exercise its judgment in the process of applying the Company's accounting policies. It also requires the use of assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Although these estimates are based on Management's best knowledge of current events and actions, actual results may ultimately differ from those estimates.

Estimates and judgements are continually evaluated and are based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances.

The estimates and assumptions that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

- **Work in progress**

  Work in progress is stated at cost plus any attributable profit less any foreseeable losses and less amounts received or receivable as progress payments. The cost of work in progress includes materials, labour and direct expenses plus attributable overheads based on a normal level of activity. The Company uses its judgment to select a variety of methods and make assumptions that are mainly based on market conditions existing at each reporting date.

**5. Other operating income**

|  | 2014 | 2013 |
|---|---|---|
|  | € | € |
| Exchange profit | - | 50,399 |
|  | - | 50,399 |

NOTES TO THE FINANCIAL STATEMENTS
31 December 2014

### 6. Other expenses

| | 2014 € | 2013 € |
|---|---|---|
| Incorporation expenses | - | 2.360 |
| | - | 2.360 |

### 7. Finance costs

| | 2014 € | 2013 € |
|---|---|---|
| Net foreign exchange transaction losses | 1.687.556 | - |
| Interest expense | 2.312.716 | 437.969 |
| Sundry finance expenses | 944 | 1.937 |
| | 4.001.216 | 439.906 |

### 8. Tax

The tax on the Company's results before tax differs from the theoretical amount that would arise using the applicable tax rates as follows:

| | 2014 € | 2013 € |
|---|---|---|
| (Loss) before tax | (4.003.708) | (397.791) |
| | | |
| Tax calculated at the applicable tax rates | (500.464) | (49.724) |
| Tax effect of expenses not deductible for tax purposes | 210.989 | - |
| Tax effect of allowances and income not subject to tax | - | 49.724 |
| Tax effect of tax loss for the year/period | 289.475 | - |
| **Tax charge** | - | - |

The corporation tax rate is 12,5%.

Under certain conditions, interest income may be subject to defence contribution at the rate of 30% (15% to 29 April 2013). In such cases, this interest will be exempt from corporation tax.

Due to tax losses sustained in the year, no tax liability arises on the Company. Under current legislation, tax losses may be carried forward and be set off against taxable income of the five succeeding years.

**YESREB HOLDING LIMITED**

**9. Inventories**

|  | 2014 | 2013 |
|---|---|---|
|  | € | € |
| Property under development | 14.379.249 | 14.317.065 |
|  | 14.379.249 | 14.317.065 |

Development site at Watford, 24 Shrewsbury Road, Dublin

It is a residential house with a large back garden. It has an initial building permit to construct an additional 3 houses in the garden and extend the main house. The building permit is under appeal.

Inventories are stated at cost.

**10. Share capital**

|  | 2014 Number of shares | 2014 € | 2013 Number of shares | 2013 € |
|---|---|---|---|---|
| **Authorised** |  |  |  |  |
| Ordinary shares of €1 each | 2.000 | 2.000 | 2.000 | 2.000 |
| **Issued and fully paid** |  |  |  |  |
| Balance at 1 January | 2.000 | 2.000 | - | - |
| Issue of shares | - | - | 2.000 | 2.000 |
| **Balance at 31 December** | 2.000 | 2.000 | 2.000 | 2.000 |

**11. Borrowings**

|  | 2014 | 2013 |
|---|---|---|
|  | € | € |
| **Non-current borrowings** |  |  |
| Other loans | 2.316.149 | 4.411.065 |
| Loans from related companies (Note 13.1) | 16.453.823 | 10.295.506 |
|  | 18.769.972 | 14.706.571 |

NOTES TO THE FINANCIAL STATEMENTS
31 December 2014

### 11. Borrowings (continued)

Maturity of non-current borrowings:

|  | 2014 | 2013 |
|---|---|---|
|  | € | € |
| Between two and five years | 18.769.972 | 14.706.571 |

Other payable loan with principal amount of €4.288.197 and interest balance of €122.868 bearsinterest of 1.25% per annum and is repayable on 2018.

### 12. Trade and other payables

|  | 2014 | 2013 |
|---|---|---|
|  | € | € |
| Shareholders' current accounts - credit balances (Note 13.2) | 3.726 | 3.726 |
| Accruals | 4.633 | 2.142 |
| Other creditors | 417 | 417 |
|  | 8.776 | 6.285 |

The fair values of trade and other payables due within one year approximate to their carrying amounts as presented above.

### 13. Related party transactions

The following transactions were carried out with related parties:

### 13.1 Loans from related undertakings (Note 11)

|  | 2014 | 2013 |
|---|---|---|
|  | € | € |
| Bloem (PTC) Ltd | 16.453.823 | 10.295.506 |
|  | 16.453.823 | 10.295.506 |

Loan payable to Bloem (PTC) Ltd bears interest of 17% and is repayable by 5 September 2018.

### 13.2 Shareholders' current accounts - credit balances (Note 12)

|  | 2014 | 2013 |
|---|---|---|
|  | € | € |
| Shareholder's current account | 3.726 | 3.726 |
|  | 3.726 | 3.726 |

The shareholders' current accounts are interest free, and have no specified repayment date.

NOTES TO THE FINANCIAL STATEMENTS
31 December 2014

**14. Contingent liabilities**

The Company had no contingent liabilities as at 31 December 2014.

**15. Commitments**

The Company had no capital or other commitments as at 31 December 2014.

**16. Events after the reporting period**

There were no material events after the reporting period, which have a bearing on the understanding of the financial statements.

**Independent auditor's report on pages 4 and 5**

DETAILED INCOME STATEMENT
31 December 2014

|  | Page | **2014**<br>**€** | 2013<br>€ |
|---|---|---|---|
| **Revenue** | | | |
| Unrealised foreign exchange profit | | **-** | 50.399 |
| | | **-** | 50.399 |
| **Operating expenses** | | | |
| Administration expenses | 19 | **(2.492)** | (5.924) |
| | | **(2.492)** | 44.475 |
| **Other operating expenses** | | | |
| Incorporation expenses | | **-** | (2.360) |
| **Operating (loss)/profit** | | **(2.492)** | 42.115 |
| Finance costs | 20 | **(4.001.216)** | (439.906) |
| **Net loss for the year/period before tax** | | **(4.003.708)** | (397.791) |

SELLING AND DISTRIBUTION EXPENSES
31 December 2014

|  | 2014 | 2013 |
|---|---:|---:|
|  | € | € |
| **Administration expenses** | | |
| Annual levy | **350** | 350 |
| Auditors' remuneration | **2.142** | 2.142 |
| Other professional fees | **-** | 1.844 |
| Management fees | **-** | 165 |
| Representation fees | **-** | 1.423 |
|  | **2.492** | 5.924 |

FINANCE COSTS
31 December 2014

|  | 2014<br>€ | 2013<br>€ |
|---|---:|---:|
| **Finance costs** | | |
| **Interest expense** | | |
| Loan interest | 2.312.716 | 437.969 |
| **Sundry finance expenses** | | |
| Bank charges | 944 | 1.937 |
| **Net foreign exchange transaction losses** | | |
| Unrealised foreign exchange loss | 1.687.556 | - |
| | 4.001.216 | 439.906 |

**YESREB HOLDING LIMITED**

REPORT AND FINANCIAL STATEMENTS
31 December 2015

**P.G. ECONOMIDES & CO LIMITED**
**Chartered Certified Accountants**

# YESREB HOLDING LIMITED

REPORT AND FINANCIAL STATEMENTS
31 December 2015

| CONTENTS | PAGE |
|---|---|
| Board of Directors and other officers | 1 |
| Report of the Board of Directors | 2 - 3 |
| Independent auditor's report | 4 - 5 |
| Statement of profit or loss and other comprehensive income | 6 |
| Statement of financial position | 7 |
| Statement of changes in equity | 8 |
| Cash flow statement | 9 |
| Notes to the financial statements | 10 - 17 |
| Additional information to the statement of profit or loss and other comprehensive income | 18 - 20 |

# YESREB HOLDING LIMITED

BOARD OF DIRECTORS AND OTHER OFFICERS

| | |
|---|---|
| **Board of Directors:** | Totaltrust Management Limited |
| **Company Secretary:** | Totalserve Management Limited |
| **Independent Auditors:** | P.G. Economides & Co Limited<br>Chartered Certified Accountants |
| **Registered office:** | Totalserve House<br>17 Gr. Xenopoulou Street<br>3106 Limassol<br>Cyprus |
| **Banker:** | Hellenic Bank Public Company Ltd |

REPORT OF THE BOARD OF DIRECTORS

The Board of Directors presents its report and audited financial statements of the Company for the year ended 31 December 2015.

**Principal activities**
The principal activities of the Company, which are unchanged from last year, is property development.

**Review of current position, future developments and significant risks**
The Company's development to date, financial results and position as presented in the financial statements are not considered satisfactory and the Board of Directors is making an effort to reduce the Company's losses.

The main risks and uncertainties faced by the Company and the steps taken to manage these risks, are described in note 3 of the financial statements.

**Results**
The Company's results for the year are set out on page 6.

**Dividends**
The Company did not have any distributable profits as at 31 December 2015, thus the Board of Directors cannot recommend the payment of a dividend.

**Share capital**
There were no changes in the share capital of the Company during the year under review.

**Board of Directors**
The sole member of the Company's Board of Directors as at 31 December 2015 and at the date of this report is presented on page 1. The sole Director was a member of the Board of Directors throughout the year ended 31 December 2015.

In accordance with the Company's Articles of Association the sole Director presently member of the Board continues in office.

There were no significant changes in the remuneration of the Board of Directors.

**Events after the reporting period**
There were no material events after the reporting period, which have a bearing on the understanding of the financial statements.

**YESREB HOLDING LIMITED**

REPORT OF THE BOARD OF DIRECTORS

**Independent Auditors**
The Independent Auditors, P.G. Economides & Co Limited, have expressed their willingness to continue in office and a resolution giving authority to the Board of Directors to fix their remuneration will be proposed at the Annual General Meeting.

By order of the Board of Directors,

Totaltrust Management Limited
Director

Limassol, 29 November 2016

**Independent auditor's report**

**To the Members of Yesreb Holding Limited**

**Report on the financial statements**

We have audited the financial statements of Yesreb Holding Limited (the "Company") on pages 6 to 17 which comprise the statement of financial position as at 31 December 2015, and the statements of profit or loss and other comprehensive income, changes in equity and cash flows for the year then ended, and a summary of significant accounting policies and other explanatory information.

*Board of Directors' responsibility for the financial statements*

The Board of Directors is responsible for the preparation of financial statements that give a true and fair view in accordance with International Financial Reporting Standards as adopted by the European Union and the requirements of the Cyprus Companies Law, Cap. 113, and for such internal control as the Board of Directors determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with International Standards on Auditing. Those Standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation of financial statements that give a true and fair view in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by the Board of Directors, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

4

**Independent auditor's report (continued)**

**To the Members of Yesreb Holding Limited**

*Opinion*

In our opinion, the financial statements give a true and fair view of the financial position of Yesreb Holding Limited as at 31 December 2015, and of its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards as adopted by the European Union and the requirements of the Cyprus Companies Law, Cap. 113.

*Emphasis of matter*

We draw attention to note 2 to the financial statements which indicates that the Company incurred a loss of €3.956.060 during the year ended 31 December 2015, and, as at that date its liabilities exceeded its assets by €8.355.559. These conditions, along with other matters as set forth in note 2 indicate the existence of a material uncertainty which may cast significant doubt about the Company's ability to continue as a going concern. Our opinion is not qualified in respect of this matter.

**Report on other legal requirements**

Pursuant to the additional requirements of the Auditors and Statutory Audits of Annual and Consolidated Accounts Laws of 2009 and 2013, we report the following:
- We have obtained all the information and explanations we considered necessary for the purposes of our audit.
- In our opinion, proper books of account have been kept by the Company, so far as appears from our examination of these books.
- The Company's financial statements are in agreement with the books of account.
- In our opinion and to the best of our information and according to the explanations given to us, the financial statements give the information required by the Cyprus Companies Law, Cap. 113, in the manner so required.
- In our opinion, the information given in the report of the Board of Directors is consistent with the financial statements.

**Other matter**

This report, including the opinion, has been prepared for and only for the Company's members as a body in accordance with Section 34 of the Auditors and Statutory Audits of Annual and Consolidated Accounts Laws of 2009 and 2013 and for no other purpose. We do not, in giving this opinion, accept or assume responsibility for any other purpose or to any other person to whose knowledge this report may come to.

Galatia Efstathiou
Certified Public Accountant and Registered Auditor
for and on behalf of
**P.G. ECONOMIDES & CO LIMITED**
**Chartered Certified Accountants**

Limassol, 29 November 2016

5

**YESREB HOLDING LIMITED**

STATEMENT OF PROFIT OR LOSS AND OTHER COMPREHENSIVE INCOME
31 December 2015

|  | Note | 2015 € | 2014 € |
|---|---|---|---|
|  |  | - | - |
| Administration expenses |  | (2.492) | (2.492) |
| **Operating loss** | 5 | (2.492) | (2.492) |
| Finance costs | 6 | (3.953.568) | (4.001.216) |
| **(Loss) before tax** |  | (3.956.060) | (4.003.708) |
| **Net loss for the year** |  | (3.956.060) | (4.003.708) |
| **Other comprehensive income** |  | - | - |
| **Total comprehensive income for the year** |  | (3.956.060) | (4.003.708) |

The notes on pages 10 to 17 form an integral part of these financial statements.

6

STATEMENT OF FINANCIAL POSITION
31 December 2015

| | Note | **2015**<br>**€** | 2014<br>€ |
|---|---|---|---|
| **ASSETS** | | | |
| **Current assets** | | | |
| Inventories | 8 | **14.431.554** | 14.379.249 |
| Cash at bank and in hand | | **26.740** | - |
| | | **14.458.294** | 14.379.249 |
| **Total assets** | | **14.458.294** | 14.379.249 |
| **EQUITY AND LIABILITIES** | | | |
| **Equity** | | | |
| Share capital | 9 | **2.000** | 2.000 |
| Accumulated losses | | **(8.357.559)** | (4.401.499) |
| **Total equity** | | **(8.355.559)** | (4.399.499) |
| **Non-current liabilities** | | | |
| Borrowings | 10 | **22.802.585** | 18.769.972 |
| | | **22.802.585** | 18.769.972 |
| **Current liabilities** | | | |
| Trade and other payables | 11 | **11.268** | 8.776 |
| | | **11.268** | 8.776 |
| **Total liabilities** | | **22.813.853** | 18.778.748 |
| **Total equity and liabilities** | | **14.458.294** | 14.379.249 |

On 29 November 2016 the Board of Directors of Yesreb Holding Limited authorised these financial statements for issue.


................................
Totaltrust Management Limited
Director

The notes on pages 10 to 17 form an integral part of these financial statements.

7

STATEMENT OF CHANGES IN EQUITY
31 December 2015

| | Share capital €| Accumulated losses €| Total €|
|---|---|---|---|
| **Balance at 1 January 2014** | 2.000 | (397.791) | (395.791) |
| **Comprehensive income** | | | |
| Net loss for the year | - | (4.003.708) | - |
| **Balance at 31 December 2014/ 1 January 2015** | 2.000 | (4.401.499) | (4.399.499) |
| **Comprehensive income** | | | |
| Net loss for the year | - | (3.956.060) | (3.956.060) |
| **Balance at 31 December 2015** | 2.000 | (8.357.559) | (8.355.559) |

Companies which do not distribute 70% of their profits after tax, as defined by the relevant tax law, within two years after the end of the relevant tax year, will be deemed to have distributed as dividends 70% of these profits. Special contribution for defence at 17% will be payable on such deemed dividends to the extent that the ultimate shareholders are both Cyprus tax resident and Cyprus domiciled. The amount of deemed distribution is reduced by any actual dividends paid out of the profits of the relevant year at any time. This special contribution for defence is payable by the Company for the account of the shareholders.

The notes on pages 10 to 17 form an integral part of these financial statements.

8

CASH FLOW STATEMENT
31 December 2015

|  | Note | **2015** €  | 2014 € |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** |  |  |  |
| **(Loss) before tax** |  | **(3.956.060)** | (4.003.708) |
| Adjustments for: |  |  |  |
| Unrealised exchange loss |  | **1.346.005** | 1.687.556 |
| Interest expense | 6 | **2.598.608** | 2.312.716 |
|  |  | **(11.447)** | (3.436) |
| **Changes in working capital:** |  |  |  |
| Increase in inventories |  | **(52.305)** | (62.185) |
| Increase in trade and other payables |  | **2.492** | 2.492 |
| **Cash used in operations** |  | **(61.260)** | (63.129) |
|  |  |  |  |
| **CASH FLOWS FROM INVESTING ACTIVITIES** |  | **-** | - |
|  |  |  |  |
| **CASH FLOWS FROM FINANCING ACTIVITIES** |  |  |  |
| Proceeds from borrowings |  | **4.032.613** | 4.063.401 |
| Unrealised exchange (loss) |  | **(1.346.005)** | (1.687.556) |
| Interest paid |  | **(2.598.608)** | (2.312.716) |
| **Net cash generated from financing activities** |  | **88.000** | 63.129 |
| **Net increase in cash and cash equivalents** |  | **26.740** | - |
| **Cash and cash equivalents at end of the year** |  | **26.740** | - |

The notes on pages 10 to 17 form an integral part of these financial statements.

9

**YESREB HOLDING LIMITED**

NOTES TO THE FINANCIAL STATEMENTS
31 December 2015

## 1. Incorporation and principal activities

### Country of incorporation

The Company Yesreb Holding Limited (the "Company") was incorporated in Cyprus on 21 February 2013 as a private limited liability company under the provisions of the Cyprus Companies Law, Cap. 113. Its registered office is at Totalserve House, 17 Gr. Xenopoulou stree, 3106 Limassol, Cyprus.

### Principal activities

The principal activities of the Company, which are unchanged from last year, is property development.

## 2. Significant accounting policies

The principal accounting policies adopted in the preparation of these financial statements are set out below. These policies have been consistently applied to all years presented in these financial statements unless otherwise stated.

### Basis of preparation

The financial statements have been prepared in accordance with International Financial Reporting Standards (IFRSs) as adopted by the European Union (EU) and the requirements of the Cyprus Companies Law, Cap.113. The financial statements have been prepared under the historical cost convention as modified by the revaluation of and investment property.

### Adoption of new and revised IFRSs

During the current year the Company adopted all the new and revised International Financial Reporting Standards (IFRS) that are relevant to its operations and are effective for accounting periods beginning on 1 January 2015. This adoption did not have a material effect on the accounting policies of the Company.

At the date of approval of these financial statements, standards and interpretations were issued by the International Accounting Standards Board which were not yet effective. Some of them were adopted by the European Union and others not yet. The Board of Directors expects that the adoption of these accounting standards in future periods will not have a material effect on the financial statements of the Company.

### Finance costs

Interest expense and other borrowing costs are charged to profit or loss as incurred.

NOTES TO THE FINANCIAL STATEMENTS
31 December 2015

## 2. Significant accounting policies (continued)

**Foreign currency translation**

(1)     <u>Functional and presentation currency</u>
        Items included in the Company's financial statements are measured using the currency
        of the primary economic environment in which the entity operates ('the functional
        currency'). The financial statements are presented in Euro (€), which is the Company's
        functional and presentation currency.

(2)     <u>Transactions and balances</u>
        Foreign currency transactions are translated into the functional currency using the
        exchange rates prevailing at the dates of the transactions. Foreign exchange gains and
        losses resulting from the settlement of such transactions and from the translation at
        year-end exchange rates of monetary assets and liabilities denominated in foreign
        currencies are recognised in profit or loss.

**Cash and cash equivalents**

For the purpose of the cash flow statement, cash and cash equivalents comprise cash at bank.

**Borrowings**

Borrowings are recorded initially at the proceeds received, net of transaction costs incurred.
Borrowings are subsequently stated at amortised cost. Any difference between the proceeds (net
of transaction costs) and the redemption value is recognised in profit or loss over the period of
the borrowings using the effective interest method.

**Land and buildings under development**

The cost of land and buildings under development and completed buildings for sale comprise the
cost of acquiring the land and the development costs of the buildings. The development cost of
the buildings includes raw materials, direct labour cost, depreciation of plant and equipment and
other indirect costs of construction.

The land for development is carried at cost and included in land and buildings under
development at the reporting date.

**Share capital**

Ordinary shares are classified as equity.

**YESREB HOLDING LIMITED**

NOTES TO THE FINANCIAL STATEMENTS
31 December 2015

**2. Significant accounting policies (continued)**

**Provisions**

Provisions are recognised when the Company has a present legal or constructive obligation as a result of past events, it is probable that an outflow of resources will be required to settle the obligation, and a reliable estimate of the amount can be made. Where the Company expects a provision to be reimbursed, for example under an insurance contract, the reimbursement is recognised as a separate asset but only when the reimbursement is virtually certain.

**Non-current liabilities**

Non-current liabilities represent amounts that are due more than twelve months from the reporting date.

**Comparatives**

Where necessary, comparative figures have been adjusted to conform to changes in presentation in the current year.

**3. Financial risk management**

**Financial risk factors**

The Company is exposed to interest rate risk, credit risk, liquidity risk, currency risk and capital risk management arising from the financial instruments it holds. The risk management policies employed by the Company to manage these risks are discussed below:

**3.1 Interest rate risk**

Interest rate risk is the risk that the value of financial instruments will fluctuate due to changes in market interest rates. The Company's income and operating cash flows are substantially independent of changes in market interest rates as the Company has no significant interest-bearing assets. The Company is exposed to interest rate risk in relation to its non-current borrowings. Borrowings issued at variable rates expose the Company to cash flow interest rate risk. Borrowings issued at fixed rates expose the Company to fair value interest rate risk. The Company's management monitors the interest rate fluctuations on a continuous basis and acts accordingly.

**3.2 Credit risk**

Credit risk arises when a failure by counter parties to discharge their obligations could reduce the amount of future cash inflows from financial assets on hand at the reporting date. The Company has no significant concentration of credit risk. The Company has policies in place to ensure that sales of products and services are made to customers with an appropriate credit history and monitors on a continuous basis the ageing profile of its receivables.

**YESREB HOLDING LIMITED**

NOTES TO THE FINANCIAL STATEMENTS
31 December 2015

**3. Financial risk management (continued)**

**3.3 Liquidity risk**
Liquidity risk is the risk that arises when the maturity of assets and liabilities does not match. An unmatched position potentially enhances profitability, but can also increase the risk of losses. The Company has procedures with the object of minimising such losses such as maintaining sufficient cash and other highly liquid current assets and by having available an adequate amount of committed credit facilities.

**3.4 Currency risk**
Currency risk is the risk that the value of financial instruments will fluctuate due to changes in foreign exchange rates. Currency risk arises when future commercial transactions and recognised assets and liabilities are denominated in a currency that is not the Company's measurement currency. The Company is exposed to foreign exchange risk arising from various currency exposures primarily with respect to the US Dollar and the Euro. The Company's management monitors the exchange rate fluctuations on a continuous basis and acts accordingly.

**3.5 Capital risk management**
Capital includes equity shares and share premium, convertible preference shares and loan from parent company

The Company manages its capital to ensure that it will be able to continue as a going concern while maximising the return to shareholders through the optimisation of the debt and equity balance. The Company's overall strategy remains unchanged from last year.

**4. Critical accounting estimates and judgements**

The preparation of financial statements in conformity with IFRSs requires the use of certain critical accounting estimates and requires Management to exercise its judgment in the process of applying the Company's accounting policies. It also requires the use of assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Although these estimates are based on Management's best knowledge of current events and actions, actual results may ultimately differ from those estimates.

Estimates and judgements are continually evaluated and are based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances.

NOTES TO THE FINANCIAL STATEMENTS
31 December 2015

**4. Critical accounting estimates and judgements (continued)**

The estimates and assumptions that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

- **Work in progress**

  Work in progress is stated at cost plus any attributable profit less any foreseeable losses and less amounts received or receivable as progress payments. The cost of work in progress includes materials, labour and direct expenses plus attributable overheads based on a normal level of activity. The Company uses its judgment to select a variety of methods and make assumptions that are mainly based on market conditions existing at each reporting date.

**5. Operating loss**

|  | 2015 | 2014 |
|---|---|---|
|  | € | € |
| Operating loss is stated after charging the following items: |  |  |
| Auditors' remuneration | 2.142 | 2.142 |

**6. Finance costs**

|  | 2015 | 2014 |
|---|---|---|
|  | € | € |
| Net foreign exchange transaction losses | 1.346.005 | 1.687.556 |
| Interest expense | 2.598.608 | 2.312.716 |
| Sundry finance expenses | 8.955 | 944 |
|  | 3.953.568 | 4.001.216 |

**7. Tax**

The tax on the Company's results before tax differs from the theoretical amount that would arise using the applicable tax rates as follows:

|  | 2015 | 2014 |
|---|---|---|
|  | € | € |
| (Loss) before tax | (3.956.060) | (4.003.708) |
| Tax calculated at the applicable tax rates | (494.508) | (500.464) |
| Tax effect of expenses not deductible for tax purposes | 168.295 | 210.989 |
| Tax effect of tax loss for the year | 326.213 | 289.475 |
| **Tax charge** | - | - |

NOTES TO THE FINANCIAL STATEMENTS
31 December 2015

### 7. Tax (continued)

The corporation tax rate is 12,5%.

Under certain conditions, interest income may be subject to defence contribution at the rate of 30%. In such cases, this interest will be exempt from corporation tax.

Due to tax losses sustained in the year, no tax liability arises on the Company. Under current legislation, tax losses may be carried forward and be set off against taxable income of the five succeeding years.

### 8. Inventories

|  | **2015** | 2014 |
|---|---|---|
|  | **€** | € |
| Property under development | **14.431.554** | 14.379.249 |
|  | **14.431.554** | 14.379.249 |

Development site at Watford, 24 Shrewsbury Road, Dublin

It is a residential house with a large back garden. It has an initial building permit to construct an additional 3 houses in the garden and extend the main house. The building permit is under appeal.

Inventories are stated at cost.

### 9. Share capital

|  | **2015** | **2015** | 2014 | 2014 |
|---|---|---|---|---|
|  | **Number of shares** | **€** | Number of shares | € |
| **Authorised** |  |  |  |  |
| Ordinary shares of €1 each | **2.000** | **2.000** | 2.000 | 2.000 |
|  |  |  |  |  |
| **Issued and fully paid** |  |  |  |  |
| Balance at 1 January | **2.000** | **2.000** | 2.000 | 2.000 |
| **Balance at 31 December** | **2.000** | **2.000** | 2.000 | 2.000 |

NOTES TO THE FINANCIAL STATEMENTS
31 December 2015

**10. Borrowings**

|  | 2015 | 2014 |
|---|---|---|
|  | € | € |
| **Non-current borrowings** |  |  |
| Other loans | **2.343.174** | 2.316.149 |
| Loans from related companies (Note 12.1) | **20.459.411** | 16.453.823 |
|  | **22.802.585** | 18.769.972 |

Maturity of non-current borrowings:

|  | 2015 | 2014 |
|---|---|---|
|  | € | € |
| Between two and five years | **22.802.585** | 18.769.972 |

Other payable loan bears interest of 1.25% per annum and is repayable on 2018.

**11. Trade and other payables**

|  | 2015 | 2014 |
|---|---|---|
|  | € | € |
| Shareholders' current accounts - credit balances (Note 12.2) | **3.726** | 3.726 |
| Accruals | **7.125** | 4.633 |
| Other creditors | **417** | 417 |
|  | **11.268** | 8.776 |

The fair values of trade and other payables due within one year approximate to their carrying amounts as presented above.

**12. Related party transactions**

The following transactions were carried out with related parties:

**12.1 Loans from related undertakings (Note 10)**

|  | 2015 | 2014 |
|---|---|---|
|  | € | € |
| Bloem (PTC) Ltd | **20.459.411** | 16.453.823 |
|  | **20.459.411** | 16.453.823 |

Loan payable to Bloem (PTC) Ltd bears interest of 17% and is repayable by 5 September 2018.

NOTES TO THE FINANCIAL STATEMENTS
31 December 2015

**12. Related party transactions (continued)**

**12.2 Shareholders' current accounts - credit balances (Note 11)**

|  | **2015** | 2014 |
|---|---|---|
|  | **€** | € |
| Shareholder's current account | **3.726** | 3.726 |
|  | **3.726** | 3.726 |

The shareholders' current accounts are interest free, and have no specified repayment date.

**13. Contingent liabilities**

The Company had no contingent liabilities as at 31 December 2015.

**14. Commitments**

The Company had no capital or other commitments as at 31 December 2015.

**15. Events after the reporting period**

There were no material events after the reporting period, which have a bearing on the understanding of the financial statements.

**Independent auditor's report on pages 4 and 5**

**YESREB HOLDING LIMITED**

DETAILED INCOME STATEMENT
31 December 2015

| | Page | 2015 € | 2014 € |
|---|---|---|---|
| **Operating expenses** | | | |
| Administration expenses | 19 | (2.492) | (2.492) |
| **Operating loss** | | **(2.492)** | (2.492) |
| Finance costs | 20 | **(3.953.568)** | (4.001.216) |
| **Net loss for the year before tax** | | **(3.956.060)** | (4.003.708) |

SELLING AND DISTRIBUTION EXPENSES
31 December 2015

|  | **2015**<br>**€** | 2014<br>€ |
|---|---|---|
| **Administration expenses** | | |
| Annual levy | **350** | 350 |
| Auditors' remuneration | **2.142** | 2.142 |
| | **2.492** | 2.492 |

FINANCE COSTS
31 December 2015

|  | 2015 € | 2014 € |
|---|---|---|
| **Finance costs** | | |
| **Interest expense** | | |
| Loan interest | **2.598.608** | 2.312.716 |
| **Sundry finance expenses** | | |
| Bank charges | **8.955** | 944 |
| **Net foreign exchange transaction losses** | | |
| Unrealised foreign exchange loss | **1.346.005** | 1.687.556 |
| | **3.953.568** | 4.001.216 |

EXHIBIT C

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT No. 2478

AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015


AFFIDAVIT OF SEAN DUNNE

I, **SEAN DUNNE**, a bankrupt, of Broome House, Broomfield Park, Ascot, Surrey, UK aged 21 years and upwards MAKE OATH AND SAY as follows:

1. I make this affidavit form facts within my own knowledge save whereso otherwise appears I believe same to be true and accurate.

**Attempts to bias the Court**

2. I wish to draw to the Court's attention that the Applicant has referred to adverse statements made by other Judges in different proceedings and on different facts.

3. The findings in AA v BA;CD have been referred to by the Official Assignee in his submissions to the Court as a basis for resisting my application and has made a contempt of court application. This is a pattern that has existed in submissions for every court action I have been involved since the start of my bankruptcy.

4. The Official Assignee is fully aware that the decision in AA v BA is highly controversial due to the fact I have been deprived due process in challenging the findings in AA v BB. These findings are flawed and the consistent obfuscation by the highest court in Ireland is laid bare by the correspondence I have had in relation to its findings. Having seen behind the false façade of how the Highest Court in Ireland operates it is of great concern to me that all my complaints of bias have been ignored. My bankruptcy has been used as a sword to deny me the right to

1

a fair hearing. The personal vendettas against me have been carried on to the bench by former senior counsel and have been allowed to be exercised unfettered.

5. The Official Assignee has made a contempt of court application which is a quasi-criminal application. The use of previous comments by judges in unrelated proceedings is a knowing attempt to prejudice the proceedings and ensure that I do not obtain a fair hearing. The Official Assignee has played a key role in denying me, my constitutional rights by objecting to me having my bias application heard. He then seeks to use the very same impugned decisions against me. This is totally inappropriate from certified experienced legal professionals who should know better. This again is proof of an ongoing abuse of process, oppression, harassment and scorched earth litigation in seeking to deprive my four minor children who are in my primary care the right to a father who will and is required to care for all their needs. The constitutional rights of my children are not allowed to stand.

6. I refer to the impugned Supreme Court decision of AA v BA regarding judicial misconduct in the judgment of Ms Justice Irvine in the High Court on 10 June 2009 in matrimonial proceedings regarding my first marriage. The now Chief Justice Clarke wrote the lead judgment in the appeal though he had a glaring conflict of interest which he did not declare.

7. Judicial bias concerning me has been and remains a major issue in my bankruptcy from the outset. It dates back to the findings of Justice Irvine in June 2009, affirmed by the new Chief Justice, Frank Clarke, in July 2014.

### Background

8. Firstly, in June of this year, the Chief Justice Frank Clarke sitting in a quasi-judicial role on the Judicial Appointments Council realised there was a potential conflict in him selecting Ms Justice Irvine for promotion to the second highest judicial position in Ireland. This necessitated him to stand down to avoid accusations of a conflict of interest. Why was this necessary in this scenario but not in my case? Was it because this was a public forum where his previous extra marital relationship with Ms Justice Irvine would be under the public spotlight versus my family law appeal which was in an in camera hearing. My bias appeal was also held in camera and again allowed the Chief Justice and the Supreme Court to deny me my constitutional rights away from the public glare. I was denied a transparent disclosure as a citizen appearing

before the Highest Court in the land. There was no transparency, no disclosure of conflicts and therefore the fact of the relationship being hidden from me and other citizens clearly proves justice was not done or seen to be done fairly. No matter how embarrassing on a personal or marital level I was entitled to transparency given he was hearing an appeal from a lover or ex-lover. I understand fairness, justice and judicial transparency to be constitutional rights there is no question of political and constitutional importance that any citizen is above the law. The basic rights of an appellant are to be made aware of any personal or business relationship between the appellant panel of judges and the trial judge who are appointed by Chief Justice to hear the appeal. This can no longer be hidden from the citizens of Ireland who rely and depend on the Chief Justice and the Highest Courts in the land to uphold every facet of the law. Not alone must justice be dispensed but it must be seen to be done. In my unique situation of a dual bankruptcy my personal and economic rights have been trampled on and now the Official Assignee seeks to take away my right to liberty by relying on judgments he knows to be contested. The Supreme Court of Ireland neatly avoided having to address the questionable behaviour of their own colleagues by ruling that I do not have standing as a bankrupt to have this case reopened on the basis of judicial bias. They allowed another officer of the court, Mr Lehane, to stop me from asserting my most personal constitutional and human rights to clear my good name. Indeed Mr Lehane and the US Trustee seek to use the contested Supreme Court Judgement against me in various legal cases pertaining to my bankruptcy. It is hardly what our forefathers who fought for our independence and wrote the Constitution envisaged. If it was applicable law in a dictatorship it would be world news. I require the independence of the courts which I once believed in and trusted to be applied without fear or favour.

9. What is it that arose in June of this year that Chief Justice Clarke decided it was necessary to recuse himself from a perception of bias in being on a panel selecting Ms Justice Irvine to be President of the High Court? It is more important that he stand down in a law suit than as a member of quasi-judicial council as the former involves the rights of citizens before the Courts which cannot be undone. There must be greater scrutiny in relation to perception of bias where he is hearing an appeal from a judge he has a conflict of interest with and this must be disclosed to the citizen. I beg to refer to a copy of said article upon which I have marked SD1 prior to the swearing hereof.

10. In Justice Clarke's letter of 8 December 2017 he states:

*"I sat on the Court which heard the appeal in AA v BA; CD in 2013 and delivered one of the judgments in that matter the following year. I confirm that since my appointment as a judge in 2004 I have not had a relationship of the type to which you refer with any person who was, has since become or is a judge."*

His admittance to an affair, I say is in relation to the affair I have highlighted as being between himself and Ms Justice Irvine. I beg to refer to a copy of said letter upon which I have marked the initials SD2 prior to the swearing hereof.

11. Secondly, in relation multiple correspondence requesting an answer to a serious conflict of interest and my request for it to be investigated by the then Chief Justice, Ms Susan Denham, the Irish Judges Association and the Minister for Justice, Francis Fitzgerald TD, I received no traction and was continuously fobbed off. I contrast this sharply with how the Supreme Court sought fit and appropriate to deal with the recent "Golfgate" dinner and Supreme Court investigation. The allegations against Mr Justice Woulfe pale into insignificance compared with the allegations I made and continue to make against the Chief Justice of Ireland, Mr Frank Clarke. They can no longer remain hidden and it time a light is shone on them.

12. In "Golfgate", Chief Justice Clarke saw fit to appoint a former Chief Justice to interview Mr Justice Woulfe and prepare a report for him. Chief Justice Clarke then proceeded to ignore the former Chief Justice's report's recommendations and demand that Mr Justice Woulfe resign. There were no procedural problems with the way the independent report was compiled. It should have been accepted by Chief Justice Clarke and implemented. Mr Justice Woulfe was given a forum to explain his actions in what was perceived to be a fair hearing. The former Chief Justice found in his favour. However Chief Justice Clarke decided to ignore the outcome of an open transparent forum and to pursue his own personal agenda, his actions prove beyond reasonable doubt my very point of lack of integrity and a personal vendetta being mentioned by the Chief Justice rather than upholding the rights of the citizen.

13. During the Golfgate debacle, it was reported that Mr Justice Woulfe expressed concerns that he was worried his colleagues were biased against him. This indicates that even a Supreme Court judge has a lack of faith in his colleagues ability to be impartial.

14. When Mr Justice Woulfe refused to resign, Chief Justice Clarke published the private correspondence between the judges to pressurise Mr Justice Woulfe to resign in a trial by public opinion. When this was unsuccessful he then deemed it appropriate to send three of his colleagues to Mr Justice Woulfe's home to demand his resignation. A leading political party in Ireland was castigated by its opponents for the very same actions, wherein senior activists doorstepped a member who was critical of the party. In matters relating Chief Justice Clarke's own impropriety he has not sought fit to exercise any of these processes to decide whether it is appropriate for him to continue to sit on the bench in light of his behaviour in AA v BA. He has brazenly and steadfastly refused to enter into any sort of procedural process to assess his propriety to sit on the Highest Court. Unfortunately despite my many requests and applications the former Chief Justice, Ms Susan Denham, denied the right to due process. In relation to my contention of bias from the new Chief Justice of Ireland. I say his position is untenable and he should resign forthwith and an independent investigation be carried out. Where the independence of this panel is to be found is a further question which requires the input of Dail Eireann at this stage.

15. The background to this matter began in 1999. I purchased 166 acres of land at Woodtown Manor, Rathfarnham from Garech de Bruin, the purchase price was £1,950,000. I appointed Arthur Cox as my conveyancing solicitors I signed a contract paid a deposit of £500,000 which was forwarded to Solicitors for the vendor. Between exchange of contracts and closing, South Dublin County Council rezoned 33 acres of the site for housing. The value of those lands increased in value substantially overnight. It was the purchases good fortune which became vendor's sour grapes. It was a bizarre and vexatious claim.

16. As the sale had not closed my solicitors Arthur Cox and I were dumbfounded to receive a summons on behalf of the vendor which was signed off by his senior counsel Mr. Frank Clarke now Chief Justice of the Supreme Court alleging fraud on the part of Arthur Cox and myself in the execution of the contract.

17. An allegation of fraud is a very serious allegation which requires the highest proof to stand up. The legal threshold to prove fraud is well established and to get a senior counsel to sign off on pleadings alleging it requires substantive proof and just a bare assertion. In the Woodtown Manor case it was a baseless and trumped up claim that Mr Justice Clarke should never have put his name to. Arthur Cox solicitors and I took the matter very seriously. We retained Paul

Gallagher SC, current Attorney General and Mr. Donal O'Donnell SC, current Supreme Court judge.

18. The matter was settled in the corridors of the Four Courts a number of years later by me agreeing to double the price paid for the site. In the passage of time the value of the land being zoned and a rising market had escalated a multiple of many times. It was accepted by the vendor and his Senior Counsel that there was no basis to ground the claim of fraud and it was simply a *"try on"* to get more money given their bad timing and my good luck. For the record in 2005, I subsequently sold the 33 acres of land with the benefit of planning permission for €75 million. This caused further great annoyance to the vendor and his legal team who were close personal friends and who I had observed on occasions drinking in the Horse Show bar of the Shelbourne.

19. My legal team of Arthur Cox, Mr. Paul Gallagher and Donal O'Donnell had represented me on the number of very high profile legal cases including Whitewater Shopping Centre. In this dispute the differences at issue for a claim by Warren Private Clients to purchase my 50% interest in White Water Shopping Centre for €37m versus its actual value €197m. This was settled by Mr Donal Gleeson S.C. for Warren after I was cross examined for a day. I had the same Senior Counsel, Paul Gallagher and Donal O'Donnell. At all times in all cases I was found to be a truthful and reliable witness. As was normal at the end of all these cases and especially settlements, I took my legal team to lunch/dinner and over the discussions Donal O'Donnell informed me that Frank Clarke SC did not like me and bore me personal animosity.

20. My remark was this could only be to do with *"the Fine Gael blood in his veins"* as I had never met or spoken to him before and the closest I ever got to him was at Leopardstown races placing a bet in the ring. As I am not a man who bears and carries grudges and I asked Donal O'Donnell to tell him *"if we ever have a pint together hopefully he won't feel that way."* I forgot about the matter as I never expected to cross his path again in any of my dealings.

21. The next date Frank Clark's name appeared in my affairs was in June 2009 in relation to a family law judgment handed down by Ms Justice Irvine. This case concerned an allegation of fraud made by my first wife in the same manner that Frank Clarke SC had pushed in the Woodtown Manor deal i.e. concealment. There were similarities to the case that Clarke and De Bruin tried to impress against me in 1999 regarding options contracts, allegations of fraud

and non-disclosure. My first wife alleged I concealed and did not declare all my assets in the settlement of our divorce in 2001. I totally refuted such allegations and still do today. On receiving of the judgment and learning of the affair for the first time, I was very concerned that Ms Justice Irvine was being used as a conduit for Frank Clarke to get at me. It was not lost on me that this was the very same allegation which Frank Clarke had signed off in the Woodtown Manor proceedings. I refer to a copy of my letter dated 1 December 2015 to then Minister for Justice, Francis Fitzgerald and her response upon which I have marked SD3 prior to the swearing hereof.

22. When Judge Irvine "delivered judgment" in the case her judicial office were adjoined to Mr Justice Clarke. My knowledge of this is derived from me being brought to Judge Irvine's chambers when an urgent matter of child custody was required to be made during my in camera family law case. While I was not comfortable being brough to the chambers and while awaiting to be brought back into the court I stood out in the corridor. Judge Clarke with his tip staff was being brought back to his chambers and I encountered him in the corridor. I acknowledged the judge by saying "hello, judge". He did not pay me the courtesy of responding or even acknowledging me and walked straight into his chambers. This confirmed what my senior counsel Donal O'Donnell had told me, that he bore personal animosity towards me and it was obvious it remained in January 2009.

23. I was very concerned to hear a senior member of my legal team on the day Ms Justice Irvine delivered her judgment in June 2009 state:

> "Mary Irvine did not write that judgment. Frank Clarke did. She could not write such a judgment."

24. This person had previously worked under Mary Irvine when she was a senior counsel. The ruling of Ms Justice Irvine was reminiscent of the views of Mr. Justice Clarke from the Woodtown Manor case. I took the view that it would be nigh on impossible to prove and parked the matter that Mr Justice Clarke had an input into the matrimonial case. Despite this not sitting easy with me.

25. The next time Justice Clarke appeared on the radar was on 23 March 2012 in relation to a procedural issue regarding my family law appeal. At this time Frank Clarke had been appointed to the Supreme Court.

26. Due to the statements made by a senior member of my legal team in June 2009, that Mr Justice Frank Clarke allegedly wrote the judgment for Ms Justice Irvine, that he had acted against me in an allegation of fraud before and he was now a Supreme Court Judge, I felt it necessary to advise my legal team to politely ask or ensure Mr Justice Clarke did not adjudicate on my family law Supreme Court Appeal. I refer to a copy of my email dated 23 March 2012 wherein I state:

> *"Frank Clarke is the current or former beau of Irvine and cannot sit on any appeal involving me. Also acted against me in a High Court case."*

I beg to refer to a copy of said email upon which I have marked SD4 prior to the swearing hereof.

27. The weeks prior to my Supreme Court hearing of 25 June 2013, I received two emails from Clerkin Lynch solicitors dated 12 and 24 of June in response of my email at SD4. I was monitoring what the make-up of the Supreme Court panel would be. I beg to refer to a copy of said emails upon which I have marked SD5 prior to the swearing hereof.

28. I was advised that my appeal would be heard by a three person Supreme Court panel made up of Justices Hardiman, McKetchnie and McMenamin. I recall thinking this was a suitable panel as neither Frank Clarke nor Donal O'Donnell were not partaking in my appeal. Donal O'Donnell while a senior counsel had written and signed off on my 157 points of law appeal to the Surpeme Court on Justice Irvine's findings against me. He confirmed to me it was the most grounds of appeal on points of law ever submitted in the history of the state. In essence Justice Irvine ignored all precedent law on the threshold for a finding of fraud and invented new law to find against me. This was because Justice Irvine had strayed so far outside of standard applicable law and had an effect made and found "new law" to tailor the conclusions to the allegations of fraud to make a finding against me.

29. What has also perplexed me and for which I have never received an adequate answer is that on the day of my Supreme Court Appeal Mr. Justice Clarke and Mr Justice Murray were set down to take a different case. On the first day of my appeal being 2 July 2013, I was in the USA. I was not required to attend the appeal as it was on points of law. I was however dumbfounded later that evening being advised by my legal team that Mr. Justice McMenamin

had failed to turn up for my appeal and Mr. Justice Frank Clarke was the first available substitute to take his place. It's beyond belief that this was a mere a coincidence.

30. Frank Clarke in his letter of 8 December 2017 in response to how the circumstances arose states the following:

*"The alternation in the assignments to which you refer came at the request of the then Chief Justice. Such changes occur from time to time because of difficulties in judges sitting for one reason or another. I am unaware of the reasons which led to the Chief Justice to request a change of the formation in this case but can confirm that it did not stem from any issue on my side or request or suggestion from me. I do not think that it is fair to suggest that there was no prior notice of the change of assignments. My recollection was that the revised assignments appeared in the legal diary some days before the hearing."*

I exhibited this letter at SD2.

31. There are many amazing questions which arise out of this. The most obvious one that the revised assignments were in the legal diary which Mr Justice Clarke pretends to recall four and half years later without knowing the reasons. It quite clear he did a thorough review of the file and declines to be open honest and frank which further fuels my suspicions regarding impartiality and bias. How many other judges and state officials are complicit and implicated in this game of "hide the ball".

32. As is seen from subsequent correspondence I have never been provided with any explanation regarding how these circumstances arose. Was Mr Justice McMenamin sick, incapacitated, unavailable or did Justice McMenamin switch with Mr Justice Clarke and hear the case that Justice Clark was set down to hear. Given the power and reputation of the Supreme Court, one would expect that a simple straightforward honest explanation would be provided to me given the seriousness of my allegation of bias. The then Chief Justice of the Supreme Court, Ms Susan Denham, refused to answer the question and Mr Justice Clarke by his own letter of 8 December 2017 *"kicks to touch"* the simple request. I believe Judges McMenamin and Clarke have known each other since their days in school together in Blackrock College and my suspicions are heightened by the events surrounding Mr Justice Clarke's last minute substitution to the panel hearing my case, with no explanation.

9

33. Given the lead judgment in my appeal of Mr Justice Clarke, was a wholesale endorsement of Ms. Justice Irvine's judgment in its entirety, I was again taken aback. Mr Justice Clarke and the Supreme Court panel of Judges ignored the basic grounds of my appeal prepared by no an eminent colleague of theirs Mr Justice O'Donnell. Of the 157 points of law Justice Frank Clarke was able to condense and summarise the largest appeal ever lodged in the history of the state into 3 points of law and 5 conclusions. Under the Constitution and the European Convention on Human Rights, the Supreme Court are not permitted to ignore my grounds of appeal in yet again another breach of my rights to a fair hearing. The complex legal issues which had arisen at the hearing were now before the Supreme Court requiring a ruling in law. The entire panel of the Supreme Court demurred from making any such findings.

34. As is evident from my exhibited correspondence, I tried without success to obtain answers to the still unanswered question but I was blocked at every turn. The true facts must be explained, given that all of my bankruptcy and every decision carved out of my bankruptcy in Ireland and the US are predicated on very much impugned findings of fraud made by Justice Irvine and Justice Clarke against me. These are very serious findings that go to the root of my good name and credibility. I have always refuted these findings and continue my fight against these now through this BPO application which is also carved out of and relies on these same findings as made in AA v BA.

35. These findings have had overtime a devastating knock on effect on my personal relationship with my family and are continuing to affect my minor children, my two oldest who are nearly 16 and 14 who are in boarding school regularly browse the internet as do all of their friends. These matters have caused and continue to cause anxiety in their childhood. The illicitly concealed relationship of the two top holders of judicial office in Ireland should not work against the right of my children to a normal childhood. Their concealment of what has been public knowledge in the Four Courts, law library and judiciary for many years is symptomatic of dysfunction that pervades higher courts of the Irish Republic. Common knowledge conflicts on the bench are simply left as a personal matter for the judge in question and there is a culture of permissiveness in relation to their conduct in their personal lives and what cases judges consider they are fit to adjudicate upon.

36. The findings have always and continue to cause me great stress and concern. I was not prepared to let matters lie, I pursued these by way of taking an application to the Supreme

Court for an apprehension of bias in January 2015. I beg to refer to a copy of my grounding affidavit is marked SD6 prior to the swearing hereof.

37. In summary, the known facts and facts that require resolution by investigation are:

    ○ Mr Justice Clarke previously alleged fraud against me in pleadings he put his name to as a Senior Counsel in 1999. These were flawed.
    ○ Mr Justice Clarke and Ms Justice Irvine had a secret extra marital romantic relationship. This was concealed from me. Its length and duration are unknown to me.
    ○ Ms Justice Irvine made finding of facts against me in a matrimonial matter which included findings of fraud similar to the Woodtown Manor Case which Mr Justice Clark previously signed off on.
    ○ It was alleged by a senior member of my legal team that Mr Justice Clarke wrote or assisted in writing Ms Justice Irvine's judgment.
    ○ Mr Justice Clarke was substituted at late notice to the Supreme Court panel to sit on my appeal.
    ○ No explanation was forthcoming concerning how he came to be at the last minutes substituted with his old school friend Mr Justice McMenamin.
    ○ He ignored all of the legal arguments advanced by Donal O'Donnell, his Supreme Court colleague, to shoehorn her findings into the category of final and unappealable.
    ○ In Mr Justice Clarke's ruling Ms Justice Irvine's decision was affirmed on every point.
    ○ At no point did Mr Justice Clarke declare that there may be circumstances which would lead to an allegation of bias. On the pointing out of this dereliction of office, Mr Justice Clarke simply obfuscated and ceased correspondence.
    ○ My plight requires absent his resignation, his impeachment by Dail Eireann.

38. There are serious issues regarding the findings of fact made against me by Ms Justice Irvine, which were not addressed by the Supreme Court appeal and lead judgment of Chief Justice Frank Clarke.

39. On the 23rd day of January 2015 I commenced my application to have the decision in AA v BB set aside because of bias. An application which my legal team and I considered was unchallengeable given the public knowledge within the walls of the Four Courts concerning the relationship between Mr Justice Clarke and Ms Justice Irvine.

40. My timing was a cardinal error of mine. The error I made was that my appeal against the dual bankruptcy and an Irish bankruptcy was already before the Supreme Court. The Supreme Court ruled in May 2015 that despite the novelty of a dual bankruptcy, the complexities it would create, the absence of an international protocol that it was still in order to make me a dual bankrupt. This implies complicity by the panel of the Supreme Court who made me a dual bankrupt. They found it necessary to reign in control over me by having an officer of the Bankruptcy Court being the Official Assignee, Mr Chris Lehane, stand in my shoes as a declared bankrupt and neuter any issue of impropriety relating to the Chief Justice. My appeal of bias against findings of fraud are a personal right to a good name and a fair hearing. However the Irish Supreme Court made up of the Chief Justice, Judge Laffoy and Judge Charleton conflated the personal human rights conveniently with my commercial rights to my estate. Another perplexing judgment which confounded my UK legal team.

41. However I know see with the year of 2020 in hindsight, the real purpose of this was to prohibit my taking of the bias case which I had grounded in January 2015. I refer to letter dated 8 December 2017 at SD2 where Chief Justice Frank Clarke confirms in response to a query regarding an affair with Justice Irvine, he states the following:

> *"I can confirm that since my appointment as a judge in 2004 I have not had a relationship of the type to which you refer with any person who was, has since become or is a judge"*

42. Chief Justice Clarke also offered a legal opinion in his answer:

> *"As a matter of principle it is difficult to envisage circumstances in which the private lives of judges prior to their appointment as such and as a very significant remove in time could be relevant in the way you maintain."*

43. The queries this letter raised required a follow up letter dated 20 December 2017 which sets out many important propositions, *inter alia,* as follows:

> *"We did not ask the question which you have answered, nor did we limit our questions to only the time period on which you took up judicial office. Your response*

*deliberately limits matters in regard of any relationship in the time period whilst you were a judge."...*

*"However, our letter was written in contemplation of a legal challenge to the Supreme Court judgment and perhaps others and, with respect, our correspondence was not seeking your legal opinion on the issue, nor was our letter seeking your personal views on the merits of such application or the relevance of any matters relating to apparent bias. We say this respectfully, as no doubt you would agree that neither you nor Ms Justice Mary Irvine could possibly sit in judgment in an apparent bias case which may raise questions about any relationship you and she may have had at any time in the past."...*

*"However, to respond to our question by deliberately limiting the reference period, does come across as concerted obfuscation. That in itself raises deep concerns from our client, given that apparent bias and a lack of transparency is at the heart of [the] proposed challenge. We do not understand how it can be suggested or inferred, on principle, that an extant or past intimate relationship between a judge hearing an appeal and the judge whose decision is impugned in that appeal, is not be "relevant" in relation to a proposed legal challenge based on apparent bias."...*

*"We again ask for clarity on your position as regards any relationship you my have had at any time with Ms Justice Mary Irvine. If no intimate relationship has ever existed, then that will dispose of the matter."*

I beg to refer to a copy of said letter upon which I have marked SD7 prior to the swearing hereof.

44. In response Chief Justice Clarke wrote again on 22 January 2018 seeking to disengage and refusing to correspond any further. Again his answer consists in providing legal advice which was never sought from him. I beg to refer to a copy of said correspondence marked SD8 prior to the swearing hereof.

45. It is now obvious my bankruptcy was extended in breach of my rights under the European Convention on Human Rights to seek to deny me as a bankrupt the right to take a bias case

13

against the highest law officer in the land in relation to an allegation of fraud which affects my good name and reputation. It impinges on my family life and my children's childhood.

46. The Chief Justice of the Supreme Court and President of the High Court both are tasked with maintaining the highest levels of judicial probity in the Irish Court system. Indeed judges turn to both for guidance in matters of ethics. Chief Justice Clarke by letter dated 8 December 2017 tacitly admits to the relationship by equivocating on the matter. The fact of their relationship has been widely known and public in the environs of the Four Courts. While their lives outside of work are their own business that privilege is lost when it impinges on the apprehension of lack of judicial independence and impartiality in the cases before them. It becomes an issue for my family and I, especially for my minor children as these allegations impinge on their childhood and their right to know that their father is an honest, albeit hard-nosed when required, businessman who was washed away economically by the worldwide financial crisis of 2008. However this was not enough to quell the animosity Mr Justice Clarke felt towards me which dates back to 1999.

47. I wrote to the then Chief Justice, Ms Susan Denham on 17 October 2014 to which she responded on 10 November 2014. This was prior to the decision on my dual bankruptcy which had not yet been determined. I beg to refer to said letter upon which I have marked the SD9 prior to the swearing hereof.

48. I believe her response may even be incorrect as the matter should have actually been commenced in the High Court.

49. On 1 December 2015, I wrote to the Minister for Justice Francis Fitzgerald who was also Tanaiste. My letter sets out the history for the Minister for Justice, in case it was news to her although I have my suspicion that it was not.

50. On 6 December 2015 I wrote to the Chief Justice and The Association of Judges of Ireland. I also wrote to the President of the High Court, Mr Justice Kelly on 29 March 2017. I cannot recall getting a response however the key points I raised were and remain unanswered today five years later:

   ○ How did Justice Frank Clarke end up sitting on my Supreme Court appeal on Judge Irvine's 2009 judgment at the very last minute?

- Why did he think it was appropriate for him to sit in judgment of his romantic/former romantic partner's decision?

- Are you, as Chief Justice aware of the relationship between Mr Justice Clarke and Ms Justice Irvine, and if so, why did you allow him to sit as an appeal court judge on two of her cases and allow him to write the lead judgment in both?

- What knowledge did the other two presiding judges who sat on the panel, judges Hardiman and McKechnie, have of the relationship between judges Irvine and Clark?

- Will the courts allow the Official Assignee, Christopher Lehane, and the US Trustee in Bankruptcy, Richard Coan, to use the contested judgment against me and attempt to use them against my wife, Gayle Dunne, who is a holy innocent party to my separation and divorce. We met in August 2002 after my first wife filed for judicial separation in 1996. To date both the OA and Trustee used decision against me in order to prejudice other Courts against me and have and have denied me the opportunity to contest the judgments.

51. I signed off my letter with the following request:

> *"I would respectfully ask you to respond to me on this more serious matter by close of business this week as I believe all of the points herein are not new to you."*

I am unaware whether or not I received a response as I do not have one on file. However if I did, it was now standard for the Judiciary to avoid the simple questions posed of them. How easy it would have been if there was no veracity to the prior existence of a relationship to say *"you are stark raving mad and you will be sued for defamation if you dare make such allegations again impugning the good name of Mr Justice Clarke and Ms Justice Irvine."* My letters were not from a crank with nothing better to do.

52. I beg to refer to a copy of said correspondence upon which I have marked **SD10** prior to the swearing hereof.

53. The deafening silence in response to the simplest of queries requires serious scrutiny.

54. In summary I stated as a bankrupt I am conveniently found not to have standing to have a case sent back for a hearing on the basis of judicial bias.

55. I stated:

> "*it is not acceptable that the politically appointed most senior members of our judiciary can conduct extramarital affairs with each other, failed to disclose same and sit in judgment of each other's findings and indeed perhaps influence each's findings.*"

56. I pointed out that this could work both ways where a former lover, if animosity existed, could find against a proper valid finding and subject parties to further legal process or have an adverse arbitrary final determination because of the way the relationship ended:

> "**there is no doubt that Judge Clarke should have refrained and those who appoint the panel of judges should have insured that Judge Clarke could never sit on an appeal of a decision made by his lover/former lover Mary Irvine**"

57. My position was stated clearly, unequivocally, left no doubt about the point I was raising, which required to be considered and decided. I stated it was a clear infringement of my human rights under the Constitution and European Convention on Human Rights. My personal rights were being conflated by the Supreme Court in Ireland and my economic plight of bankruptcy. The judiciary decided they could trample on my right to a good name wherein allegations of fraud had been made against me and use my bankruptcy as a sword to prohibit me from justice. In a review by an independent court I expect their actions to be seen as a personal vendetta which have gotten out of control. The flawed bias judgment relied upon has been used as the rod to defeat all my rights. The Courts in sporting parlance: own the pitch, make the rules, appoint the referee and linesman and appoint the VAR. It allowed for my appeal to be dealt with at their personal discretion. In my particular case this discretion was exercised against my right to appeal against judicial bias in circumstances where it is clear the claim would succeed. The impression given is Judge's Oath of Office and the Constitution is something that is paid lip service to rather than actually taken seriously.

58. The law library and legal profession have serious questions to ask themselves as to why I was blackballed from being able to obtain Irish Republic legal advice to take my bias case especially given the affair was common knowledge within the four walls of the Four Courts.

59. When one looks back at the history of the implementation of a judicial body to investigate complaints, it is easy now to understand in hindsight that the body politic of the judiciary had no interest in seeing such a bill ever being enacted. If enacted it would provide a mechanism for complaints like mine to be heard and aired in the open unlike what has with my complaint where it has been dealt with behind closed doors in secret conclave. A properly functioning independent judicial complaints body was seen as an inconvenience by the Chief Justice and his colleagues and was something to be avoided. It was filibustered by legal associates in the corridors of Leinster House and subsequently neutered by only permitting the judiciary to sit on complaints investigating themselves. The judiciary have taken the term "*judge, jury and executioner*" to a new level.

60. I requested the Minister for Justice not to allow the Supreme Court of Ireland to prevent the investigation into the behaviour of some of their own on the technical basis that the complaint does not have standing. It was a call to her to exercise her oversight function in relation to justice in Ireland. With the doors of the Four Courts locked to me – the last resort has to be the Oireachtas.

61. I stated it is totally disingenuous to expect the judiciary to investigate themselves when those at the very top are implicated in the very complaint. My complaint is valid, true and properly grounded and presented by top UK senior counsel and no effort was made by any member of the Irish judiciary to ensure justice was seen to be dispensed. My valid complaint was hijacked by the Official Assignee, an officer of the court, at odds with what my US bankruptcy trustee had confirmed in writing and against my personal constitutional and human rights. I still require these judges' conduct is investigated fully something which I have thus far been denied. I beg to refer to a copy of the letter of 5 June 2013 from my US Chp7 Trustee upon which I have marked SD11 prior to the swearing hereof.

62. I know through sources that the Minister for Justice sent my complaint to Mr Justice Clarke via her Department Secretary to advise her how best to deal with it. The false façade under which her reply is based exists on paper only and as the world knows matters are not what they seem on paper. Her actions demonstrate how consistently the point I made regarding judicial bias was "kicked to touch" and consistently placed in the tray for recycling but like the

elephant in the room it could never be made vanish even by the highest government officers in the land.

63. By letter dated 22 December 2015 the Minister for Justice responded:

> *"The courts are subject only to the constitution and the law, wholly independent in the exercise of their judicial functions and the conduct of any Court is a matter entirely for the presiding judge. In the circumstances I am returning your correspondence to you as I as minister for justice and equality have no role in that matter."*

64. I say that the failure of the Minister for Justice to take any action and return the documents was a serious breach of her Ministerial duties. It was not the documents which were contaminated by the contents which shone a light on the corruption emanating from the highest judicial officer holder rather than exercising his functions in the manner required by the Constitution and the European Convention on Human Rights.

65. As the make-up of the Supreme Court currently has five former Fine Gael members, among them Chief Justice Clarke, it is perhaps not unexpected that a Fine Gael Tainaiste would seek to minimize and dispose of the matter without any investigation. Her party political loyalty seems to have mistaken me as a Fianna Fail recipient of the boom. I can confirm that it was Fianna Fail who benefited from my support. I never sought or gained anything in return. If I had it would be investigated in depth and trotted out in every hearing in a similar manner to the AA v BA judgment.

66. Indeed my bankruptcy was handled by Ms Justice Costello who seemed to also find new novel reasons to extend my bankruptcy and make new law as the case progressed in a similar vein as Justices Clarke and Irvine. I am advised that her Bankruptcy Payments Order and 12 year bankruptcy extension are unlawful under the Irish Constitution and also under the European Convention on Human Rights. In essence her judgments are a continuation of the judicial prejudice and bias I continue to suffer in order to keep me economically muzzled to avoid me having a voice in Court.

67. The Official Assignment as an officer of the Court possessing a quasi-judicial position has seen fit to:

(a) Take the personal contents of my family from a house in the K Club, admit he was wrong but get the Courts in the face of established precedent not to award costs against him for his misconduct.

(b) Instruct his Senior Counsel Eddie Farrelly to draft an affidavit for him which they both knew was wrong grounding it in the Yesreb proceedings, swear an oath as the truth in an effort to paint me as the owner of Walford which they both knew to be incorrect.

(c) Question the veracity of a trust prepared by Matheson solicitors in 2006 for my wife Gayle Dunne as the beneficial owner of Walford. Matheson Solicitors being the top legal practice in Ireland who work for multi-nationals, banks and the government. All are seen as capable of communicating legal instructions for their clients however when it came to an instruction from me in 2006, Matheson's documentation miraculously becomes suspect and open to a twisted interpretation of the Official Assignee who swears unknowingly untruthful affidavits, to suit the narrative fallacy he peddles.

(d) Judge Costello in her "wise judgment" extending my bankruptcy by 12 years gives the Official Assignee and his counsel a free pass stating that "Homer nods". But this was far from a mistake from alertness or attention but a deliberate strategy to pervert the course of justice. This again is an example of officers of the court and state holding high office attempting to again prejudice and bias the court against my family and I.

(e) The Official Assignee has also made another baseless claim over a trust established in 1989 as being a fraud.

(f) The Official Assignee has stolen £1.6m from the "Yesreb Funds" being a trust for the benefit of my minor children to settle a personal claim against him. This was a claim by Mr Dermot Desmond that the Official Assignee, Chris Lehane, disclosed his personal private family information to the Irish media in order to generate fanciful stories which he could then exhibit in affidavits grounding other applications before Judge Costello, to shoehorn the narrative fallacy that I was the owner of Walford.

68. The Irish Tax Appeals Commission have vindicated my position on Walford and Yesreb that I ceased to hold any beneficial interest in Walford on 23 July 2005. This decisions proves the bad faith under which the Official Assignee commenced the Yesreb proceedings and acted outside his powers in order to misappropriate monies he had no entitlement to being today the assets of my minor children. I beg to refer to a copy of said decision upon which I have marked SD12 prior to the swearing hereof.

19

69. These are not the actions of an independent impartial unbiased state official but the actions of a man who knows he can act with impunity in how he handles my file. His actions regularly cross over the line of what is lawful. There has never been any sanction no matter how egregious against his actions. He knows as an officer of the Court and state official that he can act in total disregard of his office. When he does knowingly overstep the line against a bankrupt, he will not suffer any sanctions. He however misjudged matters by leaking documents to the media relating to a non-bankrupt and was forced to settle a personal claim take by Mr Desmond. His office does not cover him for his illegal actions. When challenged by one of Ireland's richest men he knew his normal scorched earth litigation strategy would fail so he collapsed his position but only by dipping into my children's trust which is excluded from my estate. It's my intention to recover these funds for my minor children. His illegalities have carried him away and lulled him into a false sense of security by the protection he is afforded to date by the Courts. In situations where he is simply dealing with a bankrupt and his/her family who probably have limited resources he is normally free to pursue any sort of strategy he pleases without fear of censure.

70. The Courts are a dark and lonely place to be even when you wish to be there by choice and are successful. To see them operating in such a manner where whenever my rights as a citizen under the Constitution to fair and unbiased hearings are raised, the atmosphere in the Courts is one of eye rolling. The contract between the state and I, as citizen, affording me my rights has been ignored by the courts.

71. As Budda said there are three things you cannot hide for long: "*the Sun, the Moon and the truth*" and the truth is my family and I have been denied a fair hearing throughout this bankruptcy process.

72. A simple bankruptcy payment application by the Official Assignee for €5,000 per annum was extended to €7,000 per month by Judge Costello. I had demonstrated to the court I had an inability to make any bankruptcy payment. However in the current climate and environment Judge Costello managed to again make novel law to achieve the most draconian result possible when my name or my family's is associated with the case. This trend dates back to Ms Justice Irvine's judgment of 12 June, 2009. The capricious and arbitrary attitude that has arisen out of my bankruptcy is evident from the cases and findings all premised in AA v BA.

73. There are many other cases which have been effected by the hidden extra marital relationship between Mr Justice Clarke and Ms Justice Irvine which only the Courts are intimately aware of. The parties concerned deserve to be advised.

74. In the circumstances any references and reliance to AA v BA, by the Official Assignee must be discarded as its findings are based on sand and are an affront to the Constitutional foundations of this country. All dogmas eventually crumble and the dogma of concealment of an illicit relationship in the highest legal offices of Ireland. To quote Lord Denning *"be you ever so high, the law is above you."*

75. For good order I have refer to the conclusions of Chief Justice Clarke in his July 2014 judgment condensing my 157 grounds of appeal upon which I have marked SD13 prior to the swearing hereof.

## Background to Bankruptcy Payment Order ("BPO")

76. By way of background, in my unique engineered dual bankruptcies, it is difficult to know where exactly to begin. I filed for bankruptcy in the US on 29 March 2013 where I had resided since August 2010. Ulster Bank subsequently made me bankrupt in Ireland on 29 July 2013.

77. I beg to refer to a copy of the order granting amended motion of Ulster Bank Ireland Limited granting a limited relief from automatic stay and his undertakings to the Judge Schiff to achieve the order marked SD14 prior to the swearing hereof. The order was made by Judge Schiff in Bridgeport Bankruptcy Court, Connecticut on 12 June 2013. This order confirms my estate, jurisdiction and discharge, rests with my first in time Chapter 7 Bankruptcy Trustee, Mr. Richard Coan. The Irish Official Assignee holds no estate. On these undertakings alone the BPO should be thrown.

78. I draw to the court's attention that this order has been resiled from by the Irish Official Assignee and my creditors who sought the application to have me made a dual bankrupt. The Irish Official Assignee is an officer of the Irish State, an officer of the court and holds a quasi-judicial position in the Irish bankruptcy courts. He has abused his position with the support of the Courts.

79. I beg to refer to a one-page extract from a submission made by my Chapter 7 US trustee to Judge Schiff in support of the lifting of the automatic stay marked SD15 prior to the swearing hereof. I draw the court's attention to paragraph nine and paragraph 10.

80. It does not require a legal mind to understand, what my Chapter 7 trustee represented to Judge Schiff in order to carry the day in the lifting of the automatic stay and allow the filling of an Irish bankruptcy petition.

81. It equally does not require a legal mind to now see this was a vacuous undertaking made by my Chapter 7 Trustee working with my creditors out of pure vindictiveness. The agenda was to make a scapegoat for the Irish banking collapse. As Nama Debtor no. 39, the internet should be sued for placing me at no. 1 if it were possible.

82. The above submission made by my Chapter 7 Trustee in support of the lifting of the stay to have me made a dual bankrupt was a key undertaking in order to achieve the filing of my bankruptcy petition in Ireland. On the record to carry the judge who was bemused by the lack of logic. Of course, there was never any logic to a dual bankruptcy other than for the reasons set out in my bias submissions.

83. The Chapter 7 Trustee in moving the application for a dual bankruptcy also undertook to enter into and submit to the court an International Protocol. Should an Irish bankruptcy be permitted. This was resiled from by all the parties to the application, claiming that the International Protocol would be entered into at the end of the bankruptcy. The Ch 7 Trustee and the Irish Official Assignee never intended to agree the protocol for my dual bankruptcy, and made false representations to the court. A protocol would have obviated the requirement for many of the unnecessary cases before the court including this application. My Ch 7 Trustee abiding by the US bankruptcy cod would have ensured no such case could ever have commenced let alone run for 18 months.

84. The dual bankruptcy was and remains a novel concept and has never been encountered in the world of bankruptcy. At various times, both trustees have operated in total harmony with each other, and at other times they have operated as if they exist in different worlds and the other bankruptcy does not exist and when it does it is with two different individuals. I am treated as two different individuals, in two different jurisdictions with different laws applied,

on behalf of the same creditors. It was from the outset a farce and remains so today. The real reason lies in those holding high judicial office abusing their positions of power, for personal vendettas.

<u>BPO</u>

85. By way of simple example is the application now before the court. I am currently the applicant to have my BPO in the sum of £7,000 a month levied against me by Judge Costello in October 2008 set aside. The BPO and decision of Costello J flies in the face of the legal position presented to the court in grounding my Irish bankruptcy petition. Her decision files in the face of the established law and common sense being proven ability to pay. Having law invented to shoehorn in such decisions must be set aside.

86. I have delivered all documents proving that I do not earn over £200 a month and have no other sources of income, wealth assets or cash at my disposal to meet this order. There is no science to a BPO. It's based on one's ability to pay from surplus income a bankrupt may have left over after meeting their normal expenses. However, despite this my application to vary the BPO has been dragged out for 18 months where replying affidavits from the OA which ignore the basic and only tenant on which a BPO is based. His response are self-serving paper filling groundless claims which even if correct are irrelevant to the issue. The OA misrepresents to the court many issues in an attempt to blacken me in order to carry favour. Their interpretation of me earning €200 per month becomes me living off €200 per month which of course was and is not what this statement represents.

87. I hereby refer to my submission of by email dated 4 December 2020 at 17.08 enclosing my submission to Addleshaw Goddard UK solicitors representing my Ch 7 Trustee in relation to the exact same queries by the Respondent OA in these proceedings. I also refer to my email of 17.27 enclosing sealed UK Court orders issued in relation to the UK investigation. I also refer to emails sent 5 December 2020 at 12.37 and 7 December 2020. I understand all of these are submitted to the Court under seal. This correspondence goes to the duplication of the process and indeed to the overlapping and treatment of me as two different individuals, in two different countries, running two different bankruptcies simultaneously, for the identical creditors. My Irish bankruptcy was from the outset a farce and a gross miscarriage of justice. In normal legal systems, legal strategies which are grounded on vexation and abuse of process

founder and fail. However in my particular circumstances they are encouraged and endorsed by the bench.

88. I believe I am the only bankrupt on earth who has two separate bankruptcies running simultaneously for the exact same creditors. No international protocol has been entered into to manage my dual bankruptcies and this is further being exacerbated by the grounding of my US bankruptcy in the UK Bankruptcy Court this year.

89. As my trustees and creditors are aware of, there are no concealed assets and Kroll and similar agencies have carried out worldwide searches to ascertain concealed assets and none have been discovered as none exist. Both trustees have a slew of professional advisers available to them, an army of legal teams, have received every document I possess in discovery and are still abusing the process.

90. Both trustees try to oppress me. In my application to vary an Irish BPO for €7,000 per month, which is outside of US bankruptcy code. My Chapter 7 Trustee, Mr Coan stands idly by to allow this oppression to proceed unbated. The making of this order by Justice Costello is not based in Irish bankruptcy law. Its has no factual support and none has been produced to support it in over two years. It is required to be vacated and all connected actions to it vacated also.

91. Turning briefly to the main points raised by Ms Fay.

92. My pension is excluded from my bankruptcy by my Ch7 Trustee, it predates my bankruptcy filing and is held by trustees. The Official Assignee has produced no legal basis for his attempts to try and garnish it. Again this is simply the Official Assignee attempting to seize anything he can get access to whether he is legally entitled to it or not.

93. In relation to Dunnington, Bartholow and Miller LLP's legal fees. Luke McGrath of that firm agreed to take on the case on the basis of its strength and my children's right to justice. They agreed to be paid out of proceeds should the claim be successful. He is a rarity in the legal world. To date he has invoiced $234,761 which remains unpaid pending resolution of the proceedings in the US. I beg to refer to a copy of said invoice upon which I have marked SD16 prior to the swearing hereof and copies of invoices from J Berman for the sum of approximately $160,263. Both sums are post-petition costs to which I am personally liable.

24

94. At paragraph 7, Ms Fay intentionally misrepresents that I swore in depositions that I transferred $100m to Gayle Dunne between 2005 and 2013. The deposition only relates to assets transfers predominantly between 2005 and 2008. The key asset being Walford. The actual is sum is €65m and she has a full schedule of this.

95. At paragraph 8, it is correct that the Chapter 7 Trustee in Bankruptcy has applied for discovery in relation to my affairs in the UK and they are currently under seal. Ms Fay complains that she does not have access to this documentation. My Ch7 Trustee has set out how the Official Assignee should go about getting information should he require it. Again we witness the Official Assignee, an arm of the state making it up as he goes along. This exhibited at SD15 above.

96. As the Official Assignee and the Chapter 7 Trustee have refused to agree a protocol in breach of a court undertaking regarding the management of my dual bankruptcy it can be no surprise to them that such situations arise. In addition the Official Assignee has already had to pay €1.6 million in damages to Mr Desmond of my children's money to settle a breach of privacy claim on foot of him leaking confidential information to the newspapers regarding this bankruptcy. To date, the Official Assignee has refused to provide any undertakings regarding the confidentiality of my private information.

97. My own bankruptcy and many other high profile Irish bankruptcies clearly proves there is not one instance that the Official Assignee, ever defended a bankrupt's rights, his family's rights to property and their own independent assets or their constitutional rights. In the OA's eyes, bolstered by the courts, all rights of the bankrupt and their families are fair game to be taken attacked or stolen or in legal parlance "misappropriated".

98. I am currently the primary care giver for my four minor children. I have no sources of income. My former wife pays the expenses for the maintenance of four minor children and my living expenses which have been agreed on an ad hoc case by case basis. There is no obligation for her to pay me an income or salary from which to pay a bankruptcy order. The Official Assignee is fully aware of all of this though he claims the opposite because it suits his application.

99. For the record, I made a full open frank filing in my bankruptcy filing including debenture tickets I held at Twickenham. I did not hide or conceal any assets. One would be forgiven

reading the international press that I was party to an international fraud perpetrated on the Irish, none of this is based in reality.

100. In the Yesreb proceedings I was forced to engage a computer expert to provide electronic discovery. When he was ready to deliver the data to the Official Assignee he said he no longer required it and left me with another bill which I am unable to pay. These are not the actions of an individual who seriously believes what he alleges. I have other costs associated with his information requests particularly legal costs which I require paid. I beg to refer to a copy of said bill marked **SD17** prior to the swearing hereof.

101. The Official Assignee has no basis in law to seek the orders he requests and indeed is quite open about the fact it lacks precedent. Again he is utterly confident that he need only ask; it is standard parlance around the Courts that "*whatever the OA wants, the OA gets.*"

## Conclusion

102. In the circumstances the Court should grant my application and overturn the BPO and dismiss the Official Assignee's application for contempt. Additionally the Court should sanction the Official Assignee and their legal team for attempting to prejudice and mislead the Court.

103. I request the Court make an order for costs against the Official Assignee for these proceedings and the Yesreb proceedings. Such costs to be personal and excluded from my bankruptcy.

SWORN BY SEAN DUNNE
This 9ᵗʰ day of December, 2020 at _Ennisworth_

in _County Wexford_
Before me a Practising Solicitor/Commissioner for Oaths
and I know the deponent or
the deponent has been identified to me by

_____                    _____
SEAN DUNNE                                  PRACTISING SOLICITOR/

26

COMMISSIONER FOR
OATHS

Filed on behalf of Sean Dunne by Gabriel Canning for the bankrupt on this day 9th December 2020.

THE HIGH COURT

BANKRUPTCY


IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015


Exhibit "SD1" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020


SEAN DUNNE


PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

# Chief justice stepped back from Irvine appointment

The Sunday Times
Mark Tighe
By Mark Tighe
25 October 2020,
756 words,
English,
4
© Times Newspapers Limited 2020

- o
- o
- o
- o
- o
- o

**Frank Clarke** left selection panel to avoid claims of conflict of interest in her High Court selection, says Shane Ross

Shane Ross has revealed that **Frank Clarke**, the chief justice, recused himself from the selection committee for president of the High Court this year over a possible conflict of interest.

Ross, a former Independent Alliance TD **and** transport minister in the last Fine Gael-led minority government, makes the revelation in a new memoir, In Bed With the Blueshirts.

He also describes his failed attempts to reform the judicial appointments process. **Ross** had secured a commitment from Fine Gael in the last programme for government that it would introduce a judicial appointments body with a lay majority **and** chair. However, the bill met massive resistance from judges and Fianna Fail, **and** failed to pass after a filibuster in the Seanad led by Michael McDowell, a barrister **and** independent senator.

In his book, **Ross** says he initially insisted no judges would be appointed by the government until progress was made on its judicial appointments bill. He said he removed this veto after some progress was made, **and** when Fine Gael insisted new judges were needed to fill gaps on the bench.

A three-person advisory committee, comprising the attorney-general, the chief justice **and** a layperson, was appointed to make recommendations to cabinet on the appointments of the presidents of various courts. **Ross** reveals that when this committee was set up in April to recommend a replacement for Peter Kelly, who was retiring as president of the High Court, Clarke initially sat on it. **Ross** said after he heard Mary Irvine, a Supreme Court judge since May 2019, was favourite for the role, it was announced Clarke had stepped back from the committee. A cabinet memo on May 22 is said to have stated that Clarke had recused himself "to ensure no perception of any conflict of interest".

Ross said when he asked Charlie Flanagan, then justice minister, to elaborate on the possible conflict, he was stonewalled. Séamus Woulfe, then attorney-general, is said to have intervened at cabinet to say Clarke had withdrawn in case a "crank" might attack his integrity and he was showing an abundance of caution.

Woulfe, who was himself subsequently appointed a Supreme Court judge, is said to have claimed he knew all the judges **and** candidates.

According to the book, Leo Varadkar, then taoiseach, intervened to say Ross should discuss the issue with Flanagan after cabinet. Ross says that Flanagan did fill him in on the reason for Clarke's recusal, but he does not reveal the details in the book.

**Ross** noted that Clarke was replaced on the committee by George Birmingham, president of the Court of Appeal. He points out that Clarke was Birmingham's election agent when he was a Fine Gael TD in the 1980s.

**Ross** does not question Irvine's qualifications for the role, to which she was appointed in June, **and** notes she is not affiliated with a political party. He says the question is about the process, not the result. He questioned why Clarke pulled out of the selection process for Irvine but remained on the committee while Birmingham's application progressed in 2018.

It is understood the committee that made recommendations on the president of the Court of Appeal position received only three applications **and** all were forwarded to government.

**Ross** said he initially opposed Irvine's appointment in June.

When he questioned the process at cabinet, he was told there were 12 applications for the job but no interviews were held. The committee had sent three names to the justice minister, who brought Irvine's name to cabinet.

**Ross** also reveals that he complained to the taoiseach when Woulfe was reported to have described the government's judicial appointments bill as a "dog's dinner" in 2018.

Varadkar is said to have responded: 'Séamus stuck his foot in it. He seems to be referring to the amendments made which we want reversed, rather than the bill itself, but it's bad."

Woulfe is still under scrutiny over his attendance at the Oireachtas Golf Society dinner in Clifden in August.

He has cancelled four meetings with Clarke on the issue since a report by Susan Denham, the former chief justice, said he should not lose his position but that his attendance at the dinner in the middle of a pandemic was wrong.

The question is about the process, not the result

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD2" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

Dublin

8th December 2017

Re: AA v BA ; CD Notice Party

Dear Sirs,

I refer to your letter of the 15th November 2017.

I sat on the Court which heard the appeal in AA v BA ; CD in 2013 and delivered one of the judgements in that matter the following year. I confirm that since my appointment as a judge in 2004 I have not had a relationship of the type to which you refer with any person who was, has since become or is a judge.

As a matter of principle it is difficult to envisage circumstances in which the private lives of judges prior to their appointment as such and at a very significant remove in time could be relevant in the way you maintain. I am not aware of any judge previously having been asked to confirm or deny aspects of his or her private life predating appointment and I do not believe that it would be appropriate that I set such a precedent.

Prior to delivering my judgement in AA v BA ; CD the only judges with whom I discussed the proceedings were the other judges on the Supreme Court who were involved in the case. These discussions involved the usual collegiate deliberations on the issues involved.

The alteration in the assignments to which you refer came at the request of the then Chief Justice. Such changes occur from time to time because of difficulties in judges sitting for one reason or another. I am unaware of the reasons which led the Chief Justice to request a change in the formation in this case but can confirm that same did not stem from any issue on my side or request or suggestion from me. I do not think that it is correct to suggest that there was no prior notice of the change of assignments. My recollection is that the revised assignments appeared in the legal diary some days before the hearing.

I trust that this letter clarifies matters. I do not believe that it would be appropriate for me to correspond further and trust that the contents will be treated in the strictest confidence.

Yours sincerely,

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD3" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

Minister for Justice

Department of Justice & Equality

94 St Stephens Green

Dublin 2

D02 FD70

Sean Dunne

22 Stillman Lane

Greenwich

CT 06831

USA

1st December 2015

Sent by Email and Post

Dear Minister Fitzgerald,

I am writing to you about a most serious incident of judicial misconduct and judicial bias in the highest courts in Ireland involving an Appeal Court Judge, Ms Mary Irvine and a Supreme Court Judge, Mr Frank Clarke.

The matters both judges adjudicated on are family law matters, therefore I am not at liberty to share the details of the cases due to the in camera rule. I do not believe the in camera rule that applies to family law cases makes my allegation of bias against Judges Irvine and Clarke an in-camera matter. Indeed it is one of extreme public interest. Their apparent judicial misconduct and the very appearance of judicial bias

that their conduct has resulted in, and the manner in which it undermines any right thinking persons reliance on the independence and fairness of the judicial system in Ireland needs to be investigated by you as a matter of urgency.

Judge Irvine made extraordinary and outlandish findings against me in an in camera judgment of 2009, findings that defied established commercial law, family law and normal legal procedure. I discovered on receiving this shocking judgment that members of the law library did not believe she had written this judgment independently, but that it was largely influenced by fellow High Court Judge Mr Frank Clarke. It was common knowledge that Ms Irvine and Mr Clarke were conducting an intense extra marital affair at the time. Their chambers were even adjacent to each other.

I also had history with Judge Clarke whereby as a Senior Counsel he represented Garech de Brun in a case against myself and Arthur Cox solicitors in 1999. We contracted to buy lands from De Brun in Woodtown Manor, Rathfarnham and paid the deposit. Shortly thereafter part of the land was rezoned before the contract closed. De Brun attempted to renege from the contract citing such allegations of fraud against me and members of my legal firm Arthur Cox. The case was settled very much in my favour with all allegations withdrawn and my counsel at the time commented on Frank Clarke's unusual and surprising personal animosity towards me. Garech de Brun was his personal friend and it was made clear to me he was taking this legal battle personally too, rather than having the usual personal disconnect of a senior counsel from his client.

I was perturbed to hear, when she delivered her judgment in 2009, that while hearing the family law case Judge Irvine had been intimately involved with Judge Clarke, particularly when the case involved options, contracts, allegations of fraud and non disclosure. There were many similarities to the case Clarke and de Brun tried to impress against me and others ,in 1999.

I appealed the decision and fully expected that such an appeal would be dealt with impartially and fairly by the Supreme Court of Ireland. The appeal was based on 157 points of appeal due to the decision  Judge Irvine made against established principles of law.  However, a most disturbing incident occurred. The panel of judges who were listed to hear the case in 2013 was changed on the day of the hearing without notice to any party, with newly appointed Supreme Court Judge Mr Frank Clarke stepping in, in place of Judge John MacMenamin.  No reason has ever been provided for this last minute change.

I only learned of this replacement after the close of the first day's hearing, as I was in the USA at the time.  I was appalled and told my legal team Judge Frank Clark must not sit in judgment of me due to his relationship with Judge Irvine and his previous acting against me as a Senior Counsel. My legal team said that it was too late now that we were already one day into a two day hearing and begged me to put my faith in the objectivity of the Supreme Court and Frank Clarke. They also said he had not spoken or asked questions throughout the day and they believed Judge Adrian Hardiman would write the judgment. I had previously , as early as March 2012, put my solicitor on notice in writing that Judge Clarke should never sit in judgment of me

due to his previous animosity in the De Bruin case and his relationship with Judge Irvine. (see attached correspondence)

When judgement was delivered a year later Frank Clarke alone delivered the judgment, fully endorsing Judge Irvine's original judgment, reiterating her "findings of fact" while failing to deal with the vast majority of the other legal complexities the case brought up. I was shocked and appalled and indeed felt violated and personally attacked. I was dumbfounded that a Supreme Court Judge could think it appropriate to compose and deliver an appeal judgement on his lover/former lover, with all the complexities such extra marital affairs can have on people's ability to be objective and the manner in which it can divide their loyalties. One would presume that Judge Frank Clarke must have known it was wholly inappropriate for him to sit in judgment of Judge Irvine. He should have informed his colleagues he would refrain from sitting on the appeal panel for this personal reason, Yet inexplicably he did not. His actions in participating in the bench on this appeal raises series questions about this man's judgment, motives and integrity.

Judge Frank Clarke had also delivered judgment in another case, Wright v Geary and Geary and another: third party: John Deere Limited: Supreme Court, November 2013, where he also roundly endorsed Judge Irvine's judgment, again on her findings of fact (which are rarely reviewed by appeal courts). I know of no other instances where a member of the Supreme Court has sat in judgment on an appeal of his wife/partner or ex wife/ex partner. I do not see how this situation distinguishes itself. The fact is he has now sat on two of her appeals and roundly endorsed her original judgment in both.

I had some reluctance putting my faith in the Supreme Court again as I found it hard to believe all did not know of the relationship with Clarke and Irvine. The existence of the relationship was common currency in the Four Courts, yet all had stood by while Judge Clarke slipped into Judge MacMenamin's place and delivered judgment.

However, I had no choice but to put my faith in the Chief Justice of Ireland to deal fairly in this matter. If the public cannot have confidence in the Chief Justice, they can have confidence in nobody. I wrote to the Chief Justice in October 2014 telling her of my concern and intention to appeal this judgment on the basis of perception of judicial bias. (see attached). As a bankrupt with limited resources I had to seek legal advice from the North of Ireland and London because no Irish barrister would take on this case, fearing it would ruin their careers in the Irish Four Courts. It was confirmed to me that the affair between Clarke and Irvine was however common knowledge.

Instead I was yet again stitched up. A substantive motion and appeal was filed by my UK legal team, and we were assured that the Supreme Court were taking the matter most seriously. Then the Irish Official Assignee in my bankruptcy, Mr Christopher Lehane, objected to my standing in taking the case, even though the US Trustee in my bankruptcy had given me permission to take the case or any family law appeal in June 2013 (see attached), before Mr Lehane or my Irish bankruptcy was even in existence. The Supreme Court of Ireland have neatly avoided having to address the questionable behaviour of their own colleagues by ruling that I do not have standing as a bankrupt to have this case reopened on the basis of perceived judicial bias. They allowed another officer of the court, Mr Lehane, to stop me from asserting my most personal

constitutional and human rights to clear my good name. Indeed Mr Lehane and the US Trustee seek to use the contested Supreme Court judgment against me in various legal cases pertaining to my bankruptcy. It is most disturbing that they are allowed to take away my right to contest the judgment in the highly unusual circumstances where fellow officers of the court, Irvine and Clarke, are suspected of wrong doing, but they can still endeavour to use those very findings against me. It is further disconcerting that The OA and US trustee's paymasters are Nama, an arm of the state, and Ulster Bank, and they act on their instructions, so are not impartial or acting independently.

For all Irish citizens sake, I do not believe this matter should be let lie just because I, as a bankrupt, am conveniently found not to have "standing" to have the case sent back for rehearing on the basis of a perception of judicial bias. It is not acceptable that the politically appointed most senior members of our judiciary can conduct extra marital affairs with each other, fail to disclose same and sit in judgment of each others findings, or indeed perhaps influence each others findings. Even if a member of the judiciary was not influenced to find in favour of his lover or former lovers legal rulings, the very perception is that he could be. Indeed in some cases the judicial member could even find against their former lover if animosity existed. Judge Clarke should have recused himself rather than parachute himself into the hearing on its opening day. There is no doubt that Judge Clarke should have refrained, and those who appoint the panel of judges should have ensured that Judge Clarke could never sit on appeal of a decision made by his lover/former lover Mary Irvine.

The current situation, where there are no means to address or even investigate judicial misconduct without the impeachment of judges is disgraceful and in direct conflict

with the most basic human rights. We have been waiting five years for a bill to be enacted to provide remedies for complaints about judicial misbehaviour and to provide for lay participation in the investigation of complaints. Not one member of the judiciary from the Chief Justice down deemed it appropriate to question how or why Frank Clarke was allowed sit and write judgment on two appeals of judgments made by Judge Mary Irvine. I ask you not to allow the Supreme Court of Ireland to prevent the investigation into the behaviour of some of their own on the basis that the complainant does not have standing. Indeed it is totally disingenuous to expect the judiciary to investigate themselves when those at the very top are implicated in the very complaint. My complaint is valid, true and properly grounded and presented by top UK Senior Counsel and no effort was made by any member of the Irish judiciary or participating counsel to say otherwise. My valid complaint was hijacked by another officer of the court at odds with what my US Bankruptcy Trustee had confirmed in writing and against my personal, constitutional and human rights. I ask you to ensure these judges conduct is investigated fully, something which I have been denied.

Should you require any further information please revert to me by post or email.

Yours Sincerely

Sean Dunne



Sean Dunne <seandunne366@gmail.com>

## Response
1 message

INFO <info@justice.ie>                                          Fri, Feb 24, 2017 at 1:07 PM
To: seandunne

Sean Dunne
seandunne366@gmail.com


Dear Mr. Dunne,

I am directed by the Tánaiste and Minister for Justice and Equality, Ms
Frances Fitzgerald T.D., to refer to your email dated 16 February 2017
regarding a copy of her previous correspondence to you.

As requested, please find below a copy of the Tánaiste's letter that was
issued to you on 23 December 2015.

Yours sincerely,


Niall Colgan
Private Secretary to the Tánaiste
and Minister for Justice and Equality



Minister Reference: 1202143141


 23 December, 2015


Dear Mr Dunne,

I refer to your letter dated 1 December. The Courts are, subject only to

the constitution and the law, wholly independent in the exercise of their
judicial functions and the conduct of any court case is a matter entirely
for the presiding judge. In the circumstances I am returning your
correspondence to you as I, as Minister for Justice and Equality, have no
role in the matter.

The Programme for Government contains a commitment to legislate to
establish a Judicial Council in order to provide an effective mechanism for
dealing with complaints against judges. This commitment is being given
expression in the form of the proposed Judicial Council Bill. As well as
providing for the establishment of a Judicial Council and Board that will
promote excellence and high standards of conduct by judges, the proposed
Bill aims to provide a means of investigating allegations of judicial
misconduct in the form of a Judicial Conduct Committee, which will have lay
representation. The Bill is a priority for the Government, but, recently,
has had to give way to other pressing priorities in the legislative area.

The Department is working closely with the Office of the Attorney General
to bring the Bill to an early conclusion, and I am committed to advancing
this legislation within a speedy timeframe.

Yours sincerely,


_____
Frances Fitzgerald T.D.
Minister for Justice and Equality

*********************************************************************************
Is le haghaidh an duine nó an eintitis ar a bhfuil sí dírithe, agus le haghaidh an duine nó an eintitis sin amháin, a bheartaítear an fhaisnéis a tarchuireadh agus féadfaidh sé go bhfuil ábhar faoi rún agus/nó faoi phribhléid inti. Toirmisctear aon athbhreithniú, atarchur nó leathadh a dhéanamh ar an bhfaisnéis seo, aon úsáid eile a bhaint aisti nó aon ghníomh a dhéanamh ar a hiontaoibh, ag daoine nó ag eintitis seachas an faighteoir beartaithe. Má fuair tú é seo trí dhearmad, téigh i dteagmháil leis an seoltóir, ie do thoil, agus scrios an t-ábhar as aon ríomhaire. Is é beartas na Roinne Dlí agus Cirt agus Comhionannais, na nOifigí agus na nGníomhaireachtaí a úsáideann seirbhísí TF na Roinne seoladh ábhair cholúil a dhícheadú.
Más rud é go measann tú gur ábhar colúil atá san ábhar atá sa teachtaireacht seo is ceart duit dul i dteagmháil leis an seoltóir láithreach agus le mailminder[ag]justice.ie chomh maith.

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer. It is the policy of the Department of Justice and Equality and the Agencies and Offices using its IT services to disallow the sending of offensive material.
Should you consider that the material contained in this message is offensive you should contact the sender immediately and also mailminder[at]justice.ie.
*********************************************************************************

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD4" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

From: seanbb@mountbrook.ie
Date: Fri, 23 Mar 2012 16:51:26 +0000
To: Niall Clerkin<niallclerkin@clerkinlynch.com>
ReplyTo: seanbb@mountbrook.ie
Subject: Re: Security for Costs Motion

Frank Clark is the current or former Beau of Irvine J and cannot sit on any appeal involving me. Also acted against me in a HC case.
Let your email find you with BlackBerry® from Vodafone

From: Niall Clerkin <niallclerkin@clerkinlynch.com>
Date: Fri, 23 Mar 2012 16:42:54 +0000
To: Sean's BlackBerry<seanbb@mountbrook.ie>
Subject: Security for Costs Motion

2

12

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD5" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

Subject:                          FW: conference call

---------- Forwarded message ----------
From: Niall Clerkin <niallclerkin@clerkinlynch.com>
Date: Wednesday, June 12, 2013
Subject: conference call
To: Sean Dunne <sean.dunnebb@gmail.com>

News just in. A five court Judge set down for your appeal:

The Chief Justice
Mr. Justice Murray
Mr. Justice Hardiman
Mr. Justice Fennelly
Mr. Justice Clarke

Regards,

Niall

Niall Clerkin

Partner

Clerkin Lynch

Solicitors

30 Molesworth Street

Dublin 2.

Tel: +353 1 611 44 00

www.clerkinlynch.com

CONFIDENTIALITY WARNING: the contents of this email and any attachment are the property of Clerkin Lynch and intended for the addressee only. It may contain private and confidential information or material that is privileged. If

13

Subject:                  FW: D v D - meeting 2:30
Attachments:          Core Book Proposed Index 2.docx

---------- Forwarded message ----------
From: Thomas McCluskey <thomasmccluskey@clerkinlynch.com>
Date: Tuesday, June 25, 2013
Subject: D v D - meeting 2:30
To: Bill Shipsey <bill.shipsey@gmail.com>, Paul McCarthy <advocate@indigo.ie>, Niall Clerkin
<niallclerkin@clerkinlynch.com>, Kevin Lynch <kevinlynch@clerkinlynch.com>

Dear Bill and Paul,

I attach the current draft index to the Core Book in relation to this appeal. Please note that this draft is incomplete.

I attended at the Office of the Supreme Court this morning. I was informed there that there are only three judges on the panel: Hardiman J., McKechnie J. and MacMenamin J. The hearing is scheduled for two days on July 2nd in the Hugh Kennedy Courtroom.

Clarke J. and Murray J. are taking a different case on July 2nd and Denham CJ. has a different case on July 3rd. Five sets of Books of Appeal have been filed but the office staff are only preparing three sets for the trial. The staff in the Office of the Supreme Court said that the panel had probably been changed.

Paul, when I spoke to Lorcan yesterday evening in relation to preparing the books of authority Lorcan was under the impression that he would have to prepare books for five judges. Please inform him otherwise.

Kind regards,

Thomas McCluskey

Clerkin Lynch

Solicitors

1

14 . —

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD6" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

32

IN THE SUPREME COURT

Appeal Numbers 328, 373 and 485/09

High Court Record Number 1997 58 M

---

AFFIDAVIT OF SEAN DUNNE

---

I, Sean Dunne, aged 18 years and upwards, make oath and say as follows;

1.  I file this affidavit in support of my motion seeking an Order setting aside both the Supreme Court's judgment of 30th July 2014 and the judgment of the High Court (Mrs. Justice Irvine) dated 10th June 2009, on grounds of perceived bias.

2.  Such bias arises by reason of the intimate relationship which was ongoing at the time of the High Court proceedings in this matter, between the trial judge, Mrs. Justice Irvine, and Mr. Justice Clarke, who delivered the judgment of the Supreme Court.

3.  In this affidavit I set out what I know of that relationship between Mrs. Justice Irvine and Mr. Justice Clarke, when I learned of it, my concerns, and what actions I have taken since first hearing a rumour about the relationship following hand-down of Mrs. Justice Irvine's judgment on 10th June 2009.

Background to the Proceedings

4.  I was the named respondent (referred to in the relevant documents as "SD" or later "AB") in matrimonial proceedings issued in the High Court in Dublin by my former wife Jennifer Dunne, now Jennifer Coyle (referred to in the relevant documents

1

initially as "JD" and subsequently as "AA"), who was the named applicant. There were two sets of proceedings: judicial separation proceedings (issued pursuant to the Judicial Separation on Family Law Reform Act 1989 and the Family Law Act 1985) and divorce proceedings (issued pursuant to the Family Law (Divorce) Act 1996).

5.  Both sets of proceedings were settled on 21st December 2001, by Order of the High Court. I attach marked as exhibit "SD1" the Order of Higgins J of that date. As the Order shows, the terms of settlement included the grant of a decree of divorce and they provided for ancillary relief (a financial settlement in favour of my former wife with me bearing full responsibility for the welfare of our three children – two who lived with me at the time, and my daughter, who has been diagnosed with Asperger's Syndrome, who since she finished school in 2002 until 2011 has predominantly lived with me was cared for by me and my wife Gayle Killilea, in particular financially).

6.  These matrimonial proceedings were however reopened in December 2006. Ms. Coyle at that point issued an application to set aside the Order of Higgins J, including the decree of divorce. The details of the proceedings instigated by Ms. Coyle and the arguments advanced by the respective parties are set out in Mrs. Justice Irvine's ruling and various submissions and arguments lodged with the High Court.

7.  In summary, however, I say that the basis of these proceedings was an allegation that I had not made full disclosure of my assets during the separation and divorce proceedings and had not made proper provision for my former wife. I strongly refuted those allegations.

8.  Central to the reopened proceedings was also an assertion by Ms. Coyle about the validity of my marriage to my wife, Gayle Killilea. In particular she asserted that my divorce was never valid and that I was still effectively married to her at the time of my marriage to my second wife. An Order was made on 29th July 2008 to join my wife as a notice party to the proceedings. She was referred to as "CD." I attach marked as exhibit "SD2" the Order of Abbott J joining my wife to the proceedings.

9.  The reopened proceedings were decided by Mrs. Justice Irvine following a hearing. Her judgment was delivered on 10th June 2009. A copy of her judgment is attached, marked as exhibit "SD3."

10. Mrs. Justice Irvine's ruling was devastating for me. She found that the 2001 High Court Order had been made in circumstances where I had failed to comply with a number of disclosure obligations, and that I had caused inaccurate information to be provided to Ms. Coyle's solicitors in order to mislead her about my true financial position. She ruled that these non-disclosures had been fraudulent and material. I utterly refute her findings.

11. Mrs. Justice Irvine ordered me to pay a substantial additional sum to Ms. Coyle as proper provision, but refused to set aside the divorce decree as Ms. Coyle had sought.

## First Information Regarding the Relationship

12. When the judgment of Mrs. Justice Irvine was delivered in June 2009 my legal team expressed amazement about the outcome, and a senior member of the team stated, *"Mary Irvine did not write that judgement - Frank Clarke wrote it for her."* This person went on to advise me that the two judges were having an affair but did not elaborate any further on how they came to that view, what it was based on, or indeed any further detail (e.g. whether or not they were actually cohabiting at that particular time, whether either was married to other parties, and so on).

13. I was very concerned to hear this information and the suggestion that the High Court ruling of Mrs. Justice Irvine had acted as a conduit for what were in fact Mr. Justice Clarke's views. However, I am not one to give much store to gossip or rumours, and I

3

knew that I could appeal, and so I pushed the story of the affair to the back of my mind and immediately set about appealing the decision to the Supreme Court.

## My Appeal to the Supreme Court

14.      I appealed against the judgment of Mrs. Justice Irvine to the Supreme Court. I attach, marked as exhibit "SD4," the grounds of appeal and submissions made in support of my appeal, and I do not repeat the content here.

## March 2012: Security for Costs Hearing

15.      On 23rd March 2012 I was informed by my solicitor in the proceedings, Mr. Niall Clerkin, that there had been a brief hearing in the Supreme Court regarding a security for costs motion brought by Ms. Coyle. The result of that hearing was that I was ordered to pay €30k and VAT into court before the appeal could proceed.

16.      The outcome of the hearing was not of particular concern to me as I understood it was essentially inevitable because I was an individual based outside the jurisdiction and in these types of proceedings security for costs would inevitably be required. But I was extremely concerned to hear from Mr. Clerkin that Mr. Justice Frank Clarke had sat that day as one of a three judge panel. Upon hearing this via email from Niall Clerkin, I immediately responded (by email) to Mr. Clerkin stating, *"Frank Clarke is the current or former beau of Irvine and cannot sit on any appeal involving me. Also acted against me in a High Court Case."* I attach a copy of this email, marked as exhibit "SD5."

17.      I do not believe I received any written response from my solicitor on this but I had a detailed telephone conversation with him explaining my reasoning for my email. It is important to note that Mr. Clerkin was not part of my legal team (for the Mrs. Justice

Irvine hearing) and had only come on record on 6th February 2012 as due to the economic fallout I was using in-house legal representation from 2009 to December 2011. This was his first family law case. He had not been present for the discussion about the rumoured affair in June 2009 which I refer to above. He was at that point just reading into the case.

18.    Despite my concerns, however, the security for costs hearing had been on an interlocutory matter the outcome of which was inevitable, and in any event was already concluded by the time I learned of any involvement on the part of Mr. Justice Clarke. I was willing to pay the security for costs which had been ordered. In those circumstances I had no reason to take the issue of him having decided the security for costs application any further. I was very clear, however, that he could not possibly sit in or decide on my substantive appeal; I had informed Mr. Clerkin of my very firm view in this regard.

12th – 25th June 2013

19.    I have recently learned, whilst preparing for this application, that Mr. Justice Clarke was initially assigned to sit in my appeal for a brief period in June 2013. The composition of the panel later changed, but during the 13-day period before it did my solicitor did not discuss the matter with me despite my clear stated position in March 2012.

20.    An email was sent to me by my solicitor, Mr. Clerkin, on the 12th June 2013 informing me of the intended composition of the Supreme Court, including Mr. Justice Clarke (it is attached, marked as exhibit "SD6"). Although it was emailed to me, I did not read that email at the time and it has only been brought to my attention recently.

·21.    At the time I was and still am a resident in Greenwich, C.T. USA and commuting in and out of New York on a daily basis. I was accessing email on my Blackbury and I was receiving a huge daily volume of emails concerning these proceedings and other

5

matters. I tended to scan read my emails on screen, and only considered closely particularly important emails which had been drawn to my attention, or were of apparent significance (given either the title or the sender).

22. The email exhibited at "SD6" is headed "conference call". The reason for this is as follows. On this particular day, 12th June 2013, a conference call was set up between James Berman, my U.S. bankruptcy trustee, Niall Clerkin and a number of other parties and I missed the conference call by either dialling too late or not being able to access the number. I wrote an email to Jim Berman at 3:21pm on the 12th of June " *Jim, are we on now as I get no response or anybody to talk with????????????*" By email some 4 minutes later Jim Berman responded "*That's because we just hung up before you got on call. Will dial back now*". Therefore, Jim Berman and I proceeded to have a telephone call and he filled me in on the conference call.

23. I firmly believed when Niall Clerkin sent the email on Wednesday evening (12 June) and saw the heading "*Conference call*" that the matter had already been dispensed with and dealt with by me and therefore did not proceed to read this email. The email subject did not refer to the Supreme Court; rather, it referred to "conference call" which had taken place and concluded by that time.


### 25th June 2013 until the Supreme Court Hearing

24. The week prior to the Supreme Court hearing date my solicitor was out of the country in the U.S.A. on vacation. I recall that a few days prior to the hearing I was advised by Mr. Clerkin of the confirmed make-up of the Supreme court panel. I recall being told that there would be a three person Supreme Court, to be made up of Justices Hardiman, McKechnie and MacMenamin. I recall thinking this was a suitable panel as neither Frank Clarke, nor Donal O'Donnell, who had prepared the appeal as my previous senior counsel, would be considered suitable judges to sit on this particular appeal and would have to recuse themselves if appointed.

6

25. I have recently whilst preparing this application also learned of an email, dated 25th June 2013, from Mr. Thomas McCluskey of Clerkin Lynch Solicitors. This email was circulated to my legal team for the Supreme Court appeal. It is attached and marked as exhibit "SD7". Mr. McCluskey refers to having attended at the office of the Supreme Court that morning at which he was informed that the Supreme Court hearing would take place before three judges, namely Justices Hardiman, McKechnie and MacMenamin. He also states that Mr. Justice Clarke and Murray J were taking a different case on 2nd July and Denham CJ on 3rd July. I did not see this email at the time, but having subsequently considered it, it is clear that the composition of the court changed at the last minute, for reasons which are unknown to me.

26. Whilst I am not certain of the day on which Mr. Clerkin informed me of the composition of the Supreme Court, I believe that it will have been on or about the 25th June, following Mr. McCluskey's attendance at the office of the Supreme Court.

27. There was no update between 25th June and the hearing commencing on 2nd July 2013 regarding the composition of the Court. As I understood it, the hearing was to take place before the three Justices identified in SD7, of which Mr. Clerkin had informed me by telephone.

Hearing – 2nd and 3rd July 2013

28. The Supreme Court hearing went ahead as scheduled. It was set down for 2 days, 2nd and 3rd July 2013.

29. After the first day, at about 7 pm Irish time on 2nd of July, I spoke with my solicitor on the phone from the U.S.A. for an overview of how the day went. During the course of this conversation with Mr. Clerkin, he mentioned in passing at the end of the call that Mr. Justice Frank Clarke was now sitting in place of Mr. Justice MacMenamin. I recall being horrified at hearing this news and becoming extremely concerned and agitated. I recall that I immediately informed my solicitor that (as I had said in March

7

2012) Mr. Justice Clarke could not sit in judgment of me, both because he was rumoured to have had a romatic relationship with the Judge whose judgment was being appealed, Judge Mary Irvine, and also because he had acted against me previously. I believe I referred to our discussion following the email of the 23rd of March 2012 and our follow up conversation (see above at paragraphs 16 – 18). I asked how could this possibly be the case given that a week earlier I was told the composition of the Court which did not include Mr Justice Clarke.

30. However Mr. Clerkin advised me that nothing could be done about his appointment to the panel at this late stage, when the two-day hearing had already completed its first day and the final day was merely hours away. I recall he also attempted to reassure me, by stating that I had nothing to fear from his appointment because he was an eminent Supreme Court Judge, and he asked me whether I had any proof of the relationship; I confirmed that I did not as it never occurred to me that I would require it. He gave me the clear impression that unless I had actual proof of the affair there was nothing that could be done at this late stage. He then quickly ended the telephone call explaining that he had overnight preparation for senior counsel.

31. In the circumstances, I did not feel there were any options open to me to challenge Mr Justice Clarke's presence on my appeal I was in a position to go against what my solicitor firmly stated Unfortunately the key information – Mr. Justice Clarke being on the panel deciding my appeal – reached me at far too late a stage for me to have any real opportunity to challenge this, or request that he recuse himself.

32. I am not aware of why this change of Judge took place, or when given Mr. McCluskey's detailed email of 25th June 2013 regarding where Supreme Court Judges were allocated. I had no reason to believe the Panel would change following my telecon with Mr. Clerkin I had no knowledge of the workings of the Supreme Court.

8

Judgment – 30th July 2014

33. When I heard of the judgement from the Supreme Court on the 30th July 2014 I was devastated with the findings. I was shocked to learn that I had lost on all grounds with some major issues of the appeal not being ruled upon.

34. The summary of the judgment relayed to me by my legal team had a serious effect on me. I was deeply concerned about the fairness of the legal system, was shocked by what had happened, and my health and general well-being suffered. Because of this, it took me over six weeks until I felt able to read the Supreme Court findings; I did so in mid-September 2014.

35. It was at this point that I realised that Mr. Justice Clarke had delivered the Court's sole available ruling. Mr. Justice Hardiman had not produced a separate judgment. I understand from my legal team that a separate judgment may have been produced by Mr. Justice McKechnie, but I have not seen this and my legal team have been unable to secure a copy of it.

36. The judgment of Mr. Justice Clarke appeared to me to be a wholesale endorsement of Mrs. Justice Irvine's 2009 judgment in its entirety. It did not deal with a number of the complex legal issues which had arisen at the hearing.

37. Having not had the opportunity to raise my concern regarding Mr. Justice Clarke determining my case prior to the hearing, or during the hearing, I then determined to take steps, in light of my consideration of the judgment – apparently solely given by Clarke, and in the absence of any other available judgment.

38. This caused me to undertake enquiries to ascertain if there was any substance to the rumour I had heard in 2009, to the effect that both Judges had conducted an extra-marital affair at some point in the recent past and in particular during the period when Mrs. Justice Irvine heard the case and delivered her ruling in 2008/ 2009.

9

39.    After making enquiries I learned from a number of sources that in fact there was a serious relationship between the two Judges and that it was well known within legal circles. It has been described by some individuals in the Law Library as an "open secret." I have been informed that this relationship resulted in one or both parties leaving their respective marriages to conduct a relationship, and furthermore that the relationship lasted for a significant period of time and was far from fleeting or very short term.

40.    It is my firm view that Mr. Justice Clarke should not have sat in judgment on my appeal against a ruling of Mrs. Justice Irvine. He was being asked to adjudicate upon her ruling, yet it is widely known that they have had a long-standing, intimate, extra-marital affair, which spanned the time when she herself gave judgment at High Court level.

41.    I am also deeply concerned that Mr. Justice Clarke did not reveal the existence of this relationship in the circumstances.

42.    My new-found knowledge regarding the relationship has also caused me to revisit the comment made by a senior member of my legal team in July 2009, suggesting that Mrs. Justice Irvine had not decided upon the case herself but had been influenced to some degree by her then partner. The comment had gone even further and suggested that she did not even write the judgment. I have no faith in her ability to have decided fairly upon my case in the circumstances.

43.    In my view, it is now incumbent on Mr. Justice Clarke to set out the history of his relationship with Judge Irvine and where it stood in 2008/ 2009 when she was presiding over the case taken by my former wife.

44.    As a result of this information about the "open secret" of this relationship, I took steps to challenge the findings of both Judges. I contacted a number of different solicitors who I wished to instruct on the issue. Given the extreme sensitivities of the

10

my request I could not find a solicitor in the Republic of Ireland to take up my case, and those that I spoke with confirmed their belief that I would have to go outside the jurisdiction after consulting with Senior Counsel in the law library.

45. Against that background I felt I had little option but to send a personal letter for the attention of the Chief Justice, Ms Susan Denham SC. By letter dated the 17th October 2014 I wrote to the court and set out my initial concerns focusing in particular on my sources in the Law Library who wished to remain anonymous that the Judges conducted a longstanding extra-marital relationship which served to prejudice my position. I refer to a copy of the letter which I have marked with my initials "SD8". I wrote this letter at a time when I had no legal team advising on this matter. In the letter, I set out as best I could why I considered there to be a perception of bias and prejudice.

46. As soon as I possibly could I instructed a firm of solicitors outside the jurisdiction and by letters dated 6th November 2014 and 17th November 2014 my newly instructed solicitors, KRW Law LLP of Belfast, wrote to the court giving them notice that they intended to make an application to come on record and serve the relevant Notice of Motion to Vacate premised on bias and prejudice. I refer to a copy of said correspondence which I have marked with my initials "SD9". My newly appointed solicitors also wrote to all other parties.

47. By letters dated the 10th and 17th November 2014 the Supreme Court wrote to myself and my solicitors respectively indicating what was required in order to proceed with such application. I refer to copies of said correspondence which I have marked with my initials "SD10".

48.    I have also now instructed counsel based outside the jurisdiction, in London. I have acted with all due expedition in circumstances where my legal team are based across two jurisdictions and I am in a third, based in the United States.

49.    In making this affidavit I appreciate entirely the sensitivity and difficulties in making averments of this nature. I do not make them lightly. I do not wish to have to make them but I feel I have little option but to do so given the adverse findings made against me and given the fact that I do not feel I have had a fair hearing before an apparently independent decision-maker either at High Court or Supreme Court level. I have also had no meaningful opportunity to challenge this position until now, as I knew nothing of the relationship until after Mrs. Justice Irvine's judgment was handed down, and I did not know Mr. Justice Clarke was sitting on the appeal until it was too late and the appeal hearing was half way to completion.

50.    I have no interest in the personal lives of two Irish judges and wish them well in their personal lives.

51.    My concern is that the bias and / or prejudice arising in this case, or at the very least the perception of such bias or prejudice, represents a serious interference with justice and constitutes a breach of my constitutional rights.

52.    I ask that this Honourable Court moves on my application.

SAVE AND EXCEPT where stated or otherwise appearing, I depose the foregoing from facts within my personal knowledge.

SWORN at _Inn Square, London WC1R 5JD_
this 93 day of _February_ 2015
before me a solicitor empowered to
administer oaths/notary public.

_Richard Slade and Company, 9 Gray's_

12

Richard Slade & Company
Solicitors
9 Gray's Inn Square
London WC1R 5JD
+44-20-3330-0500

This Affidavit is filed on behalf of the Plaintiff by KRW LAW LLP,

9-15 Queen Street, Belfast BT1 6EA

Dated this                    day of                    2015

Signed:........................................
       KRW LAW LLP
       The Sturgen Building
       9-15 Queen Street
       Belfast, BT1 6EA

IN THE SUPREME COURT

Appeal Numbers 328, 373 and 485/09

High Court Record Number 1997 58 M

---

## EXHIBIT TO AFFIDAVIT

---

I hereby attach an exhibit referred to in my affidavit dated 23rd January 2015, marked as "SD 1."

Signed: *Sean Dunne*

Date: *23rd January 2015*

Main

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD7" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

*Private & Confidential – Addressee Only*
The Honourable Mr Justice Francis Clarke
Áras Uí Dhálaigh
Ground Floor
Inns Quay
Dublin 7
D07 N972
Republic of Ireland
BY EMAIL ONLY TO:

Our Ref: ▨▨▨▨▨▨                                          20 December 2017

Dear Mr Justice Clarke

▨▨▨▨▨▨▨▨▨▨▨ – A.A.v.B.A. [2014] IESC 49

1.     Thank you for your letter dated 8 December 2017.

*Private Lives of Judges Before Appointment - Apparent Bias*

2.     As stated at paragraph 1 of our letter of 15 November 2017, we are instructed by ▨▨▨ ▨▨▨▨▨▨▨▨▨▨▨▨ on challenging a decision of the Supreme Court, on the grounds of apparent bias. As we stated in that letter, the judgment of the Supreme Court our client is considering challenging was handed down by you and was on appeal from your decision in *AA v BA* (unreported) in the High Court on an judgment from Ms Justice Mary Irvine.

3.     We note that your letter of 8 December 2017 is carefully crafted, so as not to admit to any prior relationship. However, by not answering, transparently, the question of whether you and Ms Justice Mary Irvine had, at any time, entered into a relationship strongly points to that being the case. We did not ask the question which you have answered, nor did we limit our questions only to the time period on which you took up judicial office. Your response deliberately limits matters in regard of any relationship to the time period whilst you were a judge:

> *"I confirm that since my appointment as a judge in 2004 I have not had a relationship of the type to which you refer with any person who was, has since become or is a judge."*

4.   Your response deliberately leaves open the period prior to you becoming a judge. You dismiss this, even though we did not invite your view on the legal position, by stating:

> *"As a matter of principle it is difficult to envisage circumstances in which the private lives of judges prior to their appointment as such and at a very significant remove in time could be relevant in the way you maintain."*

5.   We think your statement above is wrong in law, and we will deal with it in more detail below.

6.   However, our letter was written in contemplation of a legal challenge to the Supreme Court judgment and perhaps others and, with respect, our correspondence was not seeking your legal opinion on the issue, nor was our letter seeking your personal views on the merits of such an application or the relevance of any matters relating to apparent bias. We say this respectfully, as no doubt you would agree that neither you nor Ms Justice Mary Irvine could possibly sit in judgment in an apparent bias case which may raise questions about any relationship you and she may have had at any time in the past.

7.   If this matter is to proceed further, the question of "principle" which you describe will have to be tested before a Court (composed of judges other than you and Ms Justice Mary Irvine), and the issues would need to be determined by reference to the law. As Ireland's most senior judge, we trust that you will assist in the administration of justice and help the Court that considers these matters by disclosing the factual information requested in our letter.

8.   We stress, if this is a concern, that this is not a matter where ▮▮▮▮▮▮▮▮▮▮has any sensationalised interest in the personal or private intimate relationships of judges.

9.   In this regard, we thank you for providing a factual response to the our question about discussions you may have had regarding the appeal, by confirming that you did not discuss the proceedings except for the Supreme Court judges who were involved in the case. We

3

also thank you for clarifying the factual circumstances in which you ended up hearing the appeal case.

10. However, to respond to our questions by deliberately limiting the reference period, does come across as concerted obfuscation. That in itself raises deep concerns from our client, given that apparent bias and a lack of transparency is at the heart of her proposed challenge. We do not understand how it can be suggested or inferred, on principle, that an extant or past intimate relationship between a judge hearing an appeal and the judge whose decision is impugned in that appeal, is not be "relevant" in relation to a proposed legal challenge based on apparent bias.

11. In the English jurisdiction, for example, a relationship of friendship between a potential witness (one who was not to be called in the trial), and a judge, was sufficient to give the appearance of apparent bias requiring recusal (see *Morrison & Another v AWG Group Ltd & Another [2006] EWCA Civ 6*).

12. More recently, in the Irish jurisdiction, as recently as 18 December 2017 the President of the Court of Appeal, Mr Justice Ryan, rescued himself from hearing a case which involved our client because in 1993 he had purchased a house off a company partly owned by ▓▓▓ ▓▓▓▓▓▓▓▓▓, Sean Dunne, in Booterstown, Dublin. Mr Justice Ryan also lived close to, though he did not know, Mr Dunne's ex-wife. As you will already be aware, Mr Justice Ryan was appointed to the judiciary in 1993.

13. Therefore, given the events in the Court of Appeal only a few days ago, in relation to our client, we do not accept that it would unarguable and not "relevant" in a case that a judge should recuse him or herself for matters related to his or her private live before he or she became a judge. In fact, Mr Justice Ryan clearly felt (we say quite properly) that matters in his private life prior to being a judge, in this case a property transaction, are appropriate grounds for recusal.

14. Furthermore, whilst you have alluded to a "significant remove in time" being somehow relevant, we point to Mr Justice Ryan's recusal in relation to a property purchase conducted nearly twenty five years ago. Also, with respect, was it the case that you and Ms Justice Mary Irvine were to have had an affair prior to taking up judicial office, it is not the elapse of time from the relationship ending that is relevant, but it is the appearance to the parties in the case at the time of the appeal being heard that is most crucial.

15. We therefore ask you again, considering the office you hold and with the fair administration of justice in mind, to please respond to all the questions raised in our letter of 15 November 2017, and in particular confirm if you have ever had any intimate relationship with Ms Justice Mary Irvine, at any time, and to indicate when that relationship occurred.

16. Whilst you may personally feel that this matter is not "relevant", with the greatest respect it is not your perception that is central. Instead, the Court will determine this matter based on the perceptions of the independent observer, and it is those perceptions that are extremely relevant. The need for justice to be manifestly and undoubtedly seen to be done is a cornerstone of fair justice. The appearance/perception of the matter is just as important as the reality (see *R v Bow Street Metropolitan Stipendiary Magistrate, ex p Pinochet Ugarte (No 2) [1999] UKHL 52*). The New Zealand High Court in *Ahmed Zaoui v The Honourable Laurence Greig and Another HC AK CIV 2004 404*, at paragraph 89, highlighted the significance of *"public perception and confidence in the fair administration of justice"*. In England, the House of Lords in *Lawal v Northern Spirit Limited [2003] UKHL 35*, at para 14, noted the dicta of Lord Hope in *Porter v Magill [2001] UKHL 67* para 103:

    *"public perception of the possibility of unconscious bias is the key"*

17. In the context of a judge in the Irish jurisdiction, the wording of Article 34.6.1° of *Bunreacht na hÉireann* engages the relevance of any relationship of affection (or ill-will) to the duties of a judge:

    *"In the presence of Almighty God I do solemnly and sincerely promise and declare that I will duly and faithfully and to the best of my knowledge and power execute the office of Chief Justice (or as the case may be) without fear or favour, affection or ill-will towards any man, and that I will uphold the Constitution and the laws. May God direct and sustain me."* (Our emphasis).

18. Where a judge has or has had ties of affection or ill-will (perhaps in the case of a personal relationship which may have ended) with a judge from whom he is hearing an appeal, then constitutional obligations, made under oath, are engaged. It is manifestly unfair on

........ to simply dismiss ....concerns and requests for information on the basis that the matter may not be "relevant" or on your perception of what is a point of "principle". The matter should be tested before a Court, and determined appropriately.

19.     We remind you, again, of the guidance issued by the Association of Judges in Ireland, which states, inter alia, in reference to the Oath that:

> *"These are not empty words, or something to which mere lip-service is to be paid. It is fundamental to the maintenance of confidence in the Judiciary that judges should not only be independent, but that they should also be impartial. Moreover, not only must judges actually be impartial but they must do everything they can to ensure that they are perceived as such. According to the old adage, 'justice must not only be done but be seen to be done.'"*

20.     In this regard, the question is not whether you feel it is relevant whether you were in an intimate relationship with Ms Justice Mary Irvine prior to becoming a judge. It is your obligation to provide clarity on the matter so that the Court can determine whether that fact is relevant or not to any challenge our client pursues on the grounds of apparent bias.

21.     The matters our client is considering challenging also raise serious concerns about .... rights under, in particular, Article 6 of the European Convention on Human Rights. It is self-evident and trite law, that any apparent judicial bias infringes a citizen's right to a fair trial.

*Further Assistance*

22.     We again ask for clarity on your position as regards any relationship you may have had at any time with Ms Justice Mary Irvine. If no intimate relationship has ever existed, then that will dispose of the matter.

23.     We appreciate that if you were in a secret intimate relationship with Ms Justice Mary Irvine at any time, this may cause you or her potential personal and professional embarrassment. It is not the desire of ........any proposed action .... may consider in due course, to cause any such embarrassment. The series of judgments which are the subject matter of the potential apparent bias claim are however being used against.... in proceedings in Ireland and the United States of America to seek to discredit.... personal reputation and this is affecting.... children. For example, it has been used in relation to a

6.

[REDACTED] taken against our client and other actions taken by the Official Assignee in Ireland in the bankruptcy of Sean Dunne. Therefore, when questions are put to a Judge as to whether he is aware of facts which a citizen alleges go to apparent bias in proposed proceedings, your primary duty should be to the administration of fair justice and upholding the public perception that there could be no possibility of unconscious bias. Your personal fears or concerns must be put aside.

24. To leave the central questions in our inquiry letter of 15 November 2017 unanswered, as a senior judge, is of grave concern to our client. It does give an impression that something has and is being withheld or hidden from the parties in the case of *AA v BA*. We urge you strongly to reconsider your position and bring clarity to the matter.

25. We have advised our client that if our attempts to obtain clarity from judicial office holders, directly and as discretely as possible, result in a continued refusal to engage with our questions, then [REDACTED] will be forced to explore alternative methods of obtaining such transparency. For example, whether it could be agreed that proceedings could be held *in camera* or whether she should now look to witness summons any persons (such as work colleagues, friends, partners or ex-partners) who may have information on these matters. [REDACTED]

26. [REDACTED] is only seeking the truth and trying to ensure that justice is manifestly seen to be done fairly in all and any proceedings to which she is a party.

National Security & Administration of Justice Implications

27. In the course of considering your response a matter arises which we must now put to you. If you are, or have at any time been, in a relationship with Ms Justice Mary Irvine, which clearly was by its nature secret and it has not been made public, was the matter ever notified at any time to the Minister for Justice or to the Chief Justice of the time, or any other senior judicial office holder or minister of state?

28. We reiterate the question above, as asked at paragraph 9(iii) of our letter of 15 November 2017, as there are potential national security implications of two judges, at the most senior levels of the Irish judiciary, having or having had a potentially secret affair which may have been hidden from others who ought to have been informed.

7.

29. The implications for the administration of justice are relevant in that justice must not only be done but be seen to be done, which, we respectfully submit, undermines your suggestion that the issue is not "relevant" as a matter of "principle". In, for example, a case involving matters of serious organised crime, or terrorism, if a party to the proceedings became aware of such a secret affair and then sought to use this to potentially influence a judicial office holder there would be significant implications for national security.

30. We ask again whether you, on taking judicial office, or on Ms Justice Irvine's appointment as a High Court and to the Court of Appeal, disclosed these matters? We also ask to whom you made such disclosure? If you did not disclose such matters, please indicate why you did not disclose them, given your high office and the risk that (even at some point in the future, if it has not already happened) a persons may attempt to influence you because of any past secret relationship with a woman who is now a senior judicial office holder.

31. We believe that any action that ▓▓▓▓▓▓▓▓▓ may consider raises potentially important constitutional questions, not least on the scope of the obligations in Article 34.6.1° of *Bunreacht na hÉireann*. The proposed action also raises serious national security issues for the State, and it is wholly unsatisfactory in that regard for you to claim that these matters are not "relevant" or not subject to "principle". To our client, they seem to touch at the very heart of the fair and secure administration of justice in the State, and cry out for transparency.

32. Your prompt and positive responses, as well as your willingness to engage with our client, will assist ▓▓▓▓▓▓▓▓ to determine whether or not she is forced to seek to vindicate her rights before the Court. Upon receipt of a full and transparent response to be received by us on or before 5 January 2018, our client will consider her personal rights to fair justice as a citizen and whilst potentially also raising the issues of national security and secure administration of justice in Ireland.

Yours sincerely

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD8" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

_____

SEAN DUNNE

_____

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

Dublin



22nd January 2018

Re: AA v BA ; CD Notice Party

Dear Sirs,

As you know I am reluctant to engage in correspondence in this matter not least in circumstances where the relevant litigation concerns parties other than your client. There is however one matter raised in your letter of 21 December 2017 (received 10 January 2018 for reasons of which you are aware ) which requires reply.

I accept without hesitation the principle that it is not for me to determine any issue involved in an allegation of bias against myself. That would be a matter for a suitably-constituted panel of the Supreme Court hearing an appropriate application in the above mentioned proceedings having decided or directed what matters are relevant and necessary to its conclusions.

It does not however follow from that principle that a disappointed litigant is entitled to interrogate a judge involved in the litigation on aspects of the judge's private life and insist on answers because the litigant believes them to be relevant. This too appears to be an important point of principle.

I do not believe that it is appropriate that I correspond further in this matter.

Yours sincerely,

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD9" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

_____

SEAN DUNNE

_____

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

22 Stillman Lane,
Greenwich, CT.,
Connecticut,
USA 06831

17th October, 2014.

Ms. Susan Denham,
Chief Justice,
Four Courts,
Dublin 7.

Re: Supreme Court Record Nos: 1997/68M & 2001/168M. Dunne .v. Dunne &
Dunne .v. Dunne & Notice Party Killilea. ...

Dear Madam,

My name is Sean Dunne and I am the respondent named in the above named &
numbered proceedings.

I enclose a copy of my Passport by way of identification.

I have been adjudicated a bankrupt in two jurisdictions albeit that the Irish adjudication
is subject to an Appeal and to the extent that I am now disenfranchised as a bankrupt
will now have to represent myself and seek civil legal aid or alternatively seek pro bono
representation outside of the jurisdiction to balance the wrong perpetrated against me.

It is my intention to seek leave for a Judicial Review in respect of the above proceedings
the merits or demerits of which need hardly concern you save and except that I am
compelled to appraise you of matters of profound concern to me which I believe
warrant detailed, prompt and impartial investigation by you in the absence of a
Statutory Judicial Complaints Authority or Council.

The judgments of Judges Clarke and Irvine have severely and wrongly excoriated my
reputation to such an extent that other agencies have sought to rely on same in other
matters before the Courts in this and other jurisdictions to my absolute detriment.

I am suggesting that for Judge Clarke to sit on a division of The Supreme Court in my case is wholly inappropriate for the following reasons:

1. Judge Clarke as Senior Counsel appeared in a commercial dispute for an opposing party to me [involving a close personal friend of his Garech de Brú regarding property at Woodtown Manor, Rathfarnham] and to say that his attitude, demeanour and personalized distaste of me in the course of the matter was extraordinary would be an understatement and in the circumstances his failure to recuse himself from my Supreme Court Appeal frankly beggers belief. I acknowledge that I myself made no application to the Court for the Judge to recuse himself and that my faith in the impartiality of the system was misplaced.

2. Additionally I am advised that the relationship between Judge Clarke and Irvine of which I am sure you are aware or ought to be aware of would I am sure in normal circumstances should have precluded Judge Clare from hearing such an appeal particularly a family law matter and there is precedent for this situation.

3. Even a cursory reading of the judgments herein [which of course will be part of my application to seek leave for a judicial review] will disclose that for whatever reason fundamental grounds of my appeal which were absolutely critical to the outcome of my case were in no way referred to or canvassed by the Court in the judgment delivered.

4. Whilst Judge Hardiman presided over my Supreme Court Appeal it was Judge Clarke who delivered the judgment: Supreme Court Record Number: 328, 373 & 485/09. Delivered 30th July, 2014.

I await hearing from you as a matter of some urgency.

Yours faithfully,

Sean Dunne.


An Priomh-Bhreitheamh
The Hon. Mrs Justice Susan Denham
Chief Justice

10th November 2014

Mr. Sean Dunne
22 Stillman Lane
Greenwich CT
Connecticut
USA 06831

Re: Supreme Court Record Nos: 1997/58M & 2001/168M.
Dunne v. Dunne and Dunne v. Dunne & Notice Party Killilea

Dear Mr. Dunne,

I am in receipt of your letter of the 17th October, 2014, and note its contents.

The Supreme Court is the court of final appeal and orders made by it may be set aside only in exceptional circumstances. For example, it may be necessary for the Supreme Court to set aside one of its earlier orders in rare cases so as to protect a constitutional right, or where there has been a clear breach of the principles of natural justice. As I stated in the case of *Re Greendale Developments Ltd (No. 3)* [2000] 2 I.R. 514 at 544:

> "The Supreme Court has a jurisdiction to protect constitutional rights and justice. This jurisdiction extends to an inherent duty to protect constitutional justice even in a case where there has been what appears to be a final judgment and order. A very heavy onus rests on a person seeking to have such jurisdiction exercised. It would only be in most exceptional circumstances that the Supreme Court would consider whether a final judgment or order should be rescinded or varied. Such a jurisdiction is dictated by the necessity of justice. A case will only be reopened where, through no fault of the party, he or she has been subject to a breach of constitutional rights."

The Supreme Court must balance the principle of finality of its decisions as a court of final appeal, with the need to vindicate constitutional rights. Therefore it is open to a litigant to bring a motion before the Supreme Court seeking to set aside an earlier Order made by it. This motion requires to be grounded on an affidavit, establishing, by admissible evidence, the facts required to discharge "the very heavy onus" referred

18.

to in the paragraph quoted above. The affidavit should also address, where applicable, any failure to raise any ground of objection or complaint before the hearing which lead to the Order sought to be set aside commenced. You would need to serve any such motion and affidavit on the respondent to the appeal.

Yours sincerely,

Susan Denham
Chief Justice

19.

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD10" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

Sean Dunne
22 Stillman Lane
Greenwich
CT 06831

6th December 2015

Sent by Email and Post
CC enquiry@aji.ie; SupremeCourt@Courts.ie

Dear Chief Justice and Association of Judges of Ireland,

As the Chief Justice is aware I have been denied standing to pursue my case to over turn the High Court and Supreme Court judgments in family law case D v D regarding the perception of judicial bias.

Given my lack of standing as a bankrupt, I now ask the Chief Justice and the Association of Judges in Ireland what you intend to do about my allegations and what I believe to be extreme judicial misconduct by your fellow Supreme Court Judge Frank Clarke and Judge Mary Irvine.

Their apparent judicial misconduct and the very appearance of judicial bias that their conduct has resulted in, and the manner in which it undermines any right thinking persons reliance on the independence and fairness of the judicial system in Ireland needs to be investigated independently as a matter of urgency.

The Chief Justice already knows the unhappy history of this case. Judge Irvine made extraordinary and outlandish findings against me in an in camera judgment of 2009, findings that defied established commercial law, family law and normal legal procedure. I discovered on receiving this shocking judgment that members of the law library did not believe she had written this judgment independently, but that it was largely influenced by fellow High Court Judge Mr Frank Clarke. It was common knowledge within the judiciary that Ms Irvine and Mr Clarke were conducting an intense extra marital affair at the time. Their chambers were even adjacent to each other.

I also had history with Judge Clarke whereby as a Senior Counsel he represented Garech de Brun in a case against myself and Arthur Cox solicitors in 1999. We contracted to buy lands from De Brun in Woodtown Manor, Rathfarnham and paid the deposit. Shortly thereafter part of the land was rezoned before the contract closed. De Brun attempted to renege from the contract citing such allegations of fraud against me and members of my legal firm Arthur Cox. The case was settled very much in my favour with all allegations withdrawn and my counsel at the time commented on Frank Clarke's unusual and surprising personal animosity towards me. Garech de Brun was his personal friend and it was made clear to me he was taking this legal

20.

battle personally too, rather than having the usual personal disconnect of a senior counsel from his client.

I was perturbed to hear, when she delivered her judgment in 2009, that while hearing the family law case Judge Irvine had been intimately involved with Judge Clarke, more particularly when the case involved options, contracts, allegations of fraud and non disclosure, similarities to the case Clarke and de Brun tried to impress against me and Arthur Cox solicitors in 1999.

I appealed the decision and fully expected that such an appeal would be dealt with impartially and fairly by the Supreme Court of Ireland. The appeal was based on 157 points of appeal due to the decision Judge Irvine made against established principles of law. The appeal was prepared by my then Senior Counsel, Mr Donal O'Donnell, now a Supreme Court Judge. However, a most disturbing incident occurred. The panel of judges who were listed to hear the case in 2013 was changed on the day of the hearing without notice to any party, with newly appointed Supreme Court Judge Mr Frank Clarke stepping in, in place of Judge John MacMenamin. No reason has ever been provided for this last minute change. In fact Judge Clarke was listed to hear another matter that day.

I only learned of this replacement after the close of the first day's hearing, as I was in the USA at the time. I was appalled and told my legal team Judge Frank Clark must not sit in judgment of me due to his relationship with Judge Irvine and his previous acting against me as a Senior Counsel. My legal team said that it was too late now that we were already one day into a two day hearing and begged me to put my faith in the objectivity of the Supreme Court and Frank Clarke. They also said he had not spoken or asked questions throughout the day and they believed Judge Adrian Hardiman would write the judgment. I had previously , as early as March 2012, put my solicitor on notice in writing that Judge Clarke should never sit in judgment of me due to his previous animosity in the De Brun case and his relationship with Judge Irvine.

When judgement was delivered a year later Frank Clarke alone delivered the judgment, fully endorsing Judge Irvine's original judgment, reiterating her "findings of fact" while failing to deal with the vast majority of the other legal complexities the case brought up. I was shocked and appalled and indeed felt violated and personally attacked. I was dumbfounded that a Supreme Court Judge could think it appropriate to compose and deliver an appeal judgement on his lover/former lover, with all the complexities such extra marital affairs can have on people's ability to be objective and the manner in which it can divide their loyalties. One would presume that Judge Frank Clarke must have known it was wholly inappropriate for him to sit in judgment of Judge Irvine. He should have informed his colleagues he would refrain from sitting on the appeal panel for this personal reason, Yet inexplicably he did not. His actions in participating in the bench on this appeal raises serics questions about this man's judgment, motives and integrity.

Judge Frank Clarke had also delivered judgment in another case, Wright v Geary and Geary and another: third party: John Deere Limited: Supreme Court, November 2013, where he also roundly endorsed Judge Irvine's judgment, again on her findings of fact. I know of no other instances where a member of the Supreme

Court has sat in judgment on an appeal of his wife/partner or ex wife/ex partner. I do not see how this situation distinguishes itself. The fact is he has now sat on two of her appeals and roundly endorsed her original judgment in both.

I had some reluctance putting my faith in the Supreme Court again when I made my application to have the judgments overturned as I believed all did know of the relationship between Clarke and Irvine. The existence of the relationship was common currency in the Four Courts, yet the Chief Justice stood by while Judge Clarke slipped into Judge MacMenamin's place and delivered judgment. The fellow panel of judges also did not consider hi sitting in judgment to be an issue.

Of further concern is the latest judgment from the Supreme Court that ruled I had no standing to pursue this matter. From my perspective it appears The Supreme Court of Ireland have neatly avoided having to address the questionable behaviour of their own colleagues by ruling that I do not have standing as a bankrupt to have this case reopened on the basis of perceived judicial bias. The Supreme Court have allowed another officer of the court, Mr Lehane, to stop me from asserting my most personal constitutional and human rights to clear my good name. Indeed Mr Lehane and the US Trustee seek to use the contested Supreme Court judgment against me in various legal cases pertaining to my bankruptcy. It is most disturbing that they are allowed to take away my right to contest the judgment in the highly unusual circumstances where fellow officers of the court, Irvine and Clarke, are suspected of wrong doing, but they can still endeavour to use those very same findings against me. It is further disconcerting that The OA and US trustee's paymasters are Nama, an arm of the state, and Ulster Bank, and they act on their instructions, so are not impartial or acting independently.

For all Irish citizens sake, I do not believe this matter should be let lie just because I, as a bankrupt, am conveniently found not to have "standing" to have the case sent back for rehearing on the basis of a perception of judicial bias. It is not acceptable that the politically appointed most senior members of our judiciary can conduct extra marital affairs with each other, fail to disclose same and  sit in judgment of each others findings, or indeed perhaps influence each others findings. Even if a member of the judiciary was not influenced to find in favour of his lover or former lovers legal rulings, the very perception is that he could be. Indeed in some cases the judicial member could even find against their former lover if animosity existed. Judge Clarke should have recused himself rather than parachute himself into the hearing on its opening day. There is no doubt that Judge Clarke should have refrained, and all those who had knowledge of the relationship should have ensured that Judge Clarke could never sit on appeal of a decision made by his lover/former lover Mary Irvine.

Unfortunately my very fears seem to have been realised. A number of legal professionals I approached to take the bias appeal refused to do sao, for fear of begin black balled by the judiciary and legal profession. I ask you as Chief Justice  and the Association of Judges to restore my faith in the Irish judicial system an ensure an independent inquiry is carried out into the relationship between Judges Irvine and Clarke.

Key questions that need to answered are:

1) Did Judges irvine and Clarke discuss my family law case while Judge Irvine was hearing it?

2) Did Judge Frank Clarke inform Judge Irvine about his role in representing Garech de Brun against me in 1999?

3) Did Judge Frank Clarke seek to impress a negative opinion of me on Judge Irvine at any point?

4) Did he advise or contribute to any part of her 2009 judgment?

5) How did Judge Clarke end up sitting on my Supreme Court Appeal on Judge Irvine's 2009 judgment at the very last minute?

6) Why did he think it appropriate for him to sit in judgment of his lover/former lovers decision?

7) Were you, as Chief Justice, aware of the relationship between Judges Clarke and Irvine and if so why did you allow him to sit as an appeal court judge on two of her cases. and allow him to write the lead judgment in both?

8) What knowledge did the other two presiding judges who sat on the appeal, Judges Hardiman and McKechnie, have of the relationship between Judges Irvine and Clarke?

9) Will the courts allow the Official Assignee Christopher Lehane and the US trustee Richard Coan to use the contested judgments against me, and attempt to use them against my wife Gayle who is a wholly innocent party , my separation and divorce as we only met in August 2002 while my first wife filed for judicial separation in 1996? To date both the OA and Trustee Coan have tried to use the judgments against me in my bankruptcy proceedings while they have denied me the opportunity to contest the judgments.

I would respectfully ask you to respond to me on this most serious matter by close of business this week as I believe all of the points herein are not new to you.

Yours Sincerely

Sean Dunne

3/29/2017

Our Ref:

Mr Justice Peter Kelly SC
President of the High Court
Four Courts
Dublin 7

Dear Sir,

RE:    Complaint

I enclose herewith the following;

1. Copy Ruling of the High Court (Irvine J dated June 2009).
2. Copy letter of consent from MS Trustee dated
3. Copy Ruling of the Supreme Court (on appeal from Irvine J) dated          .
4. Copy email from Clerkin Solicitors to Sean Dunne dated <u>what date</u>        confirming appointment of Mr Justice Frank Clarke SC in the Supreme Court.
5. Copy letter Sean Dunne to the Supreme Court Chief Justice dated          .
6. Copy Affidavit of Sean Dunne dated 23/1/2015.
7. Copy response from the Chief Justice to Sean Dunne dated          .
8. Copy Ruling of the Supreme Court dated November 2015.
9. Copy affidavit of the Official Assignee in Bankruptcy dated 25/1/2017.
10. Copy preliminary representation to the Supreme Court dated 20/3/2017.

I want to complain about Judicial bias against me in my attempts to access justice in my various litigation before the courts.

In particular I complain as follows;

1. There is evidence of Judicial bias against me by Mr Justice Frank Clarke SC as per the allegations outlined in my personal letters sent to the Chief Justice of the Supreme Court the contents of which are self-explanatory.

   My affidavit sworn 23rd January 2015 sets out the basis of my application to set aside the High Court Ruling of Irvine J on the basis that one of the presiding Supreme Court Justices (Mr Justice Frank Clarke SC) was at the time of the appeal or had been previously conducting an extra-marital affair with Ms Justice Irvine, which went on over a long period of time.

The application to set aside the High Court Ruling on this basis was never deliberated upon because the Official Assignee contrary to what my US Bankruptcy Trustee advised (see 2 above) refused permission for me to mount my

application. I complain that Mr Justice Frank Clarke SC ought never to have sat on the appeal because he was biased or in the alternative the decision by him to sit on appeal created a perception of Judicial bias on my part as an eminent -SC High Court Judge he should have known better.

1. There may even be grounds for impeachment as Judge Frank Clarke I have now discovered also adjudicated on another Irvine J High Court Judgment where he again gully endorsed her High Court findings in the case of ? v John Deere. Wright v Geary and Geary and another: third party: John Deere Limited: Supreme Court, November 2013—

2. I also complain that having raised the issue of bias whether real or perceived there ought to have be an investigation or other inquiry to examine the circumstances in which Mr Justice Frank Clarke SC sat in place of Mr Justice McMenamin SC. I accept that ordinarily neither I nor any other party to any legal proceedings in the jurisdiction should be entitled to such information. However, I now make the case that with bias having been raised I ought to be entitled to the protocol or other criteria in existence which oversees the appointment of Judges in particular matters or actions. In this particular case the perception of bias is compounded by the fact that no explanation has been forthcoming to explain the late change (given the email from Clerkin Lynch set out at 3) to the panel hearing the appeal from Irvine J.

3. My application to obtain status (as a Bankrupt) to make an application to set aside the earlier Supreme Court Ruling was refused. The Chief Justice sat on the Supreme Court Panel. She was also the recipient of a detailed letter sent by me complaining about bias on the part of Mr Justice Frank Clarke SC. I now want to complain that the Chief Justice ought not to have sat on the Supreme Court Panel because she was prejudiced having had sight of the complaint letter from me. Furthermore and in the alternative in the absence of any bias there was a clear perception of bias given the content of my letter and the substance of the application seeking status to appeal. Whilst the latter application was of a preliminary nature only none the less on any examination of the submissions and grounding affidavits it was clear that substantive matters were touched upon during the course of the hearing. To that end a perception of bias was created and was very much a live issue.

4. Following the filing of an affidavit by the OA (dated 25/1/2017) and in particular the contents of paragraph 86 thereof I find myself in the impossible position of a quasi-judicial figure (the OA) denying me permission to make an application to set aside a High Court Ruling on bias which in turn is relied upon by the OA to challenge the credibility and truthfulness of me pursuant to my Discharge application. With respect I am severely prejudiced in terms of my ability to contest the averments of the OA with respect to the High Court Ruling of Irvine J.

The cumulative effect of the Judicial engagement outlined has served to deprive me of my right to a fair hearing with respect of the various strands of my litigation. Critically they are engaged in the three areas outlined.

My difficulties are compounded further because there is no Judicial Complaints Commission (or other authority) in situ to make any independent adjudication upon my complaints of Judicial bias both real and perceived. I understand proposals for such a Commission have been either suspended or deferred pending other engagement. For whatever reason the failure to have such a commission in place means that I cannot get an independent review of my complaint. I should add that KRW Law have been retained to deal with this on my behalf and if have copied this correspondence to them.

However, I note that previously in a case known colloquially as "the Sheedy Affair" the Chief Justice carried out a review of the involvement of a Supreme Court Judge and High Courts involvement in the affair. His report led to both Judges resigning. Further I note that in 2013 comments made by Judge Hogan to Judge Abbott regarding a case in front of Judge Abbott was, after media exposure, the subject of a joint investigation by High Court President Mr Justice Nicholas Kearns and Circuit Court President Ray Groarke. Therefore it it is clear that where there is a will there is a way to investigate judicial misconduct and complaints regarding judicial bias.

In the absence of any Judicial Complaints Commission or equivalent body I now request formally that you commence and oversee the investigation of my respective complaints in Bankruptcy Discharge. If you require anything else from me to assist in formulating a substantive response then please let me know. In particular, if you are of the view that I must confine my complaints to both an ongoing and pending litigation process then equally please do confirm if that is the position.

I thank you for your assistance and look forward to hearing from you.

Yours faithfully

.................................
SEAN DUNNE

THE HIGH COURT

BANKRUPTCY


IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015



Exhibit "SD11" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020


SEAN DUNNE


PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

## COAN, LEWENDON, GULLIVER & MILTENBERGER, LLC

ATTORNEYS AT LAW

495 ORANGE STREET

NEW HAVEN, CONNECTICUT 06511

RICHARD M. COAN
CARL T. GULLIVER
WHITNEY M. LEWENDON
TIMOTHY D. MILTENBERGER

CHRISTOPHER M. ROYSTON
· OF COUNSEL ·

TIMOTHY M. LEWENDON

TELEPHONE
(203) 624-4756
TELEFAX
(203) 865-3673

June 5, 2013

**Via Email Only:** niallclerkin@clerkinlynch.com
Niall Clerkin
Partner
Clerkin Lynch
Solicitors
30 Molesworth Street
Dublin 2 Ireland

Re:     Sean Dunne, Chapter 7 Case No. 13-50484 (AHWS)

Dear Mr. Clerkin:

As you know, I am the bankruptcy trustee in the United States for Sean Dunne.

Pursuant to your request, I am writing to confirm that I have no objection to your representation of Mr. Dunne, or the representation of Mr. Dunne by any other lawyer, in relation to any matters that come before the Irish Supreme Court or that may come before the High Court relating to Mr. Dunne's family law dispute with his former wife.

Very truly yours,

Richard M. Coan

RMC/lkg

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD12" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS


Section 2(4) applies only where there is *'more than one such accountable person'* however, no more than one accountable person has been identified. Therefore, I conclude in accordance with section 1 SDCA 1999, that Yesreb holding Limited is the accountable person in respect of the conveyance on sale dated 29 March 2013.

## Conclusion

As set out above, I am not satisfied that sufficient evidence was adduced in support of the existence of a trust between Mr. Dunne and his wife from 1 July 2005 in relation to the purchase of Walford. I make this finding for the following reasons;

- Mr. Dunne did not tender for Walford *'in trust'* in 2005
- The contract dated 1 July 20015 does not purport to have been purchased *'in trust'* by Mr. Dunne
- The declaration of trust executed on 23 July 2005 and the terms of that trust as drafted were not retrospective
- There was no other document or note in writing to evidence the existence of the trust as at 1 July 2005 and/or to evidence the purchase of Walford in trust as at 1 July 2005.
- There was no corroborating oral evidence as regards the existence of the trust from 1 July 2005.

The legal consequence of the declaration of trust dated 23 July 2005 was that Sean Dunne divested himself of the only interest he held under the 2005 contract, namely his beneficial interest in a one tenth moiety, and he ceased thereafter to enjoy any propriety rights in relation to Walford. From 23 July 2005 his capacity was that of bare trustee for Gayle Dunne.

Mr. Dunne ceased to be Ms. Dunne's trustee on the execution of the Nominee Agreement and this was acknowledged by him in an affidavit which he swore on 12 October 2016 and which was referred to and quoted from in the judgment of Ms. Justice Costello in *Lehane v Dunne* in July 2017.

I am satisfied that in 2013, Sean Dunne had no interest in the property and had no capacity to enter into a contract for sub-sale in respect of the property.





The operation of section 46(1) SDCA does not accommodate the insertion of the name of the purchaser under the original contract into the sub-sale contract in circumstances where that purchaser no longer has capacity as vendor in respect of the sub-sale contract.

The joinder of a person in a contract for sub-sale in circumstances where that person's involvement is unnecessary or gratuitous, does not succeed in enabling a claim for sub-sale relief in accordance with section 46(1) SDCA 1999.

### Determination

I determine that the conditions necessary to avail of sub-sale relief in accordance with section 46 of the Stamp Duty Consolidation Act, 1999 ('*SDCA*') in respect of the deed of conveyance dated 29 March 2013, have not been met and that the Appellant is thereby unable to avail of sub-sale relief.

I determine that the Appellant is the accountable person in respect of the conveyance on sale dated 29 March 2013, in accordance with section 1 SDCA 1999.

I determine that the assessment dated 17 February 2016 containing a balance of €1,428,670 shall stand.

COMMISSIONER LORNA GALLAGHER

23rd day of December 2019

33



THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD13" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS



AA v BA
SUPREME COURT FINDINGS
OF J. CLARKE JULY 2014
IRISH SUPREME COURT.

10.3. There remains only the question of the decree of divorce. I should start by saying that I would have very grave reservations as to whether it can ever be possible to set aside a decree of divorce especially after the interests of third parties, such as Ms. D on the facts of this case, have been significantly affected by that decree. Ms. D was not party to any fraudulent concealment of resources. She married Mr. A in good faith on the basis of an order of the court, valid on its face, that he was divorced and, thus, free to marry her. I cannot conceive of circumstances when her status as a married woman could be interfered with because of circumstances entirely outside her control or knowledge. Different considerations would, of course, apply if the relevant divorce was foreign and questions arose as to its recognition in this jurisdiction.

10.4. On that basis, I am satisfied that the trial judge was correct to conclude that it is possible to make further provision without interfering with the original decree of divorce. This is not, of course, further provision in the statutory sense for, as the trial judge correctly pointed out, the provision here ordered does not derive from changed circumstances or the other circumstances contemplated by the legislation.

...5. The legal basis for the further provision ordered by the trial judge in this case is that it is designed to meet the constitutional obligation that the courts ensure that there be proper provision in the case of a divorce in circumstances where it has now been established that, by virtue of the deliberate concealment of resources, Mrs. A and the court was misled into believing that what was then provided amounted to such proper provision. In those circumstances, I am satisfied that the court has a jurisdiction, without interfering with the original decree of divorce, to simply make such additional provision as the Constitution requires to be made to ensure that the total provision is appropriate in the light of the provision that would have been likely to have been considered proper at the time of the original decree of divorce, had adequate disclosure been made.

10.6. On that basis, I am satisfied that the trial judge was correct in her approach and in the order which she made.

## 11. Conclusions

11.1. For those reasons I am satisfied that the trial judge was correct to conclude that she had jurisdiction to entertain this application in the form of a motion brought in the original proceedings and that it was appropriate, in all the circumstances of this case, not least because procedures analogous to those which would apply in the plenary process had in fact been applied, to go ahead with the case in that form.

11.2. I am satisfied that the trial judge was entitled to conclude, on the evidence, that there was no further concession made by Mr. A beyond that formally made to the court in October, 2001, concerning his beneficial ownership of assets and, on that basis, that the grounds of appeal in that regard should be dismissed. Likewise, for the reasons already set out, I am not satisfied that the settlement reached when the proceedings were at hearing before O'Higgins J. preclude Mrs. A from seeking further provision on the basis of a deliberate failure to disclose assets and resources.

11.3. With the exception of the issue concerning the bond to which reference has been made, I am satisfied that each of the findings of the trial judge in respect of the other assets which are the subject of this appeal were correct both in terms of the obligation to disclose, the finding of non-disclosure, the deliberate nature of same and the materiality and value of the assets concerned.

11.4. I am also satisfied that the trial judge was correct to leave the decree of divorce in place and to make further provision in the manner in which she did subject only to the question of the bond. I would, therefore, refer back to the High Court the single issue as to whether, as counsel for Mrs. A asserted on this appeal, the relevant bond actually increased the resources available to Mr. A or

371

whether, as his counsel asserted, the release of the bond simply meant that a contingent liability did not arise but with no actual beneficial effect on his assets. No other aspects of the bond issue are, for the avoidance of doubt, being referred back.

11.5. On that basis it would appear that the order of the High Court should be affirmed save that a sum of two hundred and forty thousand Euro should be deducted from the total financial award of €2,500,000 made by way of provision pending the outcome of the one issue which I believe should be referred back. If that limited bond issue is resolved in favour of Ms. A then that reduction should be reversed and a further provision of €240,000 made.

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD14" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

```
-------------------------------------------X
                                           :   CHAPTER 7
In re:                                     :
                                           :
SEAN DUNNE,                                :   CASE NO. 13-50484(AHWS)
                                           :
              Debtor.                      :
-------------------------------------------X
ULSTER BANK IRELAND LIMITED,               :
                                           :
              Movant,                      :
         V                                 :
RICHARD M. COAN,                           :
                                           :
              Chapter 7 Trustee.           :
                                           :
SEAN DUNNE,                                :
              Respondent.                  :
-------------------------------------------X
```

ORDER GRANTING AMENDED MOTION OF ULSTER
BANK IRELAND LIMITED FOR ENTRY OF AN ORDER
GRANTING LIMITED RELIEF FROM THE AUTOMATIC STAY

Upon consideration of the Amended Motion of Ulster Bank Ireland Limited for Entry of

an Order Granting Limited Relief from the Automatic Stay to Allow the Continuance of the Irish

Bankruptcy Proceeding, dated May 28, 2013 [Docket No. 67] (the "Motion"); and after due and

proper notice thereof; and after due deliberation and sufficient cause appearing therefore; and

following a full and final hearing on the matter before this Court on June 4, 2013 (the

"Hearing"), with all parties having an opportunity to appear and be heard; and after

consideration of the objections to the Motion, filed prior to or raised at the Hearing; and the

Court finding that Ulster Bank Ireland Limited ("Ulster") has established cause under 11 U.S.C.

§ 362(d) for the relief granted herein, and that the Motion should be granted as set forth herein, it

is hereby

ORDERED that, for the reasons set forth on the record at the Hearing, the Motion is granted as set forth herein, and all objections thereto are hereby over-ruled except as explicitly set forth herein; and it is further

ORDERED that the automatic stay provided under 11 U.S.C. § 362(a) (the "Automatic Stay") is hereby modified pursuant to 11 U.S.C. § 362(d) to permit Ulster and/or its successors and assigns to take all actions necessary under Irish law to perfect service upon the debtor in the above-captioned case (the "Debtor") in relation to *In the Matter of a Petition for Adjudication of Bankruptcy by Ulster Bank Ireland Limited against Sean Dunne*, 2013 No. 798 P, Republic of Ireland, High Court (2013) (the "Irish Bankruptcy Proceeding"); and it is further

ORDERED that the Automatic Stay is hereby modified pursuant to 11 U.S.C. § 362(d) to permit parties in interest to continue with the Irish Bankruptcy Proceeding and to take all actions necessary in connection with or relating to Ulster's application to have the Debtor adjudicated "bankrupt" in the Irish Bankruptcy Proceeding, provided however, that nothing in this Order shall deprive this Court of jurisdiction over the Debtor or over the property of the bankruptcy estate; and it is further

ORDERED that the Automatic Stay is hereby modified pursuant to 11 U.S.C. § 362(d) to permit parties in interest, in the event that the Debtor is adjudicated "bankrupt" in the Irish Bankruptcy Proceeding, to attend and participate in any proceeding for nominating and/or voting in respect of the appointment of a trustee pursuant to section 110 of the Irish Bankruptcy Act of 1988, as amended, and to take all actions set forth under the laws of Ireland in connection therewith; and it is further

ORDERED that except as explicitly set forth herein the Automatic Stay shall not be modified or waived, and no party-in-interest in this case shall, except by leave of this Court, take

any affirmative action in the Irish Bankruptcy Proceeding that violates the terms of the Automatic Stay; and it is further

ORDERED that until the High Court of Ireland makes an order adjudicating the Debtor "bankrupt" in the Irish Bankruptcy Proceeding, or declines to do so in accordance with Irish law, Richard M. Coan, Trustee of the Bankruptcy Estate of the Debtor, shall use his good faith reasonable judgment to minimize the costs and expenses he incurs in connection with matters that he believes, in his good faith reasonable judgment, are more appropriately resolved in concert with the representative in the Irish Bankruptcy Proceeding, if any; and it is further

ORDERED that this Order is without prejudice to the ability of any party to seek relief from this Court and this Order, as appropriate, and this Court reserves and preserves jurisdiction to consider any dispute with respect hereto; and it is further

ORDERED that notwithstanding any contrary rule or provision, this Order shall be stayed until 4 pm (prevailing Connecticut time) on June 14, 2013; provided however if the Debtor files a motion with this Court for a stay pending appeal of this Order, this order shall be further stayed through the earlier of this Court's hearing on such motion and 4 pm (prevailing Connecticut time) on June 18, 2013. Immediately upon the expiration of the stay set forth in the immediately preceding sentence, this Order shall be fully enforceable in accordance with its terms.

DATED: June 12, 2013                                    BY THE COURT

_Alan W. Shiff_
Alan H. W. Shiff
United States Bankruptcy Judge

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD15" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

_____

SEAN DUNNE

_____

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

Conflicting legal arguments made about purpose of Irish Bankruptcy:

See attached legal filing made by the US Trustee in support of the lifting of the stay: Case 13-50484 Doc 129 Filed 06/21/13 :

Pg 9,: The Debtors claims of irreparable harm are all predicated on the unwarranted assumption that the irish court and/or the Irish creditors will violate this courts Order and the automatic stay. This court granted very limited relief. The Order allows Ulster to serve a summons on the Debtor. If, and only if, the service of the summons results in an Irish bankruptcy case, the order allows Ulster and the other parties in interest to participate in the selection of an Irish trustee. Nothing else is permitted under the courts Order. This the Debtors complaints that he will be forced by an Irish court to disclose information, pay money, and turn over property all assume that the Irish court and the Irish parties before this court will violate this courts Order and, consequently, United States law. The Debtor has presented no evidence or argument that removed these complaints from the realm of rank speculation

Page 10: The Debtor no longer has any property that could be the Corpus of an Irish bankruptcy estate. If the Irish estate representative wants books of account, he must seek them form the Trustee. If the Irish Estate representative wants reasonable assistance with regard to the Debtors *former* property, he will seek it from the Trustee. ......If the Irish court or an Irish party appearing before the Irish court violated the Order, the Debtor can seek protection in this court"

*S.DuyNE STATEMENT.*

What has happened is even worse, not only has the Irish OA and creditors violated the order, the Trustee has encouraged and participated in this violation.

K Club case:

The first action of any note taken by the Irish OA was his seizing of the contents of the K Club house in Ireland. Not only does he make the usual claim in this case that all assets of the estate vest in him (even though there were no assets left in the estate by the itme Sd was declared bankrupt in Ireland) but he flaunts the support he received from the US Trustee. Howeever, that support seems to be limited to the irish OA gathering information to assist the US Trustee.

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD16" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS

43

# DUNNINGTON
## BARTHOLOW & MILLER LLP
### ATTORNEYS AT LAW

230 PARK AVENUE  21ST FLOOR      NEW YORK, NY  10169-2403      (212) 682-8811      FED TAX ID. 13-3004781

SEAN DUNNE
232 MOTT STREET, APT 3
NEW YORK, NY  10012

November 23, 2020

Invoice No.    32985

Client:    DUNNE

| Matter Summary | Balance Forward | Fees | Expenses |
|---|---|---|---|
| GENERAL | $0.00 | $229,722.50 | $5,038.93 |

| | |
|---|---|
| Total Fees | 229,722.50 |
| Total Reimbursable Expenses | 5,038.93 |
| Total Fees and Disbursements this Period | 234,761.40 |
| Net Charges This Period | 234,761.43 |

*OWING*

December 26, 2018

| | | |
|---|---|---|
| Invoice# | 61147 | JB |
| Our file# | 12340 | 000000 |
| Billing through | 11/30/2018 | |

Sean Dunne

232 Mott Street
Apt.3
New York, NY 10012

Workout

| | |
|---|---|
| Balance forward as of invoice dated   November 20, 2018 | $158,293.11 |
| Payments received since last invoice | 0.00 |
| Accounts receivable balance carried forward | $158,293.11 |

## PROFESSIONAL SERVICES

| Date | Atty | Description | Hours | Amount |
|---|---|---|---|---|
| 11/06/2018 | JB | Telephone conference with client | 0.10 hrs. | 50.00 |
| 11/08/2018 | JB | Review file; Review motion; Email to Sean re: same; Telephone conference with client; Review T.M. email; Email to T.M. re: same | 0.40 hrs. | 200.00 |
| 11/14/2018 | JB | Review file; Telephone conference with client re: status | 0.20 hrs. | 100.00 |
| 11/16/2018 | JB | Telephone conference with Attorney P. Nolin | 0.20 hrs. | 100.00 |
| 11/19/2018 | JB | Texts and emails with S. Dunne | 0.10 hrs. | 50.00 |
| 11/20/2018 | JB | Telephone conference with client re: motion for contempt | 0.40 hrs. | 200.00 |
| 11/20/2018 | JB | Review transcript | 0.10 hrs. | 50.00 |
| 11/23/2018 | JB | Emails re: discovery and response; Telephone conference with client re: same | 0.20 hrs. | 100.00 |
| 11/26/2018 | JB | Work on response | 0.50 hrs. | 250.00 |
| 11/27/2018 | JB | Text to S. Dunne re: miscellaneous items and consider response | 0.80 hrs. | 400.00 |
| 11/27/2018 | JB | Telephone conference with  J. Ryan re: production | 0.20 hrs. | 100.00 |
| 11/27/2018 | JB | Email to S. Dunne re: bill; prepare notice of appearance; Email to S. Dunne re: same; prepare motion to extend | 0.50 hrs. | 250.00 |
| 11/28/2018 | KDJ | Draft Notice of Appearance for JB in District | 0.40 hrs. | 76.00 |

Court matter, prepare and file Notice and
Motion to Extend Time

| 11/30/2018 | KDJ | Draft Motion for Further Extension | 0.20 hrs. | 38.00 |
|---|---|---|---|---|

$1,964.00

**EXPENSES**

| 11/26/2018 | PACER Electronic Records | 0.10 |
|---|---|---|
| 11/26/2018 | PACER Electronic Records | 0.60 |
| 11/26/2018 | PACER Electronic Records | 2.20 |
| 11/26/2018 | PACER Electronic Records | 3.00 |
| 11/26/2018 | PACER Electronic Records | 0.10 |
| 11/28/2018 | PACER Electronic Records | 0.10 |

$6.10

**TIMEKEEPER FEE SUMMARY**

| Timekeeper | Total Hours | Rate | Total Fee |
|---|---|---|---|
| Berman, James | 3.70 | 500.00 | 1,850.00 |
| Joseph, Kristin | 0.60 | 190.00 | 114.00 |
| | 4.30 | | $1,964.00 |

**BILLING SUMMARY**

| Total professional services | $1,964.00 |
|---|---|
| Total expenses incurred | $6.10 |
| Total of new charges for this invoice | $1,970.10 |
| Plus net balance forward | $158,293.11 |
| TOTAL NOW DUE | $160,263.21 |

*INVOICES DUE AND PAYABLE UPON RECEIPT*

*we now accept mastercard, visa, discover & amex - limitations may apply*

** Trust account remaining balance is      $0.00

November 20, 2018

Invoice#     61050    JB
Our file#     12340    000000
Billing through   10/31/2018

Sean Dunne

232 Mott Street
Apt.3
New York, NY 10012

Workout

| | | |
|---|---|---|
| Balance forward as of invoice dated   August 3, 2018 | $157,698.11 |
| Payments received since last invoice | 0.00 |
| Accounts receivable balance carried forward | $157,698.11 |

## PROFESSIONAL SERVICES

| Date | TK | Description | Hours | Amount |
|---|---|---|---|---|
| 09/30/2018 | JB | Review S. Dunne email re: filing; prepare motion email to paralegal re: same; email to S. Dunne re: same | 1.00 hrs. | 500.00 |
| 10/02/2018 | KDJ | Draft Motion to Schedule Hearing and Proposed Order re: Motion for Confirmation | 0.50 hrs. | 95.00 |

$595.00

## TIMEKEEPER FEE SUMMARY

| Timekeeper | Total Hours | Rate | Total Fee |
|---|---|---|---|
| Berman, James | 1.00 | 500.00 | 500.00 |
| Joseph, Kristin | 0.50 | 190.00 | 95.00 |
| | 1.50 | | $595.00 |

## BILLING SUMMARY

| | |
|---|---|
| Total professional services | $595.00 |

12340    Dunne, Sean                    Invoice#  61050        Page  2

Total of new charges for this invoice          $595.00
Plus net balance forward                    $157,698.11
TOTAL NOW DUE                              $158,293.11

*INVOICES DUE AND PAYABLE UPON RECEIPT*

*we now accept mastercard, visa, discover & amex - limitations may apply*

** Trust account remaining balance is        $0.00

THE HIGH COURT

BANKRUPTCY

IN THE MATTER OF SEAN DUNNE, A BANKRUPT AND

IN THE MATTER OF SECTION 85D OF

THE BANKRUPTCY ACT 1988 TO 2015

Exhibit "SD17" as referred to in the affidavit of Sean Dunne

sworn on the 9th of December 2020

SEAN DUNNE

PRACTISING CERTIFICATE/

COMMISSIONER FOR OATHS


SYSTEMS

13/12/2019
Dear Sean,

I am sending this letter to confirm that I have completed the search terms. It was requested by David Lynch on 27/11/2019 via email ( forwarded by seandunne366@gmail.com). I used the search terms listed in the table (below) and the results provided regard emails that were sent/received or copied to the 7 people listed for the period from 1 January 2013 to 6 December 2016 (inclusive).

SEARCH TERMS

| Walford | 24 Shrewsbury Park | Queenstown |
|---|---|---|
| Queensland | Trust | Declaration of Trust |
| EOT | 23 July 2005 | Matsack |
| Nominee Agreement | 09 October 2006 | Totalstove |
| Totaltrust | Yarrah | Renxccables |
| Aoife Goodman | Lenz & Stachelin | Swensson |
| Mathesen Ormsby Prentice | Deral McAuliffe | Clodán Lynch |
| Caroline Crowley | Dermot Desmond | Celtic Traders |
| Paddy Dunn | Seamus Beddan | Celra Rogers |
| KeMG | William Fry | Stephen MacKenzie |
| Enomauidon | Asteels | Don Twomey |
| Gaytlan Purcy | Dermot Purcy | Liam McCabe |

The above search terms should also be searched in conjunction with the following:

- John Dunne;
- Gayle Dunne;
- Gayle Killilea;
- Sean Dunne;
- Ross Connolly;
- James Byrne;
- Joe Lehkowvitz

The search took longer than expected.

I was provided with full access to your email records and with your login details in order to carry out the search, attached is the invoice for this work (£10,140.00 inc 20% VAT).

Recently we have discussed that you are unable to pay this invoice due to bankruptcy, however I need to be paid before the completed work can be released. Please could you arrange for the payment to be made? Then I will forward the search results to Mr Lynch directly on your behalf ( cc'ing you in).

I trust you appreciate my position.

Thank you in advance,

Shantha

TELEPHONE: +44 [0]203 6565 320 • +44[0]8422 8386• E-MAIL: INFO@SAPATH.COM
Sapath Systems Ltd is a company registered in England and Wales with Company number 06268115 and VAT number GB 929 5632 89
Registered address: C/O Ashleigh Mann, 60a Station Road, North Harrow, England, HA2 7SL

# SAPATH SYSTEMS  Sapath Systems Limited

# Invoice

**145 Vaughan Road**
**Harrow, HA1 4EG**

Sales:   0203 6565 320
E-mail:   accounts@sapath.com

| Company VAT Reg. | Invoice Date | Invoice No. |
|---|---|---|
| 929563289 | 13/12/2019 | 7570 |

**Invoice To**

Sean Dunne
Broome House, Broomfield Park
Ascot.

| P.O. No. | Terms | Project |
|---|---|---|
|  |  |  |

| Description | Qty | Rate | Amount | VAT |
|---|---|---|---|---|
| Carry out the e-mail search as instructed by your Solicitor for a agreed fixed Fee | 1 | 8,450.00 | 8,450.00 | S |

Payment Terms: ON RECEIPT OF INVOICE
(All claims for damages, short deliveries etc, must be made within 48 hrs)
O/S balances over 14 days are charged @ interest rate of 1. 5% per month
Terms and conditions apply (Supply upon request)
HOW TO PAY
1.By Post: Please make your cheques payable to
'Sapath Systems Limited' and post to 145, Vaughan Road, Harrow HA1 4EG

2.Bank transfer or at any bank. (At banks other than HSBC you may have to pay for this service.)
Account name: Sapath Systems Limited
Account number: 71849913 Sort Code: 40-23-13
Branch address: HSBC, 26-28, St Ann's Road, Harrow, HA1 1LA



3. By Credit Card

| | |
|---|---|
| **Subtotal** | £8,450.00 |
| **VAT Total** | £1,690.00 |
| **Total** | £10,140.00 |
| **Payments/Credits** | £0.00 |
| **Balance Due** | £10,140.00 |

All goods remain property of Sapath Systems Limited until invoice settled full with cleared funds.

If you have any questions concerning this invoice, please contact us.
THANK YOU FOR YOUR BUSINESS

www.sapath.com
0203 6565 320

# EXHIBIT D

31st January 2013

**To: The Trustees of the Bloem Trust**

I, Sean Dunne, of Ouragh, Shrewsbury Road, Dublin 4, Ireland, resign as Protector of the Bloem Trust effective as of today 31st January 2013. I hereby appoint Gayle Killilea Dunne of 19 Churchfields, Straffan, Co Kildare, Ireland to replace me as protector of the Bloem Trust.

Signed by

Sean Dunne

1/31/13.

Witnessed by

Gayle Killilea Dunne

31st Jan '13

# DEED OF EXCLUSION OF BENEFICIARY


BLOEM (PTC) LTD. (as the "Trustees")


AND


GAYLE KILLILEA DUNNE (as the "Protector")

---

**IN RELATION TO THE
THE BLOEM SETTLEMENT**

---

# DEED OF EXCLUSION OF BENEFICIARY

**DATE:** 2nd day of March, 2017

**BY:**

BLOEM (PTC) LTD. duly incorporated under the laws of the Republic of Cyprus with its registered office at 19 Waterfront Drive, P.O. Box 3540, Road Town, Tortola VG 1110, British Virgin Islands (the "**Trustee**");

**AND**

Gayle Killilea Dunne of passport no. PC7040958 residing at 19 Churchfields (Barton Close), K Club, Straffan, co. Kildare, Ireland (the "**Protector**")

**WHEREAS**

(A)     This Deed is supplemental to:

a. the Discretionary Declaration dated 23rd of December, 2010 executed by John Patrick Dunne (as the "Settlor") and Line Trust Corporation Limited (the "original trustee") declaring the establishment of a Gibraltar trust known as "The Bloem Settlement" (hereinafter the "Settlement");

b. Deed of Appointment of Trustees dated 29th of November, 2012 between Mr. Sean Dunne (as the "protector") and Totalserve Trustees Limited (the "new trustees");

c. Deed of Amendment of Proper Law and Change of Governing Law of Administration dated 30th of November, 2012 between Mr. Sean Dunne (as the "protector") and Totalserve Trustees Limited (as the "trustees");

d. Deed of Retirement and Appointment of Protector dated 19th of July, 2013 between Sean Dunne (as the "retiring protector"), Gayle Killilea Dunne (as the "new protector") and Totalserve Trustees Limited (as the "trustees");

e. Deed of Addition and Removal of Beneficiaries dated 24th of July, 2013 between Totalserve Trustees Limited (as the "trustees") and Gayle Killilea Dunne (as the "protector");

f. Deed of Amendment of Proper Law and Change of Governing Law of Administration dated 23rd of November, 2013 between Totalserve Trustees Limited (as the "trustees") and Gayle Killilea Dunne (as the "protector");

2

g. Deed of Retirement and Appointment of Trustee dated 23rd of November, 2013 between Bloem (PTC) Ltd (as the "new trustee") and Gayle Killilea Dunne (as the "protector"); and

h. Deed of Addition and Removal of Beneficiaries dated 21st of January, 2015 between Totalserve Trustees Limited (as the "trustees") and Gayle Killilea Dunne (as the "protector").

(B) Terms and expressions defined in the Declaration shall bear the same meanings in this Deed so that, *inter alia*, words in the singular shall include the plural and words in the plural shall include the singular and words importing a masculine feminine or neuter gender shall be construed as importing the other gender or genders.

(C) The Trustees are the present trustees of the Settlement.

(D) The Protector is the present protector of the Settlement.

(E) The Trustee is desirous of exercising the power conferred on it by Clause 21 sub-clause (a) (i) and Clause 21 sub-clause (a) (iv) of the Trust Deed to irrevocably declare that **Ms. Gayle Killilea Dunne** ("Excluded Beneficiary") shall from the day of this Deed (a) be wholly excluded from future benefit under this Settlement and (b) be furthermore determined as an Excluded Person and that this exclusion shall be permanent and irrevocable with immediate effect.

(F) The Protector is a party to this Deed to consent to the determination of the Excluded Beneficiary as an Excluded Person with immediate effect.

## NOW THIS DEED WITNESSETH AS FOLLOWS:

1. **EXCLUSION OF BENEFICIARY**

   The Trustee, in exercise of the power conferred by Clause 21 sub-clause (a) (i) and Clause 21 sub-clause (a) (iv) of the Trust Deed and of all other relevant powers hereby enabling, hereby declares that the Excluded Beneficiary shall from the day of this Deed (a) be wholly excluded from future benefit under this Settlement and (b) be furthermore determined as an Excluded Person and that this exclusion shall be permanent and irrevocable with immediate effect SUBJECT to the consent of the Protector pursuant to the power conferred on the Protector by Clause 21 and Clause 34 sub-clause (f) of the Settlement.

2. **CONSENT**

   The Protector by applying her signature on this Deed hereby consents to the above proposed exclusion of the Excluded Beneficiary and the irrevocable determination of the Excluded Beneficiary as an Excluded Person.

3. **DATE OF EXCLUSION**

The above mentioned exclusion from future benefit under this Settlement and the determination of the Excluded Beneficiary as an Excluded Person shall be permanent and irrevocable with immediate effect.

4. **GOVERNING LAW**

This Deed is governed and construed by and in accordance with the Laws of the British Virgin Islands and all parties to this Deed hereto SUBMIT to the jurisdiction of the courts of the British Virgin Islands in all matters arising out of or in connection with this Deed and/or the Trust.

5. **DATE OF EFFECT**

The date of effect of this Deed will be the day, month and year first above written.

6. **IRREVOCABILITY**

This Deed should be deemed as irrevocable.

**IN WITNESS WHEREOF** the parties have hereunto entered into this deed the day and year first above written.

Executed as a deed and delivered by
Bloem (PTC) LTD. by affixing its
common seal in the presence of:

Witness:..................................          .........................................
                                                   Kishma Ruthine Hodge –Director

Executed as a deed and delivered by


..............................................
Gayle Dunne

In the presence of:

Witness:....................................

4

# DEED OF EXCLUSION OF BENEFICIARY


## BLOEM (PTC) LTD. (as the "Trustees")


### AND


## GAYLE KILLILEA DUNNE (as the "Protector")

---

**IN RELATION TO THE**
**THE BLOEM SETTLEMENT**

---

# DEED OF EXCLUSION OF BENEFICIARY

**DATE:** 2nd day of March, 2017

**BY:**

BLOEM (PTC) LTD. duly incorporated under the laws of the British Virgin Islands with its registered office at 19 Waterfront Drive, P.O. Box 3540, Road Town, Tortola VG 1110, British Virgin Islands (the "**Trustee**");

**AND**

Gayle Killilea Dunne of passport no. PC7040958 residing at 19 Churchfields (Barton Close), K Club, Straffan, co. Kildare, Ireland (the "**Protector**")

**WHEREAS**

(A)     This Deed is supplemental to:

        a.  the Discretionary Declaration dated 23rd of December, 2010 executed by John Patrick Dunne (as the "Settlor") and Line Trust Corporation Limited (the "original trustee") declaring the establishment of a Gibraltar trust known as "The Bloem Settlement" (hereinafter the "Settlement");

        b.  Deed of Appointment of Trustees dated 29th of November, 2012 between Mr. Sean Dunne (as the "protector") and Totalserve Trustees Limited (the "new trustees");

        c.  Deed of Amendment of Proper Law and Change of Governing Law of Administration dated 30th of November, 2012 between Mr. Sean Dunne (as the "protector") and Totalserve Trustees Limited (as the "trustees");

        d.  Deed of Retirement and Appointment of Protector dated 19th of July, 2013 between Sean Dunne (as the "retiring protector"), Gayle Killilea Dunne (as the "new protector") and Totalserve Trustees Limited (as the "trustees");

        e.  Deed of Addition and Removal of Beneficiaries dated 24th of July, 2013 between Totalserve Trustees Limited (as the "trustees") and Gayle Killilea Dunne (as the "protector");

        f.  Deed of Amendment of Proper Law and Change of Governing Law of Administration dated 23rd of November, 2013 between Totalserve Trustees Limited (as the "trustees") and Gayle Killilea Dunne (as the "protector");

g.  Deed of Retirement and Appointment of Trustee dated 23rd of November, 2013 between Bloem (PTC) Ltd (as the "new trustee") and Gayle Killilea Dunne (as the "protector"); and

h.  Deed of Addition and Removal of Beneficiaries dated 21st of January, 2015 between Totalserve Trustees Limited (as the "trustees") and Gayle Killilea Dunne (as the "protector").

(B)  Terms and expressions defined in the Declaration shall bear the same meanings in this Deed so that, *inter alia*, words in the singular shall include the plural and words in the plural shall include the singular and words importing a masculine feminine or neuter gender shall be construed as importing the other gender or genders.

(C)  The Trustees are the present trustees of the Settlement.

(D)  The Protector is the present protector of the Settlement.

(E)  The Trustee is desirous of exercising the power conferred on it by Clause 21 sub-clause (a) (i) and Clause 21 sub-clause (a) (iv) of the Trust Deed to irrevocably declare that Ms. Gayle Killilea Dunne ("Excluded Beneficiary") shall from the day of this Deed (a) be wholly excluded from future benefit under this Settlement and (b) be furthermore determined as an Excluded Person and that this exclusion shall be permanent and irrevocable with immediate effect.

(F)  The Protector is a party to this Deed to consent to the determination of the Excluded Beneficiary as an Excluded Person with immediate effect.

**NOW THIS DEED WITNESSETH AS FOLLOWS:**

1. **EXCLUSION OF BENEFICIARY**

(G)  The Trustee, in exercise of the power conferred by Clause 21 sub-clause (a) (i) and Clause 21 sub-clause (a) (iv) of the Trust Deed and of all other relevant powers hereby enabling, hereby declares that the Excluded Beneficiary shall from the day of this Deed (a) be wholly excluded from future benefit under this Settlement and (b) be furthermore determined as an Excluded Person and that this exclusion shall be permanent and irrevocable with immediate effect SUBJECT to the consent of the Protector pursuant to the power conferred on the Protector by Clause 21 and Clause 34 sub-clause (f) of the Settlement.

2. **CONSENT**

The Protector by applying her signature on this Deed hereby consents to the above proposed exclusion of the Excluded Beneficiary and the irrevocable determination of the Excluded Beneficiary as an Excluded Person.

3. **DATE OF EXCLUSION**

The above mentioned exclusion from future benefit under this Settlement and the determination of the Excluded Beneficiary as an Excluded Person shall be permanent and irrevocable with immediate effect.

4. **GOVERNING LAW**

This Deed is governed and construed by and in accordance with the Laws of the British Virgin Islands and all parties to this Deed hereto SUBMIT to the jurisdiction of the courts of the British Virgin Islands in all matters arising out of or in connection with this Deed and/or the Trust.

5. **DATE OF EFFECT**

The date of effect of this Deed will be the day, month and year first above written.

6. **IRREVOCABILITY**

This Deed should be deemed as irrevocable.

**IN WITNESS WHEREOF** the parties have hereunto entered into this deed the day and year first above written.

Executed as a deed and delivered by
Bloem (PTC) LTD. by
affixing its common seal in the presence of:

Witness:.................................          .................................
                                        Kishma Ruthine Hodge
                                        Director

Executed as a deed and delivered by

.................................
Gayle Dunne

in the presence of:.................................
                        JAMES RYAN

4

DEED OF EXCLUSION OF BENEFICIARY


BLOEM (PTC) LTD. (as the "Trustees")


AND


GAYLE KILLILEA DUNNE (as the "Protector")


———————————


**IN RELATION TO THE
THE BLOEM SETTLEMENT**

———————————

1

# DEED OF EXCLUSION OF BENEFICIARY

DATE: 2nd day of March, 2017

**BY:**

BLOEM (PTC) LTD. duly incorporated under the laws of the British Virgin Islands with its registered office at 19 Waterfront Drive, P.O. Box 3540, Road Town, Tortola VG 1110, British Virgin Islands (the "**Trustee**");

**AND**

Gayle Killilea Dunne of passport no. PC7040958 residing at 19 Churchfields (Barton Close), K Club, Straffan, co. Kildare, Ireland (the "**Protector**")

**WHEREAS**

(A)    This Deed is supplemental to:

      a.  the Discretionary Declaration dated 23rd of December, 2010 executed by John Patrick Dunne (as the "Settlor") and Line Trust Corporation Limited (the "original trustee") declaring the establishment of a Gibraltar trust known as "The Bloem Settlement" (hereinafter the "Settlement");

      b.  Deed of Appointment of Trustees dated 29th of November, 2012 between Mr. Sean Dunne (as the "protector") and Totalserve Trustees Limited (the "new trustees");

      c.  Deed of Amendment of Proper Law and Change of Governing Law of Administration dated 30th of November, 2012 between Mr. Sean Dunne (as the "protector") and Totalserve Trustees Limited (as the "trustees");

      d.  Deed of Retirement and Appointment of Protector dated 19th of July, 2013 between Sean Dunne (as the "retiring protector"), Gayle Killilea Dunne (as the "new protector") and Totalserve Trustees Limited (as the "trustees");

      e.  Deed of Addition and Removal of Beneficiaries dated 24th of July, 2013 between Totalserve Trustees Limited (as the "trustees") and Gayle Killilea Dunne (as the "protector");

      f.  Deed of Amendment of Proper Law and Change of Governing Law of Administration dated 23rd of November, 2013 between Totalserve Trustees Limited (as the "trustees") and Gayle Killilea Dunne (as the "protector");

2

g. Deed of Retirement and Appointment of Trustee dated 23rd of November, 2013 between Bloem (PTC) Ltd (as the "new trustee") and Gayle Killilea Dunne (as the "protector"); and

h. Deed of Addition and Removal of Beneficiaries dated 21st of January, 2015 between Totalserve Trustees Limited (as the "trustees") and Gayle Killilea Dunne (as the "protector").

(B)     Terms and expressions defined in the Declaration shall bear the same meanings in this Deed so that, *inter alia*, words in the singular shall include the plural and words in the plural shall include the singular and words importing a masculine feminine or neuter gender shall be construed as importing the other gender or genders.

(C)     The Trustees are the present trustees of the Settlement.

(D)     The Protector is the present protector of the Settlement.

(E)     The Trustee is desirous of exercising the power conferred on it by Clause 21 sub-clause (a) (i) and Clause 21 sub-clause (a) (iv) of the Trust Deed to irrevocably declare that Mr. Sean Dunne ("Excluded Beneficiary") shall from the day of this Deed (a) be wholly excluded from future benefit under this Settlement and (b) be furthermore determined as an Excluded Person and that this exclusion shall be permanent and irrevocable with immediate effect.

(F)     The Protector is a party to this Deed to consent to the determination of the Excluded Beneficiary as an Excluded Person with immediate effect.

**NOW THIS DEED WITNESSETH AS FOLLOWS:**

1.     **EXCLUSION OF BENEFICIARY**

(G)     The Trustee, in exercise of the power conferred by Clause 21 sub-clause (a) (i) and Clause 21 sub-clause (a) (iv) of the Trust Deed and of all other relevant powers hereby enabling, hereby declares that the Excluded Beneficiary shall from the day of this Deed (a) be wholly excluded from future benefit under this Settlement and (b) be furthermore determined as an Excluded Person and that this exclusion shall be permanent and irrevocable with immediate effect SUBJECT to the consent of the Protector pursuant to the power conferred on the Protector by Clause 21 and Clause 34 sub-clause (f) of the Settlement.

2.     **CONSENT**

The Protector by applying her signature on this Deed hereby consents to the above proposed exclusion of the Excluded Beneficiary and the irrevocable determination of the Excluded Beneficiary as an Excluded Person.

3

3. **DATE OF EXCLUSION**

The above mentioned exclusion from future benefit under this Settlement and the determination of the Excluded Beneficiary as an Excluded Person shall be permanent and irrevocable with immediate effect.

4. **GOVERNING LAW**

This Deed is governed and construed by and in accordance with the Laws of the British Virgin Islands and all parties to this Deed hereto SUBMIT to the jurisdiction of the courts of the British Virgin Islands in all matters arising out of or in connection with this Deed and/or the Trust.

5. **DATE OF EFFECT**

The date of effect of this Deed will be the day, month and year first above written.

6. **IRREVOCABILITY**

This Deed should be deemed as irrevocable.

**IN WITNESS WHEREOF** the parties have hereunto entered into this deed the day and year first above written.

Executed as a deed and delivered by
Bloem (PTC) LTD. by
affixing its common seal in the presence of:

Witness:................................

Kishma Ruthine Hodge
Director

Executed as a deed and delivered by

Gayle Dunne

in the presence of:................................

JAMES RYAN

4

EXHIBIT 9

S.D.  2/12/2020  M.K.

# EXHIBIT E

Chief Justice Manning,

District Court of Connecticut

915 Lafayette Blvd

Bridgeport

CT 06604

United States

21 September 2020

**Re: Richard M. Coan, Trustee in Bankruptcy v Yesreb Holdings Limited, Adversary Proceedings Case Number: 20-05010, Lead Bankruptcy Case Number: 13-50484**

Dear Chief Justice Manning,

I refer to the above case currently before the Connecticut District Court and in particular the hearing listed for tomorrow at noon, which I understand you have cession of. I am the father, sole disinterested guardian, custodian and next friend ("**Disinterested Guardian**") of TJ Dunne (aged 6), Ryan Dunne (aged 10), Harrison Dunne (aged 13) and Bobby Dunne (aged 15) ("**Minor Children**"). The Minor Children may be irreversibly financially affected by a decision of the Court in the case herein where currently they are unrepresented.

As Disinterested Guardian, I am deeply concerned that all parties to the case herein are attempting to perpetrate a fraudulent act on the Minor Children and the court. I have written to the attorneys for Yesreb Holding Limited on Sunday and today outlining my grave concerns (copy of today's final version letter enclosed). At the time of writing I have received no response to my letter which is most

disturbing given the gravity of the issues, tomorrow's hearing and the damaging effect a judgement based on incorrect facts and a clear lack of candor will have. The issues to be answered in my letter where eminent attorneys and the trustee to my bankruptcy estate appear to be involved in a fraudulent act are most disturbing. They require full and thorough investigation given the lasting gravity these actions will have on the Minor Children.

The timing of my letter is due to the fact that I just recently came into possession of some key documents set out in my letter. I believe the letter speaks the truth on all matters. For good order it is right and proper to enclose Attorney Nolin's letter of 15 September 2020 to which I am responding. The letter is enclosed to provide transparency to the court, which the Minor Children have been denied to date as they have no representation in the case to date. I am currently seeking Connecticut Counsel to represent the Minor Children's interests along with the appointment of an independent Guardian Ad Litem Guardian (who will not be the Disinterested Guardian) to make submissions on their behalf to the Court. Given the clear lack of candor and transparency I have no option but to write directly to the Court to request that the motion be adjourned for a minimum of two months to allow due process for the Minor Children. Justice delayed in this situation will not be justice denied as time is required to obtain the information requested in my letter in Attorneys Nolin, Miltenberger and Antonelli.

I would appreciate acknowledgement of this email. If tomorrows hearing is via video conference and I am required to join I confirm I am available to oblige the court and remain in your hands.

I look forward to hearing from you.

Yours faithfully,

Sean Dunne

paragraph 12



**TAX APPEALS
COMMISSION**

BETWEEN/

## YESREB HOLDING LIMITED

**Appellant**

## V

## REVENUE COMMISSIONERS

**Respondent**

## <u>DETERMINATION</u>

### Introduction

This is an appeal against an assessment to stamp duty dated 17 February 2016, in the sum of €1,429,000 together with interest of €269,670. A credit was provided by the Respondent in respect of stamp duty previously paid of €270,000, leaving a balance on the assessment of €1,428,670.

The dispute between the parties relates to the availability of sub-sale relief in accordance with section 46 of the Stamp Duty Consolidation Act 1999, as amended ('*SDCA*') in respect of a deed of conveyance to the Appellant dated 29 March 2013.

The Respondent issued the notice of assessment, on the basis that the Appellant was not entitled to avail of sub-sale relief pursuant to section 46 SDCA 1999. The Appellant duly appealed.



TAX APPEALS
COMMISSION

| Page | Contents |
|:---:|:---|
| 1 | Introduction |
| 2 | Contents |
| 3 | Background |
| 4 | Legislation |
| 5 | Submissions in brief |
| | |
| 5 | **EVIDENCE** |
| 5 | Documentary evidence |
| 6 | Witness evidence |
| | |
| 7 | **ANALYSIS** |
| 7 | General |
| | |
| 8 | Documentation |
| 8 | *The contract of sale dated 1 July 2005* |
| 9 | *The declaration of trust dated 23 July 2005* |
| 10 | *The nominee agreement dated 9 October 2006* |
| 11 | *Correspondence: September 2011-October 2011* |
| 15 | *Tender documents 2011* |
| 16 | *Yesreb Holding Limited loan agreement 2013* |
| 17 | *The 2013 escrow agreement* |
| 18 | *The sub-sale contract dated 28 March 2013* |
| 20 | *The deed of conveyance dated 29 March 2013* |
| | |
| 22 | Section 46 SDCA 1999 |
| 25 | *Identity* |
| 26 | *In consequence* |
| 28 | *Intervening Act* |
| | |
| 30 | The accountable person |
| | |
| 32 | **Conclusion** |
| | |
| 33 | **Determination** |





## Background

On 23 March 2005, Sean Dunne and his wife, Gayle Dunne signed a manuscript agreement titled *'Property Transfer Agreement'* whereby Sean Dunne undertook to give his wife seventy percent of the profits accruing from the sale of his share in six specified properties. The agreement records that the thirty percent of profits retained, were estimated to cover tax and associated costs of sale.

On 1 July 2005, Sean Dunne entered into a contract for the purchase of a property known as Walford, 24 Shrewsbury Road, Dublin 4 ('the property') for the purchase price of €59,950,000. The vendors were Caroline Crowley and Eamon Walsh, executors of Patrick Duggan, deceased ('the deceased'). A ten percent deposit was paid.

By declaration of trust, dated 23 July 2005, Sean Dunne declared that his entire interest in the contract of 1 July 2005 was held by him in trust for his wife, Gayle Dunne, on foot of the property transfer agreement of 23 March 2005.

In July 2006, approximately seven months after the closing date as stipulated in the contract of 1 July 2005, the balance of the purchase monies was paid. The documents of title were furnished and possession passed. No conveyance was executed.

By written nominee agreement of 9 October, 2006, between Matsack Nominees Limited ('Matsack') of the one part and Gayle Dunne of the other part, Matsack Nominees agreed to hold the property together with €25,000 on trust to retain it, but with power to deal with it, including, *inter alia*, to sell or convey it, in accordance with the prior written instructions of Gayle Dunne, as principal.

By contract of sale dated 28 March, 2013, the property was sold to Yesreb Holding Limited, a Cypriot company, for the sum of €14,000,000. The vendor on the contract was stated to be *'Sean Dunne as trustee for Gayle Dunne'*.

By deed of conveyance dated 29 March, 2013, made pursuant to the contracts of 1 July 2005, and 28 March, 2013, the original vendors (Caroline Crowley and Eamon Walsh) at the direction of the beneficial owner (Gayle Dunne) granted and conveyed the property to the sub-purchaser, Yesreb Holding Limited. The beneficial owner together with the original trustee and the present trustee (Gayle Dunne, Sean Dunne and Matsack Nominees Limited

3





respectively) further granted, conveyed and confirmed the property to Yesreb Holding Limited.

On 12 May 2013, Yesreb made a self-assessed stamp duty return of €270,000.00 calculated on the consideration of €14 million, *i.e.* the purchase monies payable on foot of the contract of 28 March 2013, on the basis that Yesreb was entitled to claim sub-sale relief in accordance with s.46(1) of the Stamp Duty Consolidation Act 1999.

The Respondent issued a notice of assessment on 17 February 2016, in the sum of €1,429,000 less the €270,000 already paid, on the basis that the Appellant was not entitled to avail of sub-sale relief pursuant to section 46 SDCA 1999.

**Legislation**

The relevant legislation is as follows;

- Section 1 SDCA 1999 – Interpretation
- Section 2 SDCA 1999 – Charging and stamping of instruments
- Section 7 SDCA 1999 – Instruments to be separately charged with duty in certain cases
- Section 46 SDCA 1999 – Directions as to sub-sales

Section 46 SDCA 1999 – Directions as to sub-sales

> *(1) Where—*
>
> *(a) a person having contracted for the purchase of any property, but not having obtained a conveyance of that property, contracts to sell the same to any other person, and*
>
> *(b) the property is in consequence conveyed immediately to the sub-purchaser,*
>
> *then the conveyance shall be charged with ad valorem duty in respect of the consideration moving from the sub-purchaser.*

4





## Submissions *in brief*

The Appellant claimed an entitlement to sub-sale relief in accordance with section 46 SDCA 1999 as amended, in respect of the deed of conveyance dated 29 March 2013.

The Respondent submitted that the Appellant did not meet the conditions necessary to avail of sub-sale relief. The Respondent submitted that the deed of conveyance dated 29 March 2013 was the chargeable instrument and was chargeable to duty in respect of both of the considerations to which it related and that the Appellant was the accountable person in respect thereof.

The Appellant accepted that it was the accountable person in the event that section 46 sub-sale relief applied but submitted that it was not the accountable person in respect of duty arising in relation to the original contract dated 1 July 2005. The Appellant submitted that it was an accountable person only for its own purchase namely, the purchase by agreement for sale dated 28 March 2013 in the sum of €14 million.

## EVIDENCE

### Documentary evidence

The declaration of trust dated 23 July 2005, a handwritten document provided as follows;

> *'I, Sean Dunne, of Ouragh, Shrewsbury Road, Ballsbridge, Dublin 4 hereby confirm that the contract to purchase the property known as Walford, Shrewsbuty Road, Ballsbridge, Dublin 4 from the Executors of Mr. Richard Duggan and signed by Mr. Paul Donnelly as my legal nominated attorney is a contract which I hereby confirm I hold in trust for my wife, Gayle Dunne (nee Killilea). The contract is dated 1st July 2005. The entire interest in this contract is held by me on foot of our property settlement agreement of 23rd March 2005 established to ensure the financial independence of my wife and children for their future and to secure the repayments for my property investments. I renounce all claims to my or to my estate's behalf over or against this property or any amount of money derived from this sale should I die before the transfer is fully completed. I confirm that I will transfer Walford to her or to her nominee when called upon to do so.'*





The declaration of trust was signed by Mr. Dunne and Ms. Gayle Dunne and was witnessed by Mr. Dunne's son, Mr. John Dunne.

Other documentation submitted in evidence included *inter alia*: the tender documentation for Walford, the contract for sale re Walford, the power of attorney of Sean Dunne, the nominee agreement with Matsack Nominees Limited, the contract of sale to Yesreb Holding Ltd, the deed of conveyance to Yesreb Holding Limited, the escrow agreement between Gayle Killilea, Yesreb Holding and Clerkin Lynch solicitors, extracts from the conveyancing file of Hayes Solicitors, certification of incorporation of Yesreb Holding Limited, the Yesreb loan agreement with Gayle Killilea and various solicitors' correspondences.

Relevant extracts are set out below.

**Witness evidence**

Evidence on behalf of the Appellant was provided by Mr. Sean Dunne.

Mr. Sean Dunne

Mr. Dunne's evidence in relation to the handwritten declaration of trust dated 23 July 2005, was that he wrote the document and that it was written in his home with his wife, Ms. Gayle Dunne present and that the declaration was witnessed by his son, John Dunne and signed by both Ms. Gayle Dunne and by himself.

The declaration of trust provided; *'I, Sean Dunne, ... hereby confirm that the contract to purchase the property known as Walford, ... is a contract which I hereby confirm I hold in trust for my wife, Gayle Dunne (nee Killilea). The contract is dated 1st July 2005.'*

While the declaration of trust is dated 23 July 2005, Mr. Dunne stated that in his view, the declaration was confirmation of the fact that he signed the contract for Walford in trust for Gayle Dunne, from the effective date of that contract, being 1 July 2005.

Mr. Dunne accepted, during cross-examination, that there was nothing on the face of the contract for sale in respect of Walford, to signify that he had purchased it in trust. He stated in direct evidence that the reason the words *'in trust'* did not appear in the contract for sale was because he was advised by his solicitor not to insert the words *'in trust'* into the contract.

6




The wording of the declaration of trust provided; *'I Sean Dunne of Ouragh, Shrewsbury Road.... Hereby confirm that the contract to purchase the property known as Walford........ is a contract which I hereby confirm I hold in trust for my wife, Gayle Dunne.... .'*

Senior Counsel for the Respondent put it to Mr. Dunne that the declaration dated 23 July 2005, having been executed 23 days post the execution of the contract for sale in respect of Walford (in circumstances where that contract did not indicate that Walford was purchased in trust) did not indicate that it was intended to apply retrospectively. In particular, Senior Counsel pointed to the fact that the operative part of the declaration was worded in the present tense namely; *'I hold in trust for my wife....'.*

Mr Dunne stated that a declaration that one holds something in trust, does not mean that one has immediately commenced holding it is trust, rather he stated, it is a reference to holding it over a period of time. By analogy he referred to holding a degree or qualification.

Senior Counsel for the Respondent asked him why he did not use the words *'I hold and have at all times held'.* Mr Dunne responded that that was what the declaration inferred.

It was put to Mr. Dunne that the construction that he placed on the declaration did not accord with the words recorded in the declaration and that the declaration was prospective in nature and not retrospective. Mr. Dunne did not accept this.

During cross-examination, Mr. Dunne accepted that the declaration of trust itself did not provide that Mr. Dunne entered into the contract in trust for his wife. He also accepted that the declaration of trust did not record on its face that the contract was at all times held in trust by him for his wife.


**ANALYSIS**

*General*

Stamp duty is a tax on instruments. The instrument, the subject of this appeal is a conveyance dated 29 March 2013 which provides for two separate considerations of €57,950,000 (in relation to the contract dated 1 July 2005) and €14,000,000 (in relation to the contract dated 28 March 2013).

7




The Respondent stated that if there was a suggestion on the part of the Appellant that the Revenue Commissioners were endeavouring to tax two transactions or two contracts that this was untrue. The Respondent stated that what was being assessed to stamp duty was the duty payable on the conveyance on sale, which was the conveyance dated 29 March 2013, from the personal representatives of the deceased owner of the property *'Walford'* to the Appellant.

As section 46 is in the nature of a relieving provision, the Appellant is required to establish that it falls within the terms of the provision. In this regard the Respondent cited the dicta of Kennedy J. in the Supreme Court case of *Revenue Commissioners v Doorley* (1995) ITR 19, at page 548 of the judgment as follows;

> *'I have been discussing taxing legislation from the point of view of the imposition of tax. Now the exemption from tax, with which we are immediately concerned, is governed by the same considerations. If it is clear that a tax is imposed by the Act under consideration, then exemption from that tax must be given expressly and in clear and unambiguous terms, within the letter of the statute as interpreted with the assistance of the ordinary canons for the interpretation of statutes. This arises from the nature of the subject-matter under consideration and is complementary to what I have already said in its regard. The Court is not, by greater indulgence in delimiting the area of exemptions, to enlarge their operation beyond what the statute, clearly and without doubt and in express terms, excepts for some good reason from the burden of a tax thereby imposed generally on that description of subject-matter. As the imposition of, so the exemption from, the tax must be brought within the letter of the taxing Act as interpreted by the established canons of construction so far as applicable.'*

On the authority of *Doorley* therefore, the Appellant must establish that it falls squarely within section 46 SDCA 1999.

**Documentation**

*The contract of sale dated 1 July 2005*

Clause 14 of the special conditions of sale (which replicates clause 16 of the tender document) in respect of 'Walford' provided:

8




*'This agreement is personal to the Purchaser who shall not assign, mortgage, charge or otherwise deal with the benefit thereof in whole or in part (other to a related company within the meaning of section 4(5) of the Companies (Amendment) Act 1990 without the previous consent in writing of the Vendors. The Vendors shall not be required to deliver a Deed of Assurance in favour of any party other than the purchaser named in the contract.'*

Special condition 5 provided; *'The purchase of the premises shall be completed and the balance of the purchase money paid by the Purchaser on 14 December 2005 (the closing date).'*

It is clear from the special conditions that in entering into the contract, Mr. Dunne bound himself to the special condition that the agreement was personal to him and that he would not deal with the contract without the previous consent in writing of the vendors. However, there is no evidence that the vendors were asked for, nor is there evidence that they provided their consent to the trust arrangement between Mr. Dunne and his wife, Ms. Gayle Dunne.

The execution of this contract on 1 July 2005, predates the enactment of the Land and Conveyancing Law Reform Act 2009 and therefore, Mr. Dunne, having paid a ten percent deposit under this contract, would, on the authority of *Tempany v Hynes* [1976] IR 101, have held a ten percent moiety in the beneficial interest in respect of this property. At that stage Mr. Dunne did not hold a legal interest in the property. The title deeds were held by Hayes & Sons solicitors on behalf of the personal representatives of the estate of the deceased.

*The declaration of trust dated 23 July 2005*

The declaration of trust dated 23 July 2005, a page long handwritten document signed by Mr. Dunne and Ms. Dunne, purported to relate to a trust which commenced on 1 July 2005. However, as highlighted by Senior Counsel for the Respondent, the declaration of trust is drafted in the present tense, the operative words providing; *'I hereby confirm I hold in trust for my wife, Gayle Dunne ....'*

There was nothing on the face of the document that supported Mr. Dunne's evidence that the declaration of trust was intended to be retrospective. The Respondent submitted that on the ordinary and natural meaning of the words, there could be no other meaning than that it was intended to be operative on a prospective basis, as and from 23 July 2005.

9




There is no note or memorandum of an intention that a trust should arise as and from 1 July 2005 (the date of execution of the contract). The only note or memorandum in existence evidencing the trust is the declaration of trust dated 23 July 2005 which supports the existence of the trust only as and from 23 July 2005. The effect of this declaration of trust is that Mr. Dunne as and from 23 July 2005, was no more than a bare trustee or nominee in respect of the ten percent beneficial interest in Walford, and that he agreed to transfer Walford to Ms. Gayle Dunne or to her nominee, when called upon to do so. Accordingly, as and from 23 July 2005, Sean Dunne divested himself of his beneficial interest in a one tenth moiety in respect of Walford.

A bare trust consists of a trustee holding property upon trust for a person beneficially entitled absolutely to the asset in the trust. The passive interests arising under a trust of this nature are noted at paragraph 10.01 of *Equity and the Law of Trusts in the Republic of Ireland* by Keane (2nd edition) in which it is observed that *'express trusts may be 'bare' trusts , where trustees are essentially passive recipients of the trust property without any management responsibilities.'* On executing the declaration of trust, Sean Dunne had no title, possession or powers and from that point on, Gayle Dunne was absolutely entitled to the beneficial interest in the one tenth moiety as against him. Mr. Dunne retained no powers of management and no powers of sale in respect of Walford. Therefore, on execution of the declaration of trust on 23 July 2005, Gayle Dunne became absolutely entitled as against Sean Dunne in relation to the ten percent beneficial interest that passed to Sean Dunne under the contract for sale.


*The nominee agreement dated 9 October 2006*

On 9 October 2006, Gayle Dunne entered into a nominee agreement with Matsack Nominees Limited which appointed Matsack Nominees to hold, as her nominee, a sum of €25,000 together with her interest in Walford. The nominee was entitled to delegate, but that nomination, as prescribed by clause 11 of the nominee agreement, was to be by deed. Clause 14 permitted the appointment of new or additional nominees.

At this stage, the legal interest remained vested in the personal representatives of the deceased.

Clause 14 provided: *'The power to remove the nominee or to appoint new or additional Nominee shall be held by the Principal'*.




The Appellant did not make the case that the nominees delegated any of their powers in accordance with clause 11 nor did the Appellant make the case that Ms. Gayle Dunne had removed or appointed any other nominee.

As and from 9 October 2006, the date of the nominee agreement, Sean Dunne ceased to hold a bare trusteeship in relation to the property. As of that date Mr. Dunne had no legal interest (as the legal interest was vested in the personal representatives and vendors of the property), he had no equitable interest (as the entire equitable interest was held by Ms. Gayle Dunne) and he had no capacity as a trustee (because Ms. Dunne had appointed new trustees to hold the property, namely, Matsack Nominees Limited). In effect, the formal appointment of Matsack Nominees as trustees ended the bare trusteeship of Sean Dunne. Provision was made in the nominee agreement in relation to the trusteeship of the property by Matsack Nominees. There were no unrestricted powers of management or sale conferred on them. The powers were limited in nature however, they were more extensive by far than the declaration of trust executed by Sean Dunne on 23 July 2005, as that declaration did not reserve any powers whatsoever to Sean Dunne.

Thus, from 9 October 2006, Matsack nominees were bare trustees of the property, the beneficial or equitable interest of which was held by Ms. Gayle Dunne. Senior Counsel for the Respondent stated that this was a matter of public record, citing *Christopher Lehane (official assignee) v Gayle Dunne* [2017] IEHC 511 a judgment of Costello J. delivered on 26 July 2017. Paragraph 47 of the judgment provides;

> *'At paragraph 53 of his grounding affidavit the Plaintiff quotes from an affidavit of the bankrupt* [a reference to Mr. Sean Dunne] *sworn on 12th October 2016 where he states that Walford:-*
>
> > *" ... was held in trust by me for my wife Gail Dunne until 9 October 2006 when Matsack Nominees Ltd a nominee company controlled by the partners of Matheson Solicitors, assumed the role of trustee."*

*Correspondence: September 2011- October 2011*





As of October 2011, Matsack Nominees Limited had secured the agreement of the solicitors to the personal representatives (the vendors) that they would execute a conveyance at the request of Matsack Nominees Limited.

Correspondence from Donal T. McAuliffe & Co. (solicitors for Matsack Nominees Limited) dated 21 September 2011, to Hayes Solicitors (solicitors for the personal representatives and vendors) provides;

| | |
|---|---|
| *'My Client:* | *Matsack Nominees Limited* |
| | *70 Sir John Rogerson's Quay, Dublin 2* |
| *Your Clients:* | *Eamon Walsh and Caroline Crowley Personal Representatives of Patrick A. Duggan Deceased.* |
| *Premises:* | *Walford, Shrewsbury Road, Dublin 4* |

*Dear Terence,*

*I refer to our telephone conversation this afternoon in relation to the above matter when I informed you that I had been instructed by my client to prepare a Tender Document for the sale of the above property. The Tender period expires on October 24th next.*

*I received the Title Documents from Matheson Ormsby Prentice yesterday and I note that the property was purchased by Mr S.D. by Contract dated 1st July, 2005 from your clients. It appears that the purchase money was discharged in full but a Conveyance to the Purchaser was never executed.*

*I am now requesting your confirmation that your clients will execute a Deed of Conveyance to a Purchaser from my client by way of Sub-Sale.*

*I intend to insert a condition in the Tender Document as follows:-*

12




*"The Vendor shall procure that a Deed of Assurance of the Subject Property shall be executed by the Personal Representatives of Patrick Duggan Deceased and the Vendor and delivered to the Purchaser on closing assuring the Subject Property to the Purchaser for an estate referred to in the Particulars and Tenure. No objection shall be made or requisition or enquiry raised or entertained in this regard."*

*The Subject Property referred to is, of course, the above property.*

*As I may be asked for Tender Documents in the immediate future I would greatly appreciate hearing from you as soon as possible.'*

A holding letter from Hayes solicitors provided that the personal representatives would take instructions. Hayes solicitors, on behalf of the personal representatives responded on 7 October 2011 as follows;

*'Executors, Patrick A Duggan Deceased*

*Your Client: Matsack Nominees Limited*

*Premises: Walford, Shrewsbury Road, Dublin 4*

*Dear Sirs,*

*We refer to our recent correspondence in relation to the above and confirm that we have received our client's instructions on your request.*

*The Executors of the late Patrick A Duggan will consent to the proposed sale of Walford by sub-sale and agree to the wording in the draft Tender Document strictly subject to the following conditions:*

1. *An immediate contribution towards the additional fees, VAT and outlay incurred since 30 June 2006 arising from the failure of the purchaser under the original Contract to take a Deed of Assurance of the Property. We measure the total of this contribution to be €12,000.00. The additional work includes protracted correspondence with Matheson Ormsby Prentice, advice to and meetings with the Executors on the ongoing situation,*

13




meetings with the residuary beneficiaries and the instructing of Counsel on three separate occasions to obtain Opinions.

2. An indemnity by your client to discharge our further fees, VAT and outlay to cover our work between now and the final completion of the transfer by the Executors of the legal estate in the property. We would hope to be able to agree these additional fees with you but, if necessary, same can be taxed in default of agreement.

3. The approval by us, on behalf of the Executors, of the draft Deed of Assurance. In this respect, our clients insist that the Deed must recite the Contract dated 1 July 2005 between the executors and the purchaser, the consideration in that the Contract and relationship between the original purchaser and Matsack Nominees Limited. We assume that you have been furnished with the correspondence between this firm and Matheson Ormsby Prentice of 7 and 10 March 2006 which varied the terms of the original Contract.

4. The indemnity by your client to our clients for any utilities or other payments in respect of the property.

We await hearing from you.'

The response from Donal T. McAuliffe & Co. dated 11 October 2011 provided;

'Our Client:     Matsack Nominees Limited

Premises:       Walford, 24 Shrewsbury Road, Ballsbridge, Dublin 4

Dear Sirs,

We are obliged for your letter of the 7th inst.

We confirm that there is considerable interest in the above property and that our client will make the suggested contribution towards your additional fees, etc. and any further fees that may arise. We should be obliged if you would please let us have copies of the letters 7th and 10th March, 2006 referred to at paragraph 3 of your letter as we have not been furnished with same.'




On 12 October 2011, Hayes solicitors responded;

> *'Your Client:  Matsack Nominees Limited*
>
> *Premises:  Walford, Shrewsbury Road, Dublin 4*
>
> *Dear Sirs*
>
> *We acknowledge receipt of your letter of 11 October and understand from this that your client is in agreement with all the conditions set out in our letter of 7 October.*
>
> *For the avoidance of doubt, we wish to clarify that the Contract dated 1 July 2005 was not signed by the purchaser in trust but was signed beneficially by him by his duly appointed Attorney.*
>
> *As requested, we enclose herewith copy correspondence passing between this firm and Matheson Ormsby Prentice between 7 and 10 March 2006.*
>
> *Finally, in relation to your request for Certificates of Discharge from CAT, please note that these were not furnished by the Revenue Commissioners to us following the submission and finalisation of all CAT Returns on the estate.'*

At hearing, the case made on behalf of the Appellant was that Mr. Dunne was the proper party to the sub-sale contract and was the only party who could be the vendor under the sub-sale contract, being the only party who could require the personal representatives of the deceased to execute a conveyance and therefore assure the property in favour of the Appellant. However, the above correspondence evidences that as of October 2011, Matsack Nominees Limited had secured the agreement of the solicitors to the personal representatives (the vendor) that they would execute a conveyance at the request of Matsack Nominees Limited to convey and assure the property.

*Tender documents 2011*

In 2011, a tender process commenced but did not progress to completion. The tender documents were not issued by Sean Dunne in trust but were issued by Matsack Nominees

15





Limited, as vendor. I note that the draft memorandum of agreement named Matsack Nominees Limited as the vendor.


*Yesreb Holding Limited loan agreement 2013*

The Appellant in these proceedings, Yesreb Holding Limited, was incorporated as a Cypriot registered company on 21 February 2013.

The Respondent stated that it was a matter of public record arising from paragraph 57 of the judgment of Costello J. in *Lehane v Dunne* [2017] IEHC 511 that the Appellant company was beneficially owned by Mr. Dunne's son, John Dunne, and was held by him for his own benefit and for the benefit of his three siblings. Paragraph 57 of that judgment provides;

> *'It is also noteworthy that the Defendant* [a reference to Gayle Dunne] *revealed in her replying affidavit that Yesreb was not a third party Cypriot company with which she had no connection. She says she lent it the money to enable it to purchase Walford from her in 2013. According to her affidavit, the ultimate beneficial owner of Yesreb is John Dunne, her stepson, and he holds the company for the benefit of himself and the three children to the marriage of the defendant and the bankrupt. The defendant maintains, contrary to the assertions of the plaintiff, that neither she nor the bankrupt have had an interest in Walford since 2013. She says his statements in that regard are false or overstatements to a culpable degree.'*

The Yesreb loan agreement names *'Gayle Killilea'* as lender and *'Yesreb Holding Limited'* as the borrower. It records in the recital:

> *'The Lender has advanced the Facility Amount to the Borrower and wishes to formally record the terms on which such monies have been advanced. The money was made available to the Borrower for the purposes specified at clause 2.1 below. The purpose of this Agreement is to record the terms on which the Lender has advanced the Facility (as hereinafter defined) to the Borrower.'*

The loan agreement defined the facility amount as an amount of €15,000,000.

Clause 2.1 of the loan agreement provided;

16





*'2.1 The Lender agrees to make available to the Borrower a credit facility amount of €15,000,000 (the 'Facility') on the terms and conditions set out in this Agreement.*

*2.2 Subject to Clause 5.1, the Facility shall be repayable in full with one bullet repayment, to include all interest arising on the Facility, on the date falling 5 years from the date of this Agreement.*

*2.3 The purpose for which the Facility is advanced is to finance the purchase of the Property for the consideration of €14,000,000 and to pay the capitalised interest arising under this Agreement (together the 'Permitted Purpose'). The Borrower hereby acknowledges that the facility is repayable to the Lender in accordance with the terms of this Loan Agreement.*

*2.4 The Borrower shall strictly use and apply the Facility for the Permitted Purpose only. The entry by the Borrower into the Contract for Sale shall be a deemed drawdown of the Facility in the amount of €14,000,000. For the avoidance of doubt any payment or purported payment of the consideration due under the Contract for Sale shall be a deemed repayment of the Facility.'*

No money in fact changed hands, by way of loan or by means of payment of the purchase price as between Gayle Killilea and Yesreb Holding Limited or as between Yesreb Holding Limited and Sean Dunne.

The repayment clause, at clause 5 of the loan agreement provided;

*'5.1 The Facility shall become repayable in one single repayment on the date falling 5 years from the date of this Agreement. The repayment date specified in this Clause 5.1 may be extended from time to time by agreement between the Lender and the Borrower.'*

*The 2013 Escrow Agreement*

In 2013, the Escrow agreement between Gayle Killilea as lender, Yesreb Holding Limited as borrower and Clerkin Lynch Solicitors as escrow agent provided that the title deeds were to be held by Clerkin Lynch as escrow agent by way of equitable security for the repayment of the loan.

17





*The sub-sale agreement dated 28 March 2013*

The sub-sale agreement dated 28 March 2013 is stated to be between Sean Dunne *'as trustee for Gayle Dunne'* described as *'Vendor'* and Yesreb Holding Limited as purchaser. This is stated to be the position notwithstanding the affidavit sworn by Mr. Dunne in October 2016 in which he averred that he had been trustee for Gayle Dunne until 9 September 2006 when Matsack Nominees Ltd. assumed the role of trustee.

The document schedule to the sub-sale agreement contains *inter alia*, the declaration of trust dated 23 July 2005 and the nominee agreement with Matsack Nominees Limited dated 9 October 2006.

Senior Counsel for the Respondent stated that what was not present in that schedule was a deed of appointment of Sean Dunne as trustee or nominee of Gayle Dunne, under the Nominee Agreement.

On behalf of the Respondent it was submitted that Mr. Dunne had no capacity to enter into the sub-sale contract on 28 March 2013. The Respondent submitted that Mr. Dunne had no legal ownership of the property as the legal title remained vested in the personal representatives of the deceased and that Mr. Dunne had no equitable or beneficial interest in the property because on his own evidence, that interest was held entirely by his wife, Gayle Dunne.

Thus, Sean Dunne ceased to be Gayle Dunne's trustee on the execution of the nominee agreement and this was acknowledged by him in an affidavit which he swore on 12 October 2016 and which was referred to and quoted from in the judgment of Ms. Justice Costello in *Lehane v Dunne* in July 2017.

The Appellant contended that Sean Dunne had to be a party to the sub-sale because he had a continuing contractual interest and because he was the only party who could compel the personal representatives to execute a conveyance and thereby assure the property. However, as is clear from the correspondence between Donal T. McAuliffe (solicitor for Matsack Nominees) and Hayes solicitors (solicitors for the personal representatives) set out above, the personal representatives had already agreed to execute a conveyance at the behest of Matsack Nominees Limited. In accordance with the Nominee Agreement, Matsack Nominees were obliged to hold the title documents, not Sean Dunne. In short, I am satisfied that in 2013,





Sean Dunne had no interest in the property and had no capacity to enter into a contract in respect of the property.

Senior Counsel for the Respondent submitted in particular, that Mr. Dunne had no capacity to enter into a contract in circumstances where that contract could never be the subject of an order for specific performance. The Respondent submitted that that was material in the context of section 46(1)(b) SDCA 1999 on the basis that the sub-section provides that where a property is contracted to a sub-purchaser, it must be *'in consequence'* conveyed immediately to the sub-purchaser.

Senior Counsel for the Appellant submitted that the issue of the availability of specific performance as a remedy was irrelevant because Mr. Dunne was at liberty to enter into the contract and if he was not in a position to complete the contract then he would be exposed to a claim in damages for breach of contract. Senior Counsel for the Respondent, addressing this submission, stated that there was no question of a claim for damages in this case as these transactions arose in the context of a family arrangement and the sub-sale was to the Appellant company, a company which was beneficially owned by Mr. Dunne's son.

On behalf of the Respondent it was submitted that if all that was required by section 46(1) SDCA 1999 was to insert the name of a person into a sub-sale contract in order to avail of sub-sale relief, that the provision would be absent of any meaning. The Respondent stated that section 46(1) required that the conveyance must occur *'in consequence'* of the two contracts; the initial contract and the sub-sale contract.

Mr. Dunne, although he was named as vendor in the sub-sale contract, had no means of completing the contract. He did not hold the beneficial interest, he was not a trustee in respect of the beneficial interest and he did not hold the title documents. In truth, Matsack Nominees was the proper vendor to the sub-sale contract.

As Mr. Dunne had no beneficial interest when he entered into the contract with the sub-purchaser, it was not therefore a contract which could be governed by section 52 of the Land and Conveyancing Law Reform Act 2009. Mr. Dunne had no beneficial interest in 2013 and therefore no beneficial interest could pass from Mr. Dunne to the sub-purchaser on execution of that contract.




*The deed of conveyance dated 29 March 2013*

Senior Counsel for the Respondent stated that because Sean Dunne had been inserted as the vendor under the sub-sale contract, the solicitors for Matsack Nominees (Donal T. McAuliffe & Co.) and for Yesreb Limited (Clerkin Lynch Solicitors) were required to then attempt to accommodate Mr. Dunne within the deed of conveyance.

In the descriptions of the parties to the deed, Sean Dunne is described *'as Trustee for Gayle Dunne'* and as the *'Original Trustee'*. Matsack Nominees are described as the *'Present Trustee'*. Gayle Dunne is described as the *'Beneficial Owner'* and Yesreb Holding Limited as the *'Sub-Purchaser'*.

Recital H in the recitals provides; *'The Original Trustee acting on behalf of the Beneficial Owner has agreed with the Sub-Purchaser for the sale to the Sub-Purchaser of the Premises for an estate in fee simple in possession free from encumbrances for the sum of €14,000,000.00'.*

In contrast to recital H in the deed of conveyance where Mr. Dunne is described as *'acting on behalf of'* or as a representative of Gayle Dunne, the sub-sale contract provided that Mr. Dunne entered into the contract *'as trustee for Gayle Dunne'.*

Senior Counsel for the Respondent described recital H as a *'complete retraction'* of the trustee status of Mr. Dunne as stated in the sub-sale contract for sale. On behalf of the Respondent it was submitted that for the purposes of section 46(1) SDCA 1999, a person could not be the purchaser in the original contract for sale and be a representative of the vendor (a different person) in the contract for sub-sale.

The operative part of the deed of conveyance provides as follows;

> *'NOW THIS INDENTURE WITNESSETH:*
>
> *That in pursuance of the said respective agreements and in consideration of the sum of €57,950,000 (fifty seven million nine hundred and fifty thousand euro) already paid by the Beneficial Owner to the Vendors (the receipt whereof the Vendors hereby acknowledge) and in consideration of the sum of €14,000,000 (fourteen million euro) now paid by the Sub-Purchaser to the Beneficial Owner (the receipt whereof the Beneficial Owner hereby acknowledges) the Vendors as personal representatives of the Testator by the direction of the Beneficial Owner hereby GRANT AND CONVEY and the*

20





> *Beneficial Owner as beneficial owner hereby, GRANTS, CONVEYS AND CONFIRMS and the Original Trustee and the Present Trustee hereby GRANT, CONVEYS AND CONFIRM unto the Sub-Purchaser ALL THAT AND THOSE the Premises TO HOLD the same unto and to the use of the Sub-Purchaser in fee simple.'*

[emphasis added]

The first observation is that the personal representatives granted and conveyed to the beneficial owner however, they did so *'by the direction of the Beneficial Owner'*. The Appellant in its submissions, contended that Sean Dunne retained a valuable right in relation to the main contract for sale, namely the right to call on the original vendors (the personal representatives) to convey and assure the property to the sub-purchaser. However, the operative part of the deed of conveyance provides that the personal representatives granted and conveyed *'by the direction of the Beneficial Owner'*.

The words contained in the operative part of the deed are consistent with the correspondence between Hayes solicitors (solicitors for the vendor) and Donal T. McAuliffe, (solicitors for Matsack Nominees) set out above whereby Hayes solicitors on behalf of the personal representatives agreed that they would convey the property directly to a sub-purchaser on foot of a sub-sale concluded by Matsack Nominees.

On 20 March 2013, Donal T. McAuliffe solicitors wrote to Hayes solicitors and stated: *'I expect at long last to be sending you a deed in the immediate future. Are the Executors readily available?'* Their availability was confirmed and a draft deed was sent to Hayes solicitors for approval.

A letter from Hayes solicitors to Donal T. McAuliffe solicitors on 27 March 2013 provides;

> *'Dear Don I acknowledge receipt of your recent email attaching Draft Deed of Conveyance. I comment on this Draft deed as follows; ...*
>
> ....
>
> *In the Operative part, the vendors should not be described "as Beneficial Owners' and instead should be described 'as Personal Representatives of the Testator" .*
>
> ....

21





*Subject to the above points, I approve the draft Deed on behalf of the vendors.'*

As is clear from this letter, the solicitor for the personal representatives, approved on behalf of the personal representatives, the words in the deed *i.e.* that they are granting, conveying and assuring the property to the sub-purchaser at the direction of the beneficial owner.

On 28 March 2013, Hayes solicitors by e-mail, notified Donal T. McAuliffe solicitors that: *'I confirm that your representative has just collected the Deed.'*

Thus, not only did the deed provide that the property would be conveyed at the direction of the beneficial owner (through Matsack Nominees) but that is what in fact occurred.

### Section 46 SDCA 1999

Both parties to the appeal opened the case of *Fitch Lovell Ltd. v Inland Revenue Commissioners* (1962) 2 All ER 685. The facts of that case are not analogous to the appeal herein however, the approach taken in relation to the interpretation of section 58(4) of the Stamp Act 1891 (the equivalent UK provision to section 46 SDCA 1999) was considered and the principles enunciated by the Court are of general application. The case arose in the context of a company takeover by the appellant company where the consideration was a share swap, and the shares so acquired were ultimately transferred to a subsidiary of the acquiring appellant company. The specific issue which fell for determination was whether those arrangements amounted to one single transaction such that sub-sale relief was available. In the course of his judgment, Wilberforce J., stated that prima facie double tax, that is, tax on each consideration, is chargeable unless a case came within s.58(4) and, in that regard cited the speech of Lord Somerville in the House of Lords in *Escoigne Properties Ltd – v – Inland Revenue Commissioners* [1958] 1 All ER 406.

At page 689 of the judgment, Lord Wilberforce stated:

> *'This is a stamp duty appeal and I am concerned with a scheme for the avoidance of, or at any rate a substantial reduction of, the stamp duty payable on a take-over bid into which, to use the words of the appellant company's solicitors, a little ingenuity has been put. Ingenuity is, of course, not inconsistent with validity, and all I have to do is to consider whether the scheme which has been adopted has the result of bringing the*

22




*taxpayer fairly within the provisions of the taxing statute, in this case the Stamp Act, 1891.'*

Senior Counsel for the Respondent stated and emphasised that the Respondent was not making a submission that the Appellant in this appeal was involved in a scheme for the avoidance of stamp duty. The Respondent's submission was that section 46 SDCA 1999 simply did not apply to the stamping of the instrument in question, namely, the conveyance dated 29 March 2019, on the basis that the Appellant had not met and satisfied the conditions necessary for availing of the relief.

In *Fitch Lovell Ltd.,* Lord Wilberforce stated that a taxpayer may take advantage of section 58(4) of the Stamp Act 1891 (the UK equivalent provision) provided only that the requirements of the subsection are complied with. At page 690 of the report Lord Wilberforce stated;

> *'Now, it seems to me that there are two questions which arise for decision, and the first is this: Should the transaction be regarded as a conveyance to the appellant company, followed by a conveyance from the appellant company to the subsidiary company; or should it be regarded as one single transaction of conveyance straight from the vendor shareholders to the subsidiary company? If the first, and if an instrument which can be regarded as a conveyance on sale can be found, ad valorem duty is chargeable on the consideration payable in respect of the main sale, and that is an end of the matter. If, on the other hand, there is only one conveyance on sale, only one transaction carried out by one document, ie, from the original vendors to the sub-purchasers, then the question arises whether advantage can be taken of s 58(4) of the Stamp Act, 1891, which enables the instrument, provided the requirements of the subsection are complied with, to be stamped only on the consideration moving from the sub-purchaser. I approach then the first question, which is to consider whether there is here a conveyance on sale with respect to the main transaction from the IBS shareholders to the appellant company. It is, of course, quite true in stamp duty matters that what is to be stamped is documents, not transactions, but, when a court is confronted with a document, it is entitled and indeed bound to inquire into the nature and intended purpose of the document before it.'*

At page 696 of the judgment, Wilberforce J. continued;




*'Taking those circumstances into consideration, it seems to me that, on the question whether transfers such as these did pass any, and what, title to the appellant company, I should come to the conclusion that a position was created and intended to be created such that the appellant company had the sale in their favour completed by the documents which were intended between them and the vendors to be the sale documents of completion of the sale, and consequently that the transfers, even though not completed, should be regarded as conveyances on sale within Sch 1 to the Stamp Act, 1891. If that conclusion is correct, then, as I have said, it is not necessary to consider the provisions of s 58(4). But, on the assumption that I am wrong and that there was no conveyance on sale to the appellant company, then the position must be that the shares were transferred direct by the vendor shareholders to the sub-purchasers, there having been two sales and two considerations: a sale to the appellant company for 30s 4d and a sale to the subsidiary company for 1d per IBS share. Prima facie in those circumstances, double tax, i.e., tax on each consideration, is chargeable unless the case comes within s 58(4) of the Stamp Act, 1891. On that I refer to the speech of Lord Somervell of Harrow in Escoigne Properties Ltd v Inland Revenue Comrs ([1958] 1 All ER 406 at p 412; [1958] AC 549 at p 563). Is then this case within s 58(4) of the Stamp Act, 1891? I observe in the first place, generally, that this seems to be a transaction of quite a different character from that which the subsection has in mind.*

Lord Wilberforce then made the following statement of principle in relation to the operation of section 58(4) of the Stamp Act 1891;

*That subsection contemplates a contract by a vendor followed by a sub-contract by the purchaser and then, before any act other than that of signing the contract of sale has been done by the vendor and before any alteration in the character of the property, an act of conveyance in consequence of the sub-contract direct to the sub-purchaser, by-passing the purchaser.'*

On the facts, the Court found that the subject matter of the contracts was not *'the same*' for the purposes of the subsection as the share capital of the acquired company had been altered in the interim, and the ordinary shares when transferred to the subsidiary/sub-purchaser were subject to the rights of newly created preference shares.

Turning now to section 46(1) SDCA 1999, which provides as follows;

*(1) Where—*





*(a) a person having contracted for the purchase of any property, but not having obtained a conveyance of that property, contracts to sell the same to any other person, and*

*(b) the property is in consequence conveyed immediately to the sub-purchaser,*

*then the conveyance shall be charged with ad valorem duty in respect of the consideration moving from the sub-purchaser.*

Having considered the statutory wording contained in section 46(1) SDCA 1999 and the dicta of Lord Wilberforce in *Fitch Lovell*, I am satisfied that the following three conditions must be met by a taxpayer in order to avail of section 46 sub-sale relief;

1. **Identity** - the purchaser in the main contract and the vendor under the sub-sale contract must be the same person, not the same name, but the same person.
2. **In consequence** - the conveyance must have been in consequence of both the original contract and the sub-sale contract and must arise from contracts which are enforceable by means of specific performance.
3. **No intervening act** - There must be no act other than the signing of the sub-sale contract, between the main contract and the execution of the conveyance.

*Identity*

Having considered the statutory language contained in section 46(1) SDCA together with the authority of *Fitch Lovell*, it is clear that the purchaser under the main contract of sale and the vendor under the sub-contract of sale must be the same person - not the same name, but the same person. I am satisfied that the issue of capacity of the purchaser-vendor is an essential consideration and that what is at issue is the capacity and status of the person and not simply their nominal identity.

On behalf of the Appellant it was argued that the purchaser-vendor was the same person on the basis that Mr. Dunne purchased Walford in trust for Gayle Dunne in 2005 (as per his evidence) and that on the sub-sale contract he was named as vendor and trustee for Gayle Dunne.

25




In Mr. Dunne's own sworn affidavit of 12 October 2016, he averred to the fact that he had ceased to be trustee on the appointment of Matsack Nominees and therefore, if Mr. Dunne had any capacity as regards the sub-sale contract in March 2013, it was nothing more than a mere agency or nominee-ship but crucially, irrespective of the wording on the contract for sub-sale, he was not a trustee. Therefore, whether Mr. Dunne entered into the 2005 contract on his own account or as trustee for Gayle Dunne is immaterial to the question of whether his capacity and status remained the same in the sub-sale contract because either way, it did not remain the same. One capacity bears no legal relation to the other. As a result, Mr. Dunne cannot and does not and meet the section 46(1) requirement that the purchaser on the original contract and the vendor under the sub-sale contract must be the same person.

*In consequence*

*Section 46(1) provides; Where - (a) a person having contracted for the purchase of any property, but not having obtained a conveyance of that property, contracts to sell the same to any other person, and (b) the property is **in consequence** conveyed immediately to the sub-purchaser...'*

[emphasis added]

The property must be conveyed to the sub-purchaser *"in consequence"* of both the contract for sale and the contract for sub-sale.

The conveyance in a sub-sale claim must give effect to two contracts where the purchaser in the original contract for sale, is the vendor in the contract for sub-sale. However, as was clear from the wording of the deed of conveyance, a role had to be found for Mr. Dunne in the conveyance so that he would become a significant party to the deed, in order that a claim for sub-sale relief might be made.

Senior Counsel for the Respondent stated that she did not in her submission criticise or take issue with the fact that this was a family arrangement however, on behalf of the Respondent it was submitted that had these transactions been arm's length transactions (i.e. had Yesreb Holding Ltd. been an independent third party purchaser) and had Mr. Dunne not completed the sale, Yesreb would have been unsuccessful in securing an order for specific performance against Mr. Dunne, because the contract was unenforceable as against him.




The Respondent submitted that the sub-sale contract must arise from contracts which are enforceable by means of specific performance and that this was not the case in relation to the sub-sale contract. The reasons for this are as follows; firstly, Mr. Dunne had no document that could have enabled him to bind Matsack Nominees or Gayle Dunne to the contract. Secondly, Mr. Dunne did not have possession of the title deeds (the title deeds were held by Matsack Nominees and only Matsack Nominees could act under the nominee agreement on the direction of Gayle Dunne). Third, Mr. Dunne could not compel the production of those title deeds as he had no power to do so. Finally, Mr. Dunne's right to call on the original vendors to further assure the property by execution of the conveyance had been superseded entirely by the agreement of 2011 between Donal T. McAuliffe solicitors and Hayes Solicitors where it was agreed that Hayes solicitors as solicitors for the personal representatives, would execute a conveyance on the direction of Matsack Nominees, on foot of a contract for sub-sale by them.

Senior Counsel for the Respondent opened a passage from the *Irish Law of Specific Performance* by John Farrell (published 1994) at paragraph 9.57 on page 263 which provided;

> 'A purchaser whose vendor cannot make title because someone else who contracted to sell to that vendor can show that that contract is a nullity has no right to specific performance. The remedy cannot be ordered against a person who has already disposed of the title necessary to enable him to fulfil his contract or other obligation.'

The authority cited for that proposition was the case of *Moffat v Greene* [1906] IR 501 which was also opened.

I accept the submission of the Respondent that had specific performance been sought in relation to this contract between Sean Dunne as trustee for Gayle Dunne and Yesreb Holding Limited, it would have failed on the basis that Mr. Dunne had no capacity. He was not a trustee, he did not hold title deeds and he had no document which would bind Matsack Nominees to the agreement.

Returning to the provisions then of section 46(1) SDCA 1999, in order for the sub-sale transactions to come within section 46(1), the conveyance must have been *'in consequence'* of two separate contracts. In this appeal, Sean Dunne had no title, legal or equitable to Walford as of the date of the 2013 sub-sale contract and therefore no capacity to conclude that contract. It follows therefrom that as the 2013 sub-sale contract was not capable of being

27





enforced by a decree of specific performance, the deed of conveyance was not made *'in consequence'* of both the contract of sale and the sub-sale contract as required by the provisions of s.46(1) SDCA 1999.

*Intervening Act*

On the authority of *Fitch Lovell* and affording the words in section 46(1) their ordinary and natural meaning, there must be no act other than the signing of the sub-contract between the original contract and the execution of the conveyance.

*Section 46(1) provides; Where - (a) a person having contracted for the purchase of any property, but not having obtained a conveyance of that property, contracts to sell the same to any other person, and (b) the property is in consequence conveyed immediately to the sub-purchaser...'*

Both parties were in agreement that the word *'immediately'* does not mean that the transaction must take place within a limited or short period of time but that the transaction must take place directly and I accept this submission. Further, it follows from the judgement of Wilberforce J. in *Fitch Lovell* that in order to qualify for sub-sale relief, there must be a seamless uninterrupted passage from the contract to the sub-contract. In other words, as formulated by Wilberforce J., what the subsection contemplates is that the conveyance must be executed *"before any other act"*. The judgement does not define or address what might constitute such act. However, I accept the submission of the Respondent that the actions of Mr. Dunne in executing the Declaration of Trust in favour of Gayle Dunne should properly be regarded as constituting such act. The legal consequence was that Mr. Dunne divested himself of the only interest he held under the 2005 contract, namely his beneficial interest in a one tenth moiety in Walford. In effect, he deprived himself of capacity to enter into a legally enforceable sub-sale contract in relation to Walford, at any future date.

Once the declaration of trust was executed, Sean Dunne was at best a bare or nominal trustee for Gayle Dunne and subject to the direction of Gayle Dunne who became absolutely entitled to the beneficial interest as against him. On the appointment of Matsack Nominees by Gayle Dunne, any such residual bare trusteeship ceased to exist.

It follows that, as between the contract, sub-contract and conveyance, there was no seamless passage as required by section 46. Instead, the rights and obligations of Sean Dunne *qua*

28




purchaser were fundamentally transformed from the party holding a beneficial interest to a party with no interest, legal or beneficial, in Walford. In fact, between the signing of the original contract and the signing of the sub-contract, the following acts took place;

1. The declaration of trust of 23 July 2005 was written and executed.
2. The appointment of Matsack Nominees was formalised by written agreement (pursuant to which Mr. Dunne's ceased to be trustee on his own account based on his sworn affidavit dated 12 October 2016).
3. The agreement between Matsack Nominees and the personal representatives (that the personal representatives would execute a conveyance on the instructions of Matsack Nominees and in respect of a sub-sale contract concluded by Matsack Nominees).

Even if this Commission accepted Mr. Dunne's evidence that the trust was in existence since 1 July 2005 and that he purchased Walford in trust for Gayle Dunne on 1 July 2005, only the first intervening step would fall away. The appointment of Matsack Nominees replacing Mr. Dunne as trustee together with the agreement between Matsack Nominees and the solicitors for the personal representatives that they would assure the property on a sub-sale concluded by Matsack Nominees, remain. I am satisfied that those two steps deprive the transactions of the immediacy required by section 46(1) SDCA 1999 and that the Appellant is thereby unable to bring itself within the terms of the sub-sale relief provision. I am satisfied that the intervening steps taken deprive the Appellant of an entitlement to avail of the relief in accordance with the provisions of section 46 SDCA 1999.

Then, to address the question of whether the declaration of trust was in operation on and from 1 July 2005, I am not satisfied that sufficient evidence was adduced in support of the existence of such a trust between Mr. Dunne and his wife from 1 July 2005. I make this finding for the following reasons;

- Mr. Dunne did not tender for Walford *in trust* in 2005
- The contract dated 1 July 2005 does not purport to have been purchased *in trust* by Mr. Dunne
- The declaration of trust executed on 23 July 2005 and the terms of that trust as drafted were not retrospective
- There was no other document or note in writing to evidence the existence of the trust as at 1 July 2005 and/or to evidence the purchase of Walford in trust as at 1 July 2005.




- There was no corroborating oral evidence as regards the existence of the trust from 1 July 2005.

In conclusion under this sub-head of analysis, I accept that the effect of the intervening acts set out at 1-3 above which indisputably altered the interest of Sean Dunne between the date of the contract for sale and the contract for sub-sale, constituted an intervening act not within the contemplation of s.46(1) and that these intervening acts render relief in accordance with section 46(1) SDCA 1999 unavailable to the Appellant.

### The Accountable person

Pursuant to the deed of conveyance, the only party to whom any interest was granted or conveyed was Yesreb Holding Ltd. The Respondent claimed that in accordance with section 1 SDCA 1999, the accountable person was the Appellant, Yesreb Holding.

Section 1 SDCA 1999 titled *'Interpretation'* provides;

> *(1) In this Act, unless the context otherwise requires –*
>
> *'accountable person' means –*
>
> *(a) The person referred to in column (2) of the Table to this definition in respect of the corresponding instruments set out in column (1) of that Table by reference to the appropriate heading in Schedule 1.*
>
> *....*
>
> *Schedule 1*

| | |
|---|---|
| *CONVEYANCE or TRANSFER on sale of any property other than stocks or marketable securities or a policy of insurance or a policy of life insurance* | *The purchaser or transferee.* |




In accordance with section 1, Yesreb Holding Limited is the accountable person in respect of the deed of conveyance.

The Appellant contended that section 7 SDCA 1999 titled *'Instruments to be separately charged with duty in certain cases'* was the appropriate section. Section 7 provides;

> *'Except where express provision to the contrary is made by this or any other Act –*
>
> *(a) An instrument containing or relating to several distinct matters shall be separately and distinctly charged, as if it were a separate instrument, with duty in respect of each of the matters;*
> *(b) An instrument made for any consideration in respect of which it is chargeable with ad valorem duty, and also for any further or other valuable consideration or considerations, shall be separately and distinctly charged, as if it were a separate instrument, with duty in respect of each of the considerations.*

The Respondent submitted that section 7 relates to the computation of the charge to duty but does not assist in clarifying the identity of the accountable person as the accountable person is already prescribed by section 1.

Senior Counsel for the Appellant submitted that section 45(4) might apply however, this subsection applies *'Where there are several instruments of conveyance'* which is not the case in this appeal as there is only one instrument of conveyance.

Senior Counsel for the Respondent submitted that if the Appellant were correct in its contention that both Yesreb Holding Ltd. and Mr. Dunne were the accountable persons, joint and several liability would apply in accordance with section 2(4) SDCA which provides;

> *'Where any instrument chargeable with stamp duty is not stamped or is insufficiently stamped –*
>
> *(a) The accountable person shall be liable, and*
> *(b) Where there is more than one such accountable person they shall be liable jointly and severally,...'*

However, other than the provisions of sections 7 and 45(4) as set out above, no other basis has been advanced in support of the proposition that Mr. Dunne is the accountable person. I am not satisfied that sections 7 or 45(4) apply to render Mr. Dunne the accountable person.

31





Section 2(4) applies only where there is *'more than one such accountable person'* however, no more than one accountable person has been identified. Therefore, I conclude in accordance with section 1 SDCA 1999, that Yesreb holding Limited is the accountable person in respect of the conveyance on sale dated 29 March 2013.

**Conclusion**

As set out above, I am not satisfied that sufficient evidence was adduced in support of the existence of a trust between Mr. Dunne and his wife from 1 July 2005 in relation to the purchase of Walford. I make this finding for the following reasons;

- Mr. Dunne did not tender for Walford *'in trust'* in 2005
- The contract dated 1 July 20015 does not purport to have been purchased *'in trust'* by Mr. Dunne
- The declaration of trust executed on 23 July 2005 and the terms of that trust as drafted were not retrospective
- There was no other document or note in writing to evidence the existence of the trust as at 1 July 2005 and/or to evidence the purchase of Walford in trust as at 1 July 2005.
- There was no corroborating oral evidence as regards the existence of the trust from 1 July 2005.

The legal consequence of the declaration of trust dated 23 July 2005 was that Sean Dunne divested himself of the only interest he held under the 2005 contract, namely his beneficial interest in a one tenth moiety, and he ceased thereafter to enjoy any propriety rights in relation to Walford. From 23 July 2005 his capacity was that of bare trustee for Gayle Dunne.

Mr. Dunne ceased to be Ms. Dunne's trustee on the execution of the Nominee Agreement and this was acknowledged by him in an affidavit which he swore on 12 October 2016 and which was referred to and quoted from in the judgment of Ms. Justice Costello in *Lehane v Dunne* in July 2017.

I am satisfied that in 2013, Sean Dunne had no interest in the property and had no capacity to enter into a contract for sub-sale in respect of the property.





TAX APPEALS
COMMISSION

The operation of section 46(1) SDCA does not accommodate the insertion of the name of the purchaser under the original contract into the sub-sale contract in circumstances where that purchaser no longer has capacity as vendor in respect of the sub-sale contract.

The joinder of a person in a contract for sub-sale in circumstances where that person's involvement is unnecessary or gratuitous, does not succeed in enabling a claim for sub-sale relief in accordance with section 46(1) SDCA 1999.

**Determination**

I determine that the conditions necessary to avail of sub-sale relief in accordance with section 46 of the Stamp Duty Consolidation Act, 1999 ('*SDCA*') in respect of the deed of conveyance dated 29 March 2013, have not been met and that the Appellant is thereby unable to avail of sub-sale relief.

I determine that the Appellant is the accountable person in respect of the conveyance on sale dated 29 March 2013, in accordance with section 1 SDCA 1999.

I determine that the assessment dated 17 February 2016 containing a balance of €1,428,670 shall stand.

COMMISSIONER LORNA GALLAGHER

**23rd day of December 2019**

33

